## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BRIAN MANETTA, SERGIO PEREIRA, ESTHER SYGAL-PEREIRA, MATTHEW MARKOSIAN, NAIMISH BAXI, HARVEY MINANO, SYDNEY PECK, MAHMUD IBRAHIM, and GEORGE AMORES, individually and on behalf of all others similarly situated, | Civil Action No. |
| **Plaintiffs,** | |
| v. | |
| NAVIENT CORPORATION, NAVIENT SOLUTIONS, LLC f/k/a NAVIENT SOLUTIONS, INC. f/k/a SALLIE MAE, INC., and SLM CORPORATION, | |
| **Defendants.** | |

## <u>CLASS ACTION COMPLAINT</u>

Date: June 24, 2020

Xavier M. Bailliard, Esq.
James Van Splinter, Esq.
Joseph Tripodi, Esq.
**KRANJAC TRIPODI & PARTNERS LLP**
30 Wall Street, 12th Floor
New York, New York 10005
Tel: 646-216-2400
E-mail:  xbailliard@ktpllp.com
          jvansplinter@ktpllp.com
          jtripodi@ktpllp.com

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ........................................................................................................4

PARTIES ................................................................................................................11

  I.  PLAINTIFFS ...................................................................................................11

  II.  DEFENDANTS ...............................................................................................14

JURISDICTION AND VENUE ...............................................................................17

FACTUAL ALLEGATIONS ....................................................................................18

      I.      DEFENDANTS ARE FINANCIALLY MOTIVATED TO MAINTAIN HIGH PRINCIPAL BALANCES FOR AS LONG AS POSSIBLE TO BOOST INTREST INCOME ........................................................................18

      II.     PAYMENTS TOWARD PRINCIPAL HAVE A SIGNIFICANT IMPACT ON THE DURATION AND TOTAL COST OF A LOAN ........................................19

      III.    DEFENDANTS SYSTEMATICALLY MISALLOCATE PAYMENTS DISPROPORTIONATELY TO INTREST INSTEAD OF PRINCIPAL ............20

      IV.    DEFENDANTS SYSTEMATICALLY ALLOCATE MONTHLY PAYMENTS TO LOANS WITH LOWER INTEREST RATES AS OPPOSED TO LOAN WITH HIGHER INTEREST RATES ..................................................................27

      V.     DEFENDANTS SYSTEMATICALLY CHARGE ARTIFICIALLY INFLATED MINIMUM INTEREST PAYMENTS ................................................29

      VI.    DEFENDANTS DELIBERATELY MISAPPLY CAPITALIZED INTEREST ........................................................................30

      VII.   DEFENDANTS' REPAYMENT SYSTEM AND CUSTOMER SERVICE IS DESIGNED TO HINDER REPAYMENT AND IMPEDE DISCOVERY OF ERRORS ........................................................................32

      VIII.  DEFENDANTS CONCEAL INFORMATION REGARDING PLAINTIFFS' LOANS ........................................................................35

      IX.    DEFENDANTS' MONTHLY STATEMENTS ARE DECEPTIVE AND MISLEADING ........................................................................36

X.    DEFENDANTS PROMOTE THE USE OF COSIGNERS, BUT DELIBERATELY HINDER THEIR RELEASE AS PROMISED ........................40

XI.   DEFENDANTS PROMOTED A BOGUS LOYALTY INCENTIVE PROGRAM WHICH DID LITTLE TO NOTHING TO LOWER STUDENT LOANS ........................................................................................................44

XII.  NAVIENT'S OFFICE OF THE CUSTOMER ADVOCATE IS MERELY AN IMITATION OF ITS CUSTOMER SERVICE .......................................................45

XIII. CLASS ALLEGATIONS........................................................................46

CAUSES OF ACTION ...............................................................................................49

COUNT I - COMMON LAW FRAUD ............................................................49

COUNT II - NEW JERSEY CONSUMER FRAUD ACT N.J.STAT.ANN. §§ 56:8-1, ET SEQ..................................................................................................51

COUNT III - DELAWARE CONSUMER FRAUD ACT DEL CODE ANN.§§  2511, ET SEQ..............................................................................................54

COUNT IV - FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT FLA.STAT.ANN. §§ 501.201, ET SEQ  ...................................................................58

COUNT V - NEW YORK CONSUMER PROTECTION FROM DECEPTICE ACTS AND PRACTICES LAW N.Y.GEN.BUS.LAW §§ 349, ET SEQ.....................................60

COUNT VI - BREACH OF FIDUCIARY DUTY ..................................................64

PRAYER FOR RELIEF ...............................................................................................64

Plaintiffs, Brian Manetta ("Manetta"), Sergio Pereira ("Pereira"), Esther Sygal-Pereira ("Sygal-Pereira"), Matthew Markosian ("Markosian"), Naimish Baxi ("Baxi"), Harvey Minano ("Minano"), Sydney Peck ("Peck"), Mahmud Ibrahim ("Ibrahim"), and George Amores ("Amores"), individually and on behalf of all others similarly situated, (collectively, "Plaintiffs"), through their attorneys, Kranjac Tripodi & Partners LLP, bring this action against Defendants Navient Corporation, Navient Solutions, LLC, ("Navient") formerly known as Navient Solutions, Inc. and formerly known as Sallie Mae, Inc., and SLM Corporation ("Sallie Mae") (collectively, "Defendants") for unlawful acts and practices, including manipulating its student loan servicing and collection practices to mislead and deceive borrowers, and allege as follows.

Plaintiffs allege the following upon personal knowledge, as to themselves, and upon information and belief as to all other matters, which is based on, among other things, the independent investigation of the undersigned counsel, which included, *inter alia:* (a) interviews and discussions with impacted individuals, and review of their available records, (b) review and analysis of relevant filings made by Defendants with the United States Securities and Exchange Commission ("SEC"); (c) review and analysis of Defendants' press releases and other publicly-disseminated publications; (d) lawsuits filed by the Consumer Financial Protection Bureau ("CFPB"),[1] as well as those filed by the Attorneys General of the State of Illinois, State of Washington, Commonwealth of Pennsylvania, State of California, and State of Mississippi;[2]

---

[1] *See CFPB v. Navient Corp., et al.*, No. 3:17-CV-00101-RDM (M.D. Pa.).

[2] *See Commonwealth of Pennsylvania v. Navient Corp.*, *et al.*, No. 3:17-cv-01814-RDM (M.D. Pa.), *People of the State of Illinois v. Navient Corp., et al.*, No. 2017 CH 00761 (Cir. Ct. Cook Cnty. Ch. Div.), *State of Washington v. Navient Corp., et al.*, No. 17-2-01115-1 SEA (King Cnty. Super. Ct.), *State of Mississippi v. Navient Corp., et al.*, No. 25CH1:18-cv-00982 (Miss. Ch. Ct. Hinds Cnty.), and *People of the State of California v. Navient Corp., et al.*, No. CGC-18-567732 (Cal. Super. Ct. San Fran. Cnty.).

(e) related federal securities and derivative class actions brought against Defendants;[3] and (f) related class actions brought against Defendants.[4]

Counsel's investigation into the factual allegations contained herein is continuing, and many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody or control.  Plaintiffs believe that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This is an action for fraud, violation of the New Jersey Consumer Fraud Act, violation of the Delaware Consumer Fraud Act, violation of the Florida Deceptive and Unfair Trade Practices Act, violation of the New York General Business Law, and breach of fiduciary duty against Defendants arising out of Defendants' flagrant fraud in servicing the student loan debt of Plaintiffs.  Plaintiffs seek monetary and injunctive relief.

2.      In what has become one of the largest and fastest-growing debt markets in the United States, approximately 45 million people[5] currently owe over $1.67 trillion in student loan debt.[6]

---

[3] *See Buffalo Grove Police Pension Fund, et al., v. Diefenderfer, III, et al.*, No. 2:19-cv-00062 (E.D. Pa.); *Lord Abbett Affiliated Fund, Inc., et al., v. Navient Corp., et al.*, No. 1:16-cv-0012 (D. Del.); and *In re Navient Corp. Sec. Litig.*, No. 1:17-cv-08373 (D.N.J).

[4] *See Daniel, et al., v. Navient Solutions, LLC*, No. 8:17-cv-0250 (M.D. Fl.); *Demyanenko-Todd, et al., v. Navient Corp., et al.*, No. 3:17-cv-00772 (M.D. Pa.); *Hyland, et al., v. Navient Corp., et al.*, No. 1:18-cv-09031 (S.D.N.Y.); and *Travis, et al., v. Navient Corp., et al.*, No. 2:17-cv-04885 (E.D.N.Y.).

[5] Richard Howells, *Student Loan Debt Statistics In 2020: A Record $1.6 Trillion,* FORBES (Feb. 3, 2020), available at https://www.forbes.com/sites/zackfriedman/2020/02/03/student-loan-debt-statistics/#1a579f44281f.

[6] *See* Consumer Credit Outstanding Levels, BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM (June 2020), available at https://www.federalreserve.gov/releases/g19/HIST/cc_hist_memo_levels.html.

3.  These 45 million people are of all ages.  As of 2020, approximately 8.1 million Americans aged 50 and older owe $317.1 billion in student loans.[7]

4.  Of the country's 45 million student debtors, roughly a quarter are either in default or having trouble making their monthly payments.[8]

5.  This massive financial weight drags heavily on the country's economy.

6.  Even for those making regular monthly student loan payments, student loan debt has significantly impacted borrowers' financial futures.  Student loan debt delays homeownership by years, costs borrowers around hundreds of thousands in lost retirement savings, and significantly reduces lifestyle qualities.[9]

7.  Navient, formerly known as Sallie Mae, Inc., is currently the largest student loan servicer in the United States. Navient services the loans of more than 12 million borrowers, including over 6 million customer accounts under a contract with the U.S. Department of Education, and more than $300 billion in federal and private student loans.

8.  Defendants' principal responsibilities as a servicer include managing borrowers' accounts; processing monthly payments; assisting borrowers to learn about, enroll in, and remain in alternative repayment plans; and communicating directly with borrowers about the repayment of their loans.

---

[7] Richard Howells, *Student Loan Debt Statistics In 2020: A Record $1.6 Trillion,* FORBES (Feb. 3, 2020), available at https://www.forbes.com/sites/zackfriedman/2020/02/03/student-loan-debt-statistics/#1a579f44281f.

[8] *Id.*

[9] *TIAA-MIT AgeLab Study Finds Student Loan Debt Significantly Impacts Retirement Savings, Longevity Planning and Family Relationships*, TIAA-MIT AGELAB (Jul. 30, 2019), available at https://tiaa.new-media-release.com/mit-agelab/pages/fullrelease.html.

9.      The structured repayment of debt is not a guessing game.  Monthly payments are formulaic and predictable – using factors including the initial amount of the loan, interest accrual, and repayment of principal and interest over time.

10.      Defendants employ a loan repayment system where student loans accrue interest based on the amount of principal of the outstanding loan.

11.      Consequently, there should be less outstanding principal that accrues interest as a borrower makes payments to reduce the principal of the outstanding student loan.  When these payments are applied correctly, the principal amount shrinks, meaning the borrower will pay less in interest and spend less time in debt.  However, this cuts both ways since loan servicers like Defendants lose revenue from borrowers paying less in interest and spending less time in debt.

12.      Defendants have worked tirelessly to ensure the latter does not happen.

13.      Indeed, Plaintiffs, like many others, have diligently made their monthly loan payments and have tried to escape debt.  Defendants, however, have developed a repayment system intended, by design, to maximize a borrower's indebtedness through a scheme that inflates interest and thwarts repayment of principal to increase their own interest income—the bulk of their revenue stream.  To trap student loan borrowers in debt for as long as possible, Defendants routinely engage in unfair, deceptive, and illegal practices by implementing a scheme designed to misallocate student loan payments towards interest—a method most beneficial to themselves and most detrimental to the borrower.

14.      In short, Defendants' repayment system model is a complicated array of arbitrarily fluctuating monthly billing amounts, hidden repayment terms, vague billing statements, labyrinth-like websites with inaccurate information, and calculated, non-responsive and misleading answers to questions about loans that Plaintiffs and student loan borrowers must wade through in order to

7

repay their debt.  This structure is designed to leave Defendants swimming in billions of profits, while student loan borrowers drown in debt.

15.     Defendants' past and ongoing acts are deliberate and unconscionable.

16.     Plaintiffs have been damaged as a direct result of Defendants' willful and intentionally deceptive conduct.

17.     As a result of Defendants' misconduct, Plaintiffs and millions of borrowers have been severely damaged.  For example, in many instances, although borrowers have been making payments for over a decade (and sometimes decades), the amounts they currently owe Defendants have barely been reduced from their original loan amounts and, in some instances, have actually increased.  This has caused these millions of borrowers to spend millions, if not billions, of dollars toward their student loans, which should have reduced their loan debt, but did not.

18.     Throughout the time Defendants have been servicing private and/or federal student loans (the "Class Period"), Defendants engaged in a fraudulent scheme to deprive student borrowers of beneficial repayment opportunities and, therefore, profit at these students' expense.

19.     Plaintiffs are not alone in their allegations of misconduct, fraud, and deceptive practices by Defendants.  Indeed, Defendants' rampant widespread misconduct in servicing loans has come to light over the past decade via multiple governmental and private actions.

20.     Since 2011, Defendants have been sued countless times, in the federal courts of 48 states (plus the District of Columbia) and in more than 1,000 state courts in connection with their improper and fraudulent servicing of their borrowers' federal and private student loans.

21.     These include lawsuits brought by governmental organizations, including  the CFPB and Attorneys General for numerous states.

22.     In its lawsuit filed in 2017, *Consumer Fin. Prot. Bureau v. Navient Corp.*, 3:17-CV-101 (M.D. Pa. Jan. 18, 2017), the CFPB accuses Navient of predatory loan practices, including: (i) failing to correctly apply or allocate borrower payments to their accounts, (ii) steering struggling borrowers toward paying more than they have to on loans, (iii) obscuring information consumers needed to maintain their lower payments; and (iv) deceiving private student loan borrowers about requirements to release their co-signer from the loan.

23.     In a press release regarding its lawsuit,[10] the CFPB plainly stated:

For years, Navient, formerly part of Sallie Mae, created obstacles to repayment by providing bad information, processing payments incorrectly, and failing to act when borrowers complained. Through shortcuts and deception, the company also illegally cheated many struggling borrowers out of their rights to lower repayments, which caused them to pay much more than they had to for their loans. The Bureau seeks to recover significant relief for the borrowers harmed by these illegal servicing failures. "For years, Navient failed consumers who counted on the company to help give them a fair chance to pay back their student loans," said CFPB Director Richard Cordray. "At every stage of repayment, Navient chose to shortcut and deceive consumers to save on operating costs. Too many borrowers paid more for their loans because Navient illegally cheated them and today's action seeks to hold them accountable." CFPB press release, January 18, 2017.

24.     In addition to the CFPB, the Attorneys General for several states have filed actions against Navient in their respective jurisdictions for similar misconduct, echoing allegations by the CFPB.  Those states include Pennsylvania, California, Illinois, Washington, and Mississippi.

25.     In Pennsylvania, the Attorney General alleged, among other things forbearance steering, income recertification failures, cosigner release misrepresentations, and payment processing errors.[11]

---

[10] *See*, https://www.consumerfinance.gov/about-us/newsroom/cfpb-sues-nations-largeststudent-loan-company-navient-failing-borrowers-every-stage-repayment/.

[11] *See Commonwealth of Pennsylvania v. Navient Corp.*, *et al.*, No. 3:17-cv-01814 (M.D. Pa.).

26.     In California, the Attorney General alleged that "Navient has failed to live up to its responsibilities servicing federal student loans" and that "Navient also promised borrowers that they could reduce their principal by making extra payments but applied overpayments first to fees and interest."[12]

27.     In Illinois, the Attorney General alleged Defendants' misconduct related to servicing and origination of student loans.[13]

28.     In Washington, the Attorney General alleged Defendants' misconduct related to servicing and origination of student loans, including targeting and enhancing subprime lending through targeted loan programs like Signature Student.[14]

29.     In Mississippi, the Attorney General alleged Defendants' misconduct related to servicing and origination of student loans and that Defendants have engaged in practices that have harmed "countless Mississippi student loan borrowers by: (a) peddling risky and expensive subprime loans Defendants knew or should have known were likely to default, and (b) while servicing those student loans, making misrepresentations, omitting material information and failing to perform core servicing duties, thereby causing harm to borrowers and cosigners."[15]

30.     A sample of private actions that have been filed against Navient also demonstrates Defendants' rampant fraudulent practices.

---

[12] *See People of the State of California v. Navient Corp., et al.*, No. CGC-18-567732 (Cal. Super. Ct. San Fran. Cnty.).

[13] *See People of the State of Illinois v. Navient Corp., et al.*, No. 2017 CH 00761 (Cir. Ct. Cook Cnty. Ch. Div.).

[14] *See State of Washington v. Navient Corp., et al.*, No. 17-2-01115-1 SEA (King Cnty. Super. Ct.).

[15] *See State of Mississippi v. Navient Corp., et al.*, No. 25CH1:18-cv-00982 (Miss. Ch. Ct. Hinds Cnty.).

31.     For example, in *Hyland v. Navient Corp. et al.*, plaintiffs were a group of public service professionals who were negatively impacted by Navient's loan servicing practices related to the administration of the federal Public Service Loan Forgiveness program.[16]

32.     In *Travis v. Navient Corp. et al.*, a class action involving a New York resident with federal loans serviced by Navient, plaintiffs explain how, among other things, Defendants harmed student loan borrowers through various forms of misconduct, including steering them into forbearance rather than income driven repayment plans, and failing to guide borrowers through the process that would have otherwise lowered their monthly payments and ultimately led to loan forgiveness.[17]

33.     In *In Re Navient Corp. Secs. Litig.*, a putative class action raised under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5, plaintiffs explain how Defendants made false and misleading statements about the lawsuits referenced herein brought against Defendants by the CFPB and several State Attorneys General for misconduct that harmed student borrowers in the repayment process.[18]

34.     The list of cases against Defendants goes on.[19]  That said, the instant action is by no means a copycat case.  Instead, Plaintiffs' allegations are cast against the backdrop of Defendants' overarching scheme to systematically defraud its student loan borrowers to their detriment and to Defendants' benefit.

---

[16] *See Hyland, et al., v. Navient Corp., et al.*, No. 1:18-cv-09031 (S.D.N.Y.).

[17] *See Travis, et al., v. Navient Corp., et al.*, No. 2:17-cv-04885 (E.D.N.Y.).

[18] *In re Navient Corp. Sec. Litig.*, No. 1:17-cv-08373 (D.N.J.).

[19] *See, e.g., Daniel, et al., v. Navient Solutions, LLC*, No. 8:17-cv-0250 (M.D. Fl.); *Demyanenko-Todd, et al., v. Navient Corp., et al.*, No. 3:17-cv-00772 (M.D. Pa.); *Buffalo Grove Police Pension Fund, et al., v. Diefenderfer, III, et al.*, No. 2:19-cv-00062 (E.D. Pa.); *Lord Abbett Affiliated Fund, Inc., et al., v. Navient Corp., et al.*, No. 1:16-cv-0012 (D. Del.).

35.     Yet, while these lines of cases are wholly distinguishable from the instant action, they nonetheless share a common theme, namely, that Navient is a particularly bad actor in the student loan servicing space, and they have created systematic methods – from the top down – to defraud their borrowers from every conceivable angle.

36.     Of course, the sheer volume of claims against a litigant is not evidence of wrongdoing in any particular case, per se.  Except, the allegations against Defendants in the thousands of cases against them are shockingly similar, leading to the inescapable conclusion that Defendants, at the very least, are doing something wrong.

**PARTIES**

**I.      PLAINTIFFS**

37.     Plaintiff Manetta is an individual who resides in, and is a citizen of, the State of New Jersey.  Plaintiff Manetta is a practicing attorney.  Plaintiff Manetta attended Ithaca College from 1998 to 2002 and Seton Hall University School of Law from 2003 to 2006.  Plaintiff Manetta took out loans between 1998 to 2006 to pay for both his undergraduate and graduate studies, totaling approximately $71,000.00.  Although Plaintiff Manetta has never deferred payments and has made regular continuous payments since 2006/2007 (for 14 years) to repay his loans, Plaintiff Manetta still owes approximately $43,000.00 to Defendants.

38.     Plaintiff Pereira is an individual who resides in, and is a citizen of, the State of Florida.  Plaintiff Pereira is a practicing physician.  Plaintiff Pereira completed his undergraduate studies in 1998 and graduated from medical school in 2010.  Plaintiff Pereira took out loans from 2006 to 2009 to pay for his medical school studies, totaling approximately $262,000.00.  As a result of the extremely high minimum payments required, Plaintiff Pereira was obligated to defer his payments for a period of time.  However, when not in deferment, Plaintiff Pereira made both

regular and advance payments towards repaying his loans.  Notwithstanding, by 2017, Plaintiff Pereira's outstanding loan balance owed to Defendants had ballooned to over $433,000.00.   In or around that time, Plaintiff Pereira refinanced approximately $400,000.00 of his outstanding loans with another lender, leaving the remainder with Defendants.  Presently, Plaintiff Pereira's outstanding balance with Defendants is approximately $46,000.00 and his balance with the other lender (which had ballooned while they were serviced by Defendants) is approximately $326,000.00.

39.     Plaintiff Sygal-Pereira is an individual who resides in, and is a citizen of, the State of Florida.  Plaintiff Sygal-Pereira is currently a sales and accounts manager for a large consulting firm.  Plaintiff Sygal-Pereira completed her undergraduate studies in 2002 and her graduate studies in 2005.  Plaintiff Sygal-Pereira took out loans in 2006 to pay for her graduate studies, which totaled approximately $18,000.00.  Although Plaintiff Sygal-Pereira never deferred her payments and made regular payments towards repaying her loans, she only finally repaid the entirety of her loans in October 2019.

40.     Plaintiff Markosian is an individual who resides in, and is a citizen of, the State of New York.   Plaintiff Markosian is a practicing attorney.  Plaintiff Markosian attended Lafayette College and then Seton Hall University School of Law from 2003 to 2006.  Plaintiff Markosian took out loans to pay for law school, totaling approximately $19,000.00.  To date, even though Plaintiff Markosian has never deferred his loans and has been making regular  payments, Plaintiff Markosian still owes Defendants approximately $8,400.00.

41.     Plaintiff Baxi is an individual who resides in, and is a citizen of, the State of New Jersey.  Plaintiff Baxi is a practicing physician.  Plaintiff Baxi completed his undergraduate studies at Rutgers University in 2005.  Plaintiff Baxi then attended medical school from 2005 to 2009.

Upon graduating medical school, Plaintiff Baxi completed an internship at Jersey City Medical Center from 2009 to 2010, a residency at Mount Sinai Hospital from 2010 to 2013, and a fellowship from 2013 to 2014.  Plaintiff Baxi took out loans in 2000 to pay for his undergraduate studies.  Plaintiff Baxi made some payments towards his loans in 2011 and has been making regular payments since 2013.  Plaintiff Baxi still owes Defendants approximately $28,000.00.

42.     Plaintiff Minano is an individual who resides in, and is a citizen of, the State of New Jersey.  Plaintiff Minano is currently a physical therapist.  Plaintiff Minano attended undergraduate school at Kean University and graduate school at Franklin Pierce University.  Plaintiff Minano took out student loans beginning in August 2014, totaling approximately $130,000.00.  Plaintiff Minano made payments from September 2015 to December 2015 and has been making regular payments since February 2018.  Plaintiff Minano now owes approximately $154,000.00 to Defendants, over $23,000.00 more than his original loan amount.

43.     Plaintiff Peck is an individual who resides in, and is a citizen of, the State of New York.   Plaintiff Peck is a practicing attorney with Brooklyn Defender Services.  Plaintiff Peck graduated from Seton Hall University School of Law in 2007.   Plaintiff Peck took out loans in 2005 and 2006 to pay for her law school studies, including loans from Defendants, in the amount of approximately $110,000.00.  In 2018, Peck refinanced a portion of her loans.  To date, Plaintiff Peck still owes approximately $6,000.00 to Defendants and $27,000.00 to the lender with which she refinanced.

44.     Plaintiff Ibrahim is an individual who resides in, and is a citizen of, the State of New Jersey.  Plaintiff Ibrahim is a practicing physician.  Plaintiff Ibrahim attended Fordham University from 2000 to 2004 and New York University School of Medicine from 2004 to 2008.  Plaintiff Ibrahim took out loans between 2000 to 2008 to pay for both his undergraduate and

medical school studies, totaling approximately $318,000.00.  After completing his medical school studies, Plaintiff Ibrahim completed a residency at Mount Sinai Hospital.  Since Plaintiff Ibrahim made only a minimal salary during his residency, he was not able to pay his student loan payments, and was forced to defer and forbear payments on a few occasions.  In June 2019, in an effort to reduce the extreme monthly burden of his loan repayments, Plaintiff Ibrahim refinanced a portion of his loans with another lender.  Although Plaintiff Ibrahim has been out of school for 12 years, he still owes approximately $67,300.00 to Defendants and $149,000.00 to his new lender.

45.     Plaintiff Amores is an individual who resides in, and is a citizen of, the State of New York.  Plaintiff Amores is currently an English teacher.  Plaintiff Amores completed undergraduate studies at New York University from 1996 to 2000, graduate studies at New York University from 2004 to 2005, and post-graduate studies at Stony Brook University from 2016 to 2019.  Plaintiff Amores consolidated his student loans with Defendants in 2005, totaling approximately $42,200.00.  Although Plaintiff Amores has been making regular payments since 2005 (for 15 years), Plaintiff Amores still owes Defendants approximately $23,400.00.

## II.    **DEFENDANTS**

46.     Upon information and belief, Navient Corporation is a publicly-traded Delaware corporation, trading on the NASDAQ stock exchange under ticker symbol "NAVI."  Navient Corporation's principal place of business is at 123 Justison Street, Suite 300, Wilmington, Delaware 19801.

47.     Navient Solutions, LLC, formerly Navient Solutions, Inc., formerly Sallie Mae, Inc., is a Delaware corporation and a wholly-owned subsidiary of Navient Corporation.

48.     Upon information and belief, originally, and at most of the relevant times mentioned herein, SLM Corporation owned Sallie Mae, Inc., the student loan servicer from which some of Plaintiffs' loans originated.

49.     The history of and relationships between the Defendants is convoluted.

50.     In 1972, Congress created a government sponsored enterprise ("GSE"), the Student Loan Marketing Association (commonly referred to as "Sallie Mae"), to support the guaranteed student loan program created by the Higher Education Act of 1965.  In 1984, Sallie Mae became a publicly-traded company, trading under the ticker symbol "SLM."  From approximately 1997 to 2004, Sallie Mae transitioned from a GSE into a private company, during which time SLM Holding Corporation was incorporated and eventually became SLM Corporation.

51.     Sallie Mae became fully privatized by 2004, with SLM Corporation as the parent company and subsidiary Sallie Mae, Inc. responsible for most of the company's servicing and collections businesses.  From 2004 until April 2014, SLM Corporation and its subsidiaries operated through one corporate structure in originating loans issued under the Federal Family Education Loan Program.  SLM developed and implemented lending policies; marketed student loans and loan packages to schools and students; funded and distributed loans; and also serviced and collected loans.  In 2014, however, these business activities were split into two separate corporate structures.

52.     In April 2014, the former SLM Corporation separated into two publicly-traded entities: (i) Navient Corporation, a servicing and debt collection business, and (ii) a new SLM Corporation, a student lending business.

53.     Pursuant to the terms of the 2014 split, Navient Corporation assumed responsibility for liabilities resulting from the pre-reorganization conduct of old SLM Corporation and its

subsidiaries related to servicing student loans.  Navient Corporation is therefore included in this Complaint for servicing misconduct occurring prior to 2014, as a successor to SLM Corporation, as well as the similar conduct that it engaged in after it was formed as a stand-alone entity.

54.     The 2014 corporate split also provided for the transfer of Sallie Mae, Inc. to Navient Corporation and its subsidiaries.  Sallie Mae, Inc. then changed its name to Navient Solutions, Inc. ("NSI").  Allegations in this Complaint that address the conduct of Sallie Mae, Inc. and/or NSI, are attributed herein to NSI.

55.     NSI was the main servicing subsidiary of Navient Corporation, servicing more than $300 billion in student loans for more than 12 million borrowers.

56.     In connection with an internal corporate reorganization, NSI changed its name, effective January 31, 2017, to Navient Solutions, LLC ("NSL").

57.     Since their founding, there has been significant overlap between the corporate governance and management of Navient Corporation and NSI/NSL.  Many of the directors and officers of NSI/NSL have also served as directors or officers of Navient Corporation.

58.     Navient Corporation often makes no meaningful distinction between it and its subsidiaries.  Rather, it conflates the entities, naming only "Navient" in at least the following ways:

- Both Navient Corporation and NSL use the same website—www.navient.com. The website is registered to NSL but is identified as Navient Corporation's website, including in Navient Corporation's filings with the SEC.

- The company has one publicly available Code of Business Conduct that is addressed generically to "Navient Employee[s]" and refers throughout all Navient companies, including Navient Corporation and NSL.

- At least certain personnel at Navient Corporation and NSL use "navient.com" email addresses.

- Navient Corporation's SEC filings repeatedly hold out "Navient" as the "leading loan management, servicing and asset recovery company" rather than NSL, or any other Navient Corporation subsidiary.

59.     Navient Corporation issues consolidated annual reports and SEC filings, which include consolidated financial statements and balance sheets for itself and its subsidiaries.

60.     Navient Corporation owns or leases the offices used by its subsidiaries.

61.     Navient Corporation controls and directs the hiring of employees for its subsidiaries.

62.     Navient Corporation consents to, has knowledge of, approves of, directs, and controls the policies, practices, and acts of its subsidiaries, including the misconduct described herein.

## JURISDICTION AND VENUE

63.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because (a) there are at least 100 class members; (b) the matter in controversy exceeds $5 million, exclusive of interest and costs; and (c) at least one Plaintiff is a citizen of a different state than Defendant.

64.     This Court has personal jurisdiction over Defendants because Defendants regularly and systematically transact business in the District of New Jersey and have entered into contracts substantially connected with the District of New Jersey.

65.     Venue is proper under 28 U.S.C. § 1391(b) and (c) because Defendants are subject to personal jurisdiction in the District of New Jersey and because Defendants have and continue to enter into contracts in the District of New Jersey and collect student loan payments from the District of New Jersey.

18

## FACTUAL ALLEGATIONS

66.     Defendants are student loan servicers.

67.     Student loan servicers deal with a variety of issues affecting student loan borrowers including the issuance of the loans, payment collections, and providing repayment options to borrowers.  They can also function as a collection agency when students and cosigners default on their loans.

68.     Private student lending and servicing markets are highly concentrated.

69.     Navient is the largest student loan servicer in the United States.

70.     Navient services the loans of more than 12 million borrowers and more than $300 billion in federal and private student loans.

71.     Student loan servicers, like Defendants, are usually for-profit, publicly-traded companies, or subsidiaries of them.

72.     In their 2019 Form 10-K Annual Reports to the SEC, Navient and SLM Corporation reported net interest income from its educational loan portfolio of $1,185,000,000 and $1,623,000,000, respectively.

73.     To generate this massive amount of interest income, Defendants employ business policies and practices designed to maximize profits at the ongoing expense of student borrowers who took out student loans to cover the ever-increasing costs of higher education and achieve a better life.

I.      **DEFENDANTS ARE FINANCIALLY MOTIVATED TO MAINTAIN HIGH PRINCIPAL BALANCES FOR AS LONG AS POSSIBLE TO BOOST INTEREST INCOME.**

74.     Defendants have a strong financial interest in hindering student loan borrowers from paying down principal on their loans, in order to increase interest they receive.

75.     Indeed, in its 2019 Form 10-K Annual Report to the SEC, Navient reported that: "The most significant portion of our earnings is generated by the spread earned between the interest income we receive on assets in our education loan portfolios and the interest expense on debt funding these loans. We report these earnings as net interest income."  In its 2019 Form 10-K Annual Report to the SEC, SLM Corporation reported that: "Net interest income is the primary source of cash flow generated by our loan portfolios."

76.     Defendants have rapidly grown their profits by thwarting student loan borrowers from paying off their loans and thereby inflating income from interest.

77.     As described in detail below, Defendants, through their financial instruments, websites, online and mobile payment system, customer service representatives, and automated phone system, have constructed a system to intentionally misallocate student loan payments and obscure this misallocation to the benefit of Defendants and to the detriment of the student loan borrowers.  And, therefore, have engaged and continue to engage in unfair and deceptive acts and practices.

## II.     PAYMENTS TOWARD PRINCIPAL HAVE A SIGNIFICANT IMPACT ON THE DURATION AND TOTAL COST OF A LOAN.

78.     A student loan, like most loans, is made up of payments of principal and interest amortized (spread out) over time.

79.     The principal of a loan is the amount initially borrowed from the lender.

80.     The interest on a loan is the amount of debt that accumulates based on: the outstanding principal, a fixed or variable interest rate, and time.

81.     Interest on student loans typically accrues daily.

82.     The student loans that Defendants service accrue interest according to its "Simple Daily Interest Calculation."  Navient's website offers the following formula:

> The amount of interest that accrues on your loan is determined by a simple daily interest calculation:
>
> Your current principal balance
> × The number of days since your last payment
> × Interest rate factor = interest rate ÷ 365.25 (number of days in a year)
> = Your daily interest rate.

83. Alternatively, Navient's customer service representatives have explained the interest calculation this way:

> Daily interest accrual on your private student loans is calculated using the following formula: (Unpaid Principal x Interest Rate) divided by Number of Days in the Year = Approximate Daily Interest. Approximate Daily Interest x Number of Days in Your Billing Period = Approximate Interest Due.

84. Under either calculation, the greater the current principal balance, the more interest that accrues per day. Conversely, the lesser the current principal balance, the less interest that accrues per day.

85. Therefore, two student loans with the same total balance and interest rate may nonetheless accrue different amounts of interest if one loan has a higher principal balance.

## III.   DEFENDANTS SYSTEMATICALLY MISALLOCATE PAYMENTS DISPROPORTIONATELY TO INTEREST INSTEAD OF PRINCIPAL.

86. Over the span of a loan, payments are allocated towards both principal and interest.

87. At the outset of the loan, a greater portion of the payments will be applied towards interest rather than towards principal.

88. Over time, however, as payments are made (and the principal due is reduced), the portion of the payment that is allocated towards interest should normally go down and, in turn, the portion that is allocated towards principal should increase.

89.     However, if any payment at any time is misallocated disproportionally towards interest (no matter how small), then the principal will not be reduced as it should.  Because the principal is not reduced as it should, it will be artificially inflated and, thus, accrue more interest.

90.     For example, if a borrower has a current student loan with a balance due of $10,000, where $9,500 is owed as principal and $500 has accrued as interest.  And, the borrower's minimum monthly payment is $500 where $200 should go towards the principal and $300 should go towards the interest.  If she made her minimum monthly payment, her total remaining balance should be $9,800 and the interest would accrue on the $9,800 balance.  If, however, her payment was allocated improperly, e.g., $150 towards principal and $350 towards interest, her total remaining balance would be $9,850 and the interest would accrue on that greater amount going forward.

91.     As a result, over the life of the loan, the student loan borrower, who made regular payments, would instead be deprived of the full benefit from the payment, and would pay significantly more in interest because of the misallocation of the payments, i.e., more to interest than to principal.

92.     These misallocations of payments lower the payments to principal and increase the payments to interest and, as a result, lengthen the overall time of indebtedness for the borrower.

93.     Defendants routinely misallocate Plaintiffs' payments – allocating more towards interest (and less towards principal) than they should, thereby causing Plaintiffs to overpay interest and extend their indebtedness – all to unfairly increase interest income for Defendants while penalizing Plaintiffs.

94.     At other times, Defendants apply payments toward principal erratically – at times increasing the principal amount from automatic payments, other times decreasing them, which, in turn, unpredictably changes the amount of outstanding principal.

*__Plaintiff Baxi Misallocation – Principal/Interest__*

95.     For example, in 2014 Plaintiff Baxi made regular monthly payments that Defendants allocated inconsistently and excessively towards interest rather than principal:

- On July 20, 2014, for Loan 1-03 Stafford - Unsubsidized, Defendants debited $29.40, and applied $12.19 to interest and $17.21 to principal.

- On August 20, 2014, for Loan 1-03 Stafford – Unsubsidized, Defendants debited $12.75, and applied $12.50 to interest and $0.25 to principal.

- On September 18, 2014, for Loan 1-03 Stafford – Unsubsidized, Defendants debited $12.75 applying $11.69 to interest and $1.06 to principal.

- On or before September 20, 2014, for Loan 1-03 Stafford – Unsubsidized, Plaintiff Baxi submitted an extra payment of $12.75, which Defendants applied $11.94 to principal and misallocated $0.81 to interest.

A similar example of misallocation occurred in 2015:

- On January 20, 2015, for Loan 1-03 Sallie Mae Medical School – Stafford, Defendants debited $47.45, applying $25.50 to interest and $21.95 to principal.

- On February 20, 2015, for Loan 1-03 Sallie Mae Medical School – Stafford, Defendants debited $47.45, applying $25.45 to interest and $22.00 to principal.

- On March 20, 2015, for Loan 1-03 Sallie Mae Medical School – Stafford, Defendants debited $47.45, applying $22.95 to interest and $24.50 to principal.

- On April 17, 2015, for Loan 1-03 Sallie Mae Medical School – Stafford, Defendants debited $58.73, applying $35.81 to interest and $22.92 to principal.

- On or before April 20, 2015, for Loan 1-03 Sallie Mae Medical School – Stafford, Plaintiff Baxi submitted an extra payment of $241.36, which Defendants applied $248.91 to principal and misallocated $2.45 to interest.

*__Plaintiff Ibrahim Misallocation – Principal/Interest__*

96.     In 2016 and 2017, Plaintiff Ibrahim made payments towards various loans that Defendants also allocated inconsistently and excessively towards interest, thereby improperly keeping the principal amount owed higher than it should have been.

97.     For Plaintiff Ibrahim's Loan 1-16 Sallie Mae Medical School – Consolidation:

23

- On October 10, 2016, Defendants debited $212.16, and applied $195.09 to interest and $17.07 to principal.

- On November 10, 2016, Defendants debited $212.16, and applied $201.54 to interest and $10.62 to principal.

- On December 10, 2016, Defendants debited $322.62, and applied $195.01 to interest and $127.61 to principal.

- On or before January 27, 2017, Plaintiff Ibrahim made an overpayment of $690.96, which Defendants applied $365.16 to principal and misallocated $325.80 to interest.

Indeed, it is inexplicable for Defendants to have applied more than the minimum payment for a given month to interest, yet the prior three loan payments and lack of fees show that the minimum payment for the period was no greater than $212.16.

98.    The same occurred for Plaintiff Ibrahim's Loan 1-17 Sallie Mae Medical School – Consolidation:

- On October 10, 2016, Navient debited $107.36, and applied $98.73 to interest and $8.63 to principal.

- On November 10, 2016, Navient debited $107.36, and applied $101.99 to interest and $5.37 to principal.

- On December 10, 2016, Navient debited $163.25, and applied $98.68 to interest and $64.57 to principal.

- On or before January 27, 2017, Consolidation, Plaintiff Ibrahim made an overpayment of $349.66, which Defendants applied $184.8 to principal and misallocated $164.86 to interest.

Like with Plaintiff Ibrahim's Loan 1-16 Sallie Mae Medical School – Consolidation, it is inexplicable for Defendants to have applied more than the minimum payment for a given month to interest, yet the prior loan payments and lack of fees show that the minimum payment for the period was no greater than $107.36.

24

### *Plaintiff Manetta Misallocation – Principal/Interest*

99.     In 2007, Plaintiff Manetta made payments towards various loans that Defendants also allocated inconsistently and excessively towards interest.

100.    For Plaintiff Manetta's Loan 1-01 Consolidation:

- On July 20, 2007, Defendants debited $204.06, and applied $193.80 to interest and $10.26 to principal.

- On August 6, 2007, Defendants debited $204.06, and applied $91.77 to interest and $112.29 to principal.

- On September 14, 2007, Defendants debited $204.06, and applied $193.18 to interest and $10.88 to principal.

- On or before September 18, 2007, Plaintiff Manetta submitted an extra payment of $204.06., which Defendants applied $183.73 to principal and misallocated $20.33 to interest.

101.    For Plaintiff Manetta's Loan 1-02 Consolidation:

- On July 20, 2007, Defendants debited $174.94, and applied $166.14 to interest and $8.80 to principal.

- On August 6, 2007, Defendants debited $174.94, and applied $78.68 to interest and $96.26 to principal.

- On September 14, 2007, Defendants debited $174.94, and applied $165.61 to interest and $9.33 to principal.

- On or before September 18, 2007, Plaintiff Manetta submitted an extra payment of $174.94, which Defendants applied $157.51 to principal and misallocated $17.43 to interest.

### *Plaintiff Markosian Misallocation – Principal/Interest*

102.    In 2008 and 2009, Plaintiff Markosian made payments towards various loans that Defendants also allocated inconsistently and excessively towards interest.

103.    For Plaintiff Markosian's Loan 1-01 Consolidation:

- On November 26, 2008, Defendants debited $26.46, and applied 100% of the amount to interest.

- On December 31, 2008, Defendants debited $26.46, and applied 100% of the amount to interest.

- On January 21, 2009, Defendants debited $26.46, and applied $25.55 to interest and $0.91 to principal.

- On or before February 19, 2009, although the minimum payment for this loan during this time period was $26.46, Plaintiff Markosian made an overpayment of $44.30, which Defendants applied $24.08 to interest and $20.22 to principal.

- On or before March 31, 2009, for Loan 1-01 Consolidation, Plaintiff Markosian made another overpayment of $44.30. This time, Defendants applied $33.11 to interest and $11.19 to principal.

It is inexplicable for Defendants to have applied more than the minimum monthly payment of $26.46 to interest on this loan during this time period.

104.   For Plaintiff Markosian's Loan 1-02 Consolidation:

- On November 26, 2008, Defendants debited $53.13, and applied 100% of the amount to interest.

- On December 31, 2008, Defendants debited $53.13, and applied 100% of the amount to interest.

- On January 21, 2009, Defendants debited $53.13, and applied $51.40 to interest and $1.73 to principal.

- On or before February 19, 2009, although the minimum payment was $53.13, Plaintiff Markosian made an overpayment of $88.95, which Defendants applied $48.35 to interest and $40.60 to principal.

- On or before March 31, 2009, for Loan 1-02 Consolidation, Plaintiff Markosian made another overpayment of $44.30. This time, Defendants applied $66.48 to interest and $22.47 to principal.

Like with Plaintiff Markosian's Loan 1-01 Consolidation, it is inexplicable for Defendants to have applied more than the minimum monthly payment of $53.13 to interest on this loan during this time period.

### *Plaintiff Peck Misallocation – Principal/Interest*

105.    In 2008 and 2018, Plaintiff Peck made payments towards various loans that Defendants also allocated inconsistently and excessively towards interest.

106.    For Plaintiff Peck's Loan 1-07 Stafford – Subsidized:

- On January 1, 2008, Defendants debited $99.79, and applied $46.70 to interest and $53.09 to principal.

- On January 29, 2008, Defendants debited $99.79, and applied $46.40 to interest and $53.39 to principal.

- On March 31, 2008, Plaintiff Peck made an overpayment of $194.36.  Although the minimum payment for the period was no greater than $99.79, Defendants applied $92.26 to principal and allegedly misallocated $102.10 to interest.

It is inexplicable for Defendants to have applied more than the minimum payment for a given month to interest.

107.    For Plaintiff Peck's Loan 1-04 Consolidation:

- On June 20, 2018, Defendants debited $67.81, and applied $7.55 to interest and $60.26 to principal.

- On July 20, 2018, Defendants debited $67.81, and applied $7.18 to interest and $60.63 to principal.

- On August 16, 2018, across two payments, Defendants debited $67.81, and applied $6.34 to interest and $61.47 to principal.

- On August 20, 2018, for Loan 1-04 Consolidation, Plaintiff Peck made an overpayment of $183.46, which Defendants applied $182.45 to principal and misallocated $1.01 to interest.

108.    In short, Plaintiffs are repeatedly penalized by Defendants' actions and loan repayment system, as the misapplication of payments to both loan principal and interest impedes the repayment of principal and enhances the accrual of interest on the student loans.

109.    While these misallocations to interest seem minor (when viewed in a vacuum and on an individual basis), when committed repeatedly over the life of a loan, these minor

misallocations lead to significantly and artificially inflated remaining balances, thereby extending the life of the loan and increasing the interest income to Defendants.

110.    More, the misallocations are purposely done in small amounts and in connection with automatically debited monthly payments –which generally remain static.  As such, most borrowers see the same and/or similar monthly debit amount –but not the actual allocations between principal and interest – and think nothing of it.

**IV.    DEFENDANTS SYSTEMATICALLY ALLOCATE MONTHLY PAYMENTS TO LOANS WITH LOWER INTEREST RATES AS OPPOSED TO LOANS WITH HIGHER INTEREST RATES.**

111.    Plaintiffs normally have various different loans through Defendants, with different principal amounts and different interest rates.

112.    Those loans with higher interest rates necessarily accrue interest at higher amounts.

113.    As such, on the one hand, Plaintiffs have an incentive to pay down their loans with higher interest rates.

114.    On the other hand, Defendants have an incentive to allocate payments towards the opposite – towards loans with lower interest rates.  This allows Defendants to ensure that those loans with higher interest rates—i.e., loans which accrue more interest and thus increase the outstanding balance at a higher rate/amount—are paid off slower than those loans at lower interest rates.

115.    With that goal in mind, Defendants systematically and unilaterally allocate Plaintiffs' monthly payments to loans with lower interest rates, as opposed to loans with higher interest rates.

*** Plaintiff Baxi Misallocation – Lower Interest Loans ***

116.    For example, on April 20, 2014, Plaintiff Baxi made a payment totaling $675.13 towards three loans: 1-01 Sallie Mae Medical School – Stafford loan, 1-02 Sallie Mae Medical School – Stafford loan, and 1-03 Stafford – Unsubsidized.

117.    At the time, the interest rate on Plaintiff Baxi's 1-03 Stafford – Unsubsidized loan was higher than for his two Sallie Mae loans.  Defendants unilaterally allocated greater portions of his payment towards his Sallie Mae loans (with lower interest rates):

- 1-01 Sallie Mae Medical School - Stafford: $67.33 to principal, $52.46 to interest.

- 1-02 Sallie Mae Medical School - Stafford: $295.61 to principal, $230.33 to interest.

- 1-03 Safford - Unsubsidized: $16.53 to principal, $12.87 to interest.

118.    On July 20, 2014, Plaintiff Baxi again made a payment totaling $675.13 towards his 1-01 Sallie Mae Medical School – Stafford loan, 1-02 Sallie Mae Medical School – Stafford loan, and his 1-03 Stafford – Unsubsidized.  Again, the interest rate on Plaintiff Baxi's Stafford – Unsubsidized loan was higher than for his two Sallie Mae loans.  And yet again, Defendants unilaterally allocated greater portions towards the lower interest rate loans (i.e., the Sallie Mae loans), as follows:

- 1-01 Sallie Mae Medical School - Stafford: $70.12 to principal, $49.67 to interest.

- 1-02 Sallie Mae Medical School - Stafford: $307.87 to principal, $218.07 to interest.

- 1-03 Safford - Unsubsidized: $17.21 to principal, $12.19 to interest.

*** Plaintiff Ibrahim Misallocation – Lower Interest Loans ***

119.    As another example, on May 14, 2014, Plaintiff Ibrahim made a payment totaling $940.60 towards his 2-01 Sallie Mae Medical School – Stafford loan, 2-02 Sallie Mae Medical

School – Stafford loan, and Bar Study loan (which had a higher interest rate than the Sallie Mae loans). Yet again, Defendants unilaterally allocated greater portions towards the lower interest rate loans (i.e., the Sallie Mae loans), as follows:

- 2-01 Sallie Mae Medical School - Stafford: $61.38 to principal, $45.17 to interest.

- 2-02 Sallie Mae Medical School - Stafford: $304.80 to principal, $229.25 to interest.

- Loan 5818 (Bar Study): $15.22 to principal, $284.78 to interest.

120. On October 14, 2014, Plaintiff Ibrahim made a payment totaling $976.03 towards his 2-01 Sallie Mae Medical School – Stafford loan, 2-02 Sallie Mae Medical School – Stafford loan, and Loan 5818 (Bar Study) (which also had a higher interest rate than the Sallie Mae loans). Again, Defendants unilaterally allocated greater portions towards the lower interest rate loans (i.e. the Sallie Mae loans), as follows:

- 2-01 Sallie Mae Medical School - Stafford: $62.89 to principal, $3.66 to interest.

- 2-02 Sallie Mae Medical School - Stafford: $12.35 to principal, $221.70 to interest.

- Loan 5818 (Bar Study): $18.28 to principal, $317.15 to interest.

121. The purposeful allocations towards lower interest rate loans ensured that Plaintiffs higher interest rate loans were paid off at a slower pace than the lower interest rate loans, which, in the end, overwhelmingly benefits Defendants and significantly harms Plaintiffs.

## V.   DEFENDANTS SYSTEMATICALLY CHARGE ARTIFICIALLY INFLATED MINIMUM INTEREST PAYMENTS.

122. In addition, Defendants also improperly charge inflated minimum interest payments. As such, Plaintiffs were not only deceived into making larger minimum payments, but those excess payments did nothing to lower their principal balances.

123.    For example, on June 27, 2017, Plaintiff Pereira made significant payments toward the following loans (with the following balances):

- 1-02 Graduate PLUS: $8,921.98

- 1-04 Stafford-Subsidized: $3,622.98

- 1-05 Global Health Stafford: $1,811.28

- 1-06 Global Health Stafford: $2,674.12

124.    Even though Plaintiff Pereira's payments were more than enough to cover the minimum purported payment towards interest and all remaining principal on these loans, none of the loans' principal balances were reduced.

125.    Again, this misconduct allowed Defendants to receive inflated interest payments to their benefit and to the detriment of Plaintiffs.

**VI.    DEFENDANTS DELIBERATELY MISAPPLY CAPITALIZED INTEREST.**

126.    Student loans are typically in deferment status while a student is enrolled in school. Navient's website defines deferment as "a period where you postpone making payments on your loan."

127.    Under certain types of loans in the deferment period, interest on the principal balance continues to accrue and is added to the principal at periodic intervals as Capitalized Interest.

128.    Once repayment on a loan begins, interest is no longer capitalized in the same manner as during deferment, and instead, begins to accrue and is applied daily.

129.    However, while Plaintiffs' loans were in repayment (rather than in deferment), Defendants repeatedly incorrectly capitalized interest at both abnormal times and frequencies, which improperly inflated the outstanding balances on Plaintiffs' loans.

31

### *Plaintiff Ibrahim – Misapplied Capitalized Interest*

130.    For example, Plaintiff Ibrahim's 1-16 Sallie Mae Medical School – Consolidated, 1-17 Sallie Mae Medical School – Consolidated, 1-18 Stafford – Subsidized, 1-19 Stafford – Unsubsidized, and 2-01 & 2-02 Sallie Mae Medical School – Stafford loans were all capitalized on both December 22, 2018 and December 24, 2018.   Each of these loans, other than the 2-01 and 2-02 loans, had also all been capitalized on both February 1, 2012 and February 11, 2012.  The 1-16 and 1-17 loans were both also capitalized on both June 30, 2012 and July 1, 2012.   Lastly, his 1-20 Medical Graduate PLUS loan was capitalized on both May 15 and 16, 2008.

### *Plaintiff Pereira – Misapplied Capitalized Interest*

131.    Plaintiff Pereira's 1-03 Stafford – Unsubsidized loan and 1-05 Global Health Stafford loan were both capitalized on both September 24, 2010 and October 3, 2010.  In addition, Plaintiff Pereira's 1-04 and 1-10 Graduate PLUS loans were both capitalized on both March 19 and 31, 2010, as well as June 30, 2010 and July 1, 2010.

132.    More, although Plaintiff Pereira's 5622 Tuition Answer loan was normally capitalized quarterly, on August 13, 2010 the loan was capitalized only 44 days after the prior capitalization.  Finally, on July 1, 2016, Defendants capitalized interest on several of Plaintiff Pereira's loans.  However, the transactions are unexplainable as there are no debits to interest or credits to principal.

### *Plaintiff Amores – Misapplied Capitalized Interest*

133.    Plaintiff Amores's 1-02 Consolidated loan was capitalized three times in the span of one month, on June 30, 2018, July 28, 2018 and July 30, 2018.

*Plaintiff Baxi – Misapplied Capitalized Interest*

134.    Although Plaintiff Baxi's 1-02 Sallie Mae Medical School – Stafford loan was normally capitalized annually, on March 21, 2012, the loan was capitalized only 91 days after the prior capitalization.

135.    By capitalizing Plaintiffs' loans inconsistently and repeatedly in short intervals, Defendants have been able to increase interest charged to Plaintiffs.

## VII.   DEFENDANTS' REPAYMENT SYSTEM AND CUSTOMER SERVICE IS DESIGNED TO HINDER REPAYMENT AND IMPEDE DISCOVERY OF ERRORS.

136.    Every aspect of Defendants' repayment system is structured to inhibit the payment of principal and to prolong the life of indebtedness.  More, when a student loan borrower requests that an extra loan payment be applied in accordance with that borrower's request, Defendants systematically dissuade borrowers from pursuing the issue further by providing misinformation, failing to respond, and/or by misleading the borrower about possible solutions.

137.    Notably, the loan applications and Promissory Notes are devoid of specifics, including actual interest rates and term durations.  Even if they contained this information, those documents would not shed any light on a specific posted transaction – a point most Navient customer representatives refuse to acknowledge.  More, Navient customer representatives "do not have access to the Promissory Notes in their system," which further delays unearthing issues.

138.    For example, Navient's online portal Help Center allows borrowers to submit inquiries through its Email Us section.  The convoluted format of Navient's responses to questions through its Email Us section – if there is a response at all – is designed to discourage users from using the system.  Borrowers' questions and Navient's responses follow disparate paths of emails,

separate website pages, and documents which the user must navigate between.  All with different information and tracking numbers, and none that are easily reconcilable with the other.

139.    Navigating to the Email Us section is laborious and tedious and often leads to the website timing out and logging the user off – regardless of the user's Internet connection speed. In addition, once the user clicks on the Email Navient with Your Question link, the user must type her question in a box to submit to Navient.  Once submitted, Navient sends the user an email confirmation with a seven-digit reference number, but there is no record of the actual question in this confirmation.

140.    To make matters worse, if/when Navient responds to a question, the seven-digit reference number is not included in the body of the response and, the original question is often not included in the response.  As such, a borrower who receives a response from Navient is unable to obtain a clear record of what question is being responded to and if a follow up question is needed (and/or how a follow up question could even be submitted to properly refer to the original question) – this is especially worsened when a borrower has submitted multiple questions at different times. In short, if Navient responded properly, by actually allowing a user to determine to what question the response was made, a user might be able to infer or recall the details of her question – based on information in the response – but this is most often not the case.  This is exacerbated by Navient's deliberate efforts to keep its responses perfunctory and non-specific, regardless of the specificity of the question.

141.    The following is a typical example of the interaction with Navient's online help system.

> **Step 1:** The user logs in and navigates to Navient's Help Center.
>
> **Step 2:** The user navigates to the Email Us section located on the bottom of the Help Topics page.

**Step 3:** The user chooses from several drop-down boxes then types in her question in the <u>Messages</u> box.

**Step 4:** The user clicks Submit and submits her question. There is no confirmation number on the website, only a new webpage that reads "Thank you for your email. We'll email you an answer or post a personalized message to your inbox account."

**Step 5:** Navient sends out an automated confirmation email with a seven-digit reference number.

**Step 6:** Once Navient has prepared a response, the user receives another automated message that then directs the user to log in to her account in order to view the response.

**Step 7:** Once the user logs in to Navient, she is taken to a separate site with a <u>Correspondence</u> section through the <u>Inbox/Upload</u> section. Notably, there is a prominent section on the Navient website for <u>Alerts</u> (Navient only recently changed the <u>Alerts</u> section name from the even more misleading name, <u>Messages</u>), however, that is separate and distinct from the <u>Correspondence</u> section. The <u>Correspondence</u> tabs lists all of the messages from the past 12 months, however, only by the seven-digit reference number and general phrases like "Response to email" or "Statement."

**Step 8:** Once the user clicks the link to the appropriate document, the actual response document is devoid of identifying information – it contains <u>no reference</u> to: (i) the seven-digit reference number; (ii) date of response; and, often, (iii) does not contain the original question.

142.     More, if the user has a follow up question, there is no way to respond directly within the same query chain. Instead, the user must create a new query altogether. Not only is this wildly inefficient, it is intentionally inefficient as a dilatory tactic by Navient.

143.     This opacity allows Defendants to dictate and change the terms of any loan at will, with little-to-no visibility for Plaintiffs. And, Defendants have used this lack of transparency as a means to dramatically increase costs to Plaintiffs by increasing duration, misallocating payments to interest, and capitalizing interest incorrectly.

## VIII. DEFENDANTS CONCEAL INFORMATION REGARDING PLAINTIFFS' LOANS.

144. Defendants also deliberately fail to provide borrowers with critical information pertaining to their loans.

145. For instance, every loan, whether it is for a mortgage, car, credit card, or student loan, shares three key components. The amount of principal, the interest rate, and the duration.

146. In all instances, the total cost of the loan and the monthly payments of principal and interest can be shown using an amortization schedule, which is a table of the periodic loan payments showing the amount of principal and interest that comprise each payment until that loan is paid in full at the end of the term. If the interest rate is fixed, the amortization schedule gives a clear picture of the costs of the loan for the full duration. If, however, the interest rate is variable, the initial amortization schedule gives the borrower a clear picture of the costs of the loan based on the initial interest rate, but could become stale once the interest rate changes. In either scenario, an amortization schedule is crucial at the outset for both borrower and lender to agree on what the payments and cost of a loan will be.

147. Unlike any other traditional lender, Navient does not provide amortization schedules to borrowers regardless of whether the loans have a fixed or variable interest rate. More, the promissory notes are silent on the actual duration of the loan and instead offer maximum periods, e.g., "up to 300 months" or "the maximum Repayment Period is 30 years."

148. This leaves the student loan borrower at the mercy of Navient when it comes to calculating the minimum monthly payments and projecting the total cost of the loan if the borrower were to make extra payments. Indeed, unless a borrower is particularly skilled in finance and also able to spend boundless time to calculate what minimum monthly payments should be, without an

amortization schedule, it is impossible for a borrower to understand what her overall balance should be –and/or whether the minimum monthly payments charged by Navient is accurate.

149.     Navient's refusal to provide accurate and consistent loan information on its loans is intentional and demonstrates clearly its attempts to keep its borrowers in the dark on critical aspects of the debts.

## IX.     DEFENDANTS' MONTHLY STATEMENTS ARE DECEPTIVE AND MISLEADING.

150.     To make this even more opaque for borrowers, Navient deliberately withholds the breakdown of payment allocations toward principal and interest on its monthly statements in order to conceal or, at least, delay discovery of any errors or misapplication of payments by borrowers.

151.     For example, on a typical mortgage statement, information provided includes date and application of the last payment, the amount of that payment that was applied toward principal and interest, and allocation of any extra payment (towards principal and/or interest).

152.     Navient provides none of this information on its monthly statements.

153.     In fact, when viewing a Navient monthly statement, it is impossible to discern (much less correct) any misallocation of payments.

154.     The Account History section on Navient's website is the only way for a borrower to determine how payments have actually been allocated by Navient.  However, Navient makes this task extremely difficult, as it requires navigating through a multi-step process on Navient's website and can only be discovered after a series of selections through clicks and drop-down boxes.

155.     As such, a borrower is unable to determine the principal, interest or fees breakdown from her monthly statements or through the By Transaction screen on Navient's Account History page of its online portal.  The only way to determine the payment breakdown for principal, interest,

37

or fees is to log in to Navient, go to the <u>Account History</u> section, select the <u>By Loan</u> dropdown, and then select the specific loan.

156.   More, unlike almost every other large institutional lender, Navient does not allow its smartphone application to permit user authentication using Face ID, Touch ID or any other similar security authentication software designed to streamline secure access.

157.   In other words, Defendants make it difficult for Plaintiffs to access their own information by placing seemingly small obstacles to delay discovery of errors.  If a borrower needs to verify how Defendants allocated their payments, it cannot be from the monthly billing statement but instead, the borrower needs to log on to Navient's online portal or smartphone application and jump through a number of hoops to get to the basic information needed and they'd better have their username and password, every single time.

158.   Moreover, on its monthly statements, Navient puts the Unpaid Interest and Unpaid Fees in the same category column in order to conceal or at least delay discovery of any late and/or other fees charged.

159.   For instance, if a borrower had $22 in accrued interest for the month, but also had $30 in late fees, the column would simply read: Unpaid Interest and Unpaid Fees $52 – making it impossible to know from the monthly statement that a late fee had been charged.  This is especially true since the interest amount so frequently fluctuates from month to month on Defendants' issued loans.  Similar to the allocation issue, borrowers can only discover if fees were charged through Navient's convoluted online portal.

160.   More, over the lifespan of Plaintiffs' loans, Navient will make changes to the loans' repayment terms.  However, Navient deliberately fails to provide any actual information regarding

reasons for those changes, making it impossible for a borrower to even guess whether the change was proper.

161.    For example, any notices about changes to a loan from Navient appears on the second page of a monthly statement, but it simply lists a litany of possible vague and unclear reasons for the impending change:

> Your repayment terms have changed due to **<u>one or more</u>** of the following reasons:
> 1. The grace, separation, deferment, or forbearance period has expired. Interest may be capitalized (added to the loan principal), depending on your loan program.
> 2. The borrower's enrollment status has changed.
> 3. The payment due date has changed.
> 4. The interest rate has changed.
> 5. The payment amount has changed, as requested.
> 6. The repayment terms has been extended, as requested.
> 7. The Graduate Repayment Period has ended.
> 8. The modified repayment plan, which required interest only payments on this loan for a specified period of time has ended. (Emphasis added.)

162.    The borrower is thus left to having to guess which of the possible eight general reasons was/were the cause of the change.  And even if the borrower somehow is able to determine which of the eight possible reasons apply/applies, he still is left in the dark as to how or why the change(s) occurred.

163.    Navient also provides instructions to submit extra payments, but then fails to honor them despite the borrower's diligent adherence to those instructions.  For example, on its monthly statements, Navient states:

> **How can I be sure my payments are allocated correctly and on a timely basis?**
> To ensure accurate and timely processing of your payment, you can send your payment with the included remittance slip, pay by Auto Pay, or pay online at Navient.com. You can instruct us to allocate payments differently. Clearly write your instructions on **a separate piece of paper** included with your check.  We cannot process instructions written on the check_or remittance slip. (Bold in original.)

164.    Notably, while Navient states that it "cannot process instructions written on the check" – therefore requiring a separate letter for instructions – it nonetheless instructs borrowers to "be sure to include your 16-digit Loan Group Number on your check or money order and make it payable to Navient."

165.    Moreover, Defendants apply payments inconsistently and in contradiction with even their own language in their promissory notes.

166.    For example, Defendants' Payments or Application of Payments sections contain "pay in advance" or "pay ahead" language in promissory notes for Plaintiffs' Signature Student, Tuition Answer, Smart Option, and Private Consolidation Loans in following provisions:

> **Signature Student** Promissory Note: Payments – Payments will be applied first to Late Charges, then to Payment Return Fees and Collection Costs, then to accrued interest, and the remainder to principal.  Payments in excess of the amount due will advance the next payment due date by the number of whole payments satisfied by the extra funds.  (For example, if my payment amount is $100, I am not delinquent and I pay $400 for the month of January, my next payment due date will be May.)

> **Tuition Answer** Promissory Note: Application of Payments – Payments will be applied first to applicable fees, charges, and costs then to accrued interest; and the remainder to principal (including Capitalized Interest) as permitted by applicable law.  Payments in excess of the amount due will advance the next payment due date by the number of whole payments satisfied by the extra funds.  (For example, if my monthly payment amount is $100, I am not delinquent and I pay $400 for the month of January, my next payment due date will be May.)

> **Smart Option** Promissory Note: Payments will be applied first to applicable fees, charges, and costs; then to interest; and the remainder to principal, as permitted by applicable law.  Additionally, payments in excess of the amount due will be credited against the payment(s) that would otherwise be required in the next billing cycle(s) unless the excess payment is made during the first billing cycle prior to any payment being due, in which case it will be applied to principal and not credited against the next payment(s).

**Private Consolidation** Promissory Note:  Payments will be applied first to Late Charges, then to Payment Return Fees and Collection Costs, then to accrued interest, and the remainder to principal.  <u>Payments in excess of the amount due will advance the next payment due date by the number of whole payments satisfied by the extra funds.</u>  (For example, if my payment amount is $100, I am not delinquent and I pay $400 for the month of January, my next payment due date will be May.)

167.   Defendants' application of payments, however, does not adhere to the promissory notes Payments or Application of Payments sections.  Extra payments made by Plaintiffs in between automatic monthly debits – that are applied by Navient towards principal <u>and</u> interest, and are <u>in excess</u> of the upcoming automatic monthly debit amounts – has little or no impact on reducing the amount of interest paid the next month or even the following monthly amount due.

168.   As set forth above, Navient deliberately changes the allocation of payments to neutralize Plaintiffs' attempts to reduce principal and increase Defendants' revenue – even in contravention to its own promissory notes – and have deliberately failed to provide Plaintiffs with any meaningful explanation or insight into the method of application of their payments.

## X.    DEFENDANTS PROMOTE THE USE OF COSIGNERS, BUT DELIBERATELY HINDER THEIR RELEASE AS PROMISED.

169.   In 2007, the percentage of cosigners on SLM Corporation's Private Education Loans was 52%.[20]

170.   In 2009, 2010, and 2011 the percentage of cosigners on SLM Corporation's Private Education Loans was 57%, 59%, and 62%, respectively.[21]

---

[20] *See* 2007 Form 10-K Annual Report to the Securities and Exchange Commission, available at: https://www.navient.com/assets/about/investors/shareholder/annualreports/200710KBOW49222 BOW014_BITS_NFeb292009.pdf

[21] *See* 2011 Form 10-K Annual Report to the Securities and Exchange Commission, available at https://www.navient.com/assets/about/investors/shareholder/annual-reports/2011Form10K.pdf

171.    In 2014, 2015, and 2016, the percentage of cosigners on Navient's Private Education Loans was 64%.[22]

172.    In 2017, 2018, and 2019, the percentage of cosigners on Navient's Private Education Loans was 63,%, 56%, and 47%, respectively.[23]

173.    In numerous filed Form 10-K Reports, Defendants tout their use of cosigners as a way to mitigate adverse impacts to its bottom line.  Indeed, the use of cosigners lowers Defendants' risk exposure and increases the perceived value of the loans to investors.

174.    Defendants are, therefore, strongly incentivized to not release cosigners.

175.    Defendants promote the use of cosigners to students through promotional materials, websites, and coaxing by representatives when a student is applying for a loan.

176.    Defendants offer borrowers benefits for signing up a cosigner like lower interest rates, lower costs, and access to "free quarterly FICO score benefit to students and cosigners with a Smart Option Loan."

177.    In promoting the use of cosigners, Defendants also represent to students and cosigners that a cosigner can be easily released once the student begins making timely payments over 12 months and meets Defendants' credit requirements.

178.    Finally, on their website, Defendants have included information meant to teach potential borrowers how to convince family members to become cosigners.

---

[22] *See* 2016 Form 10-K Annual Report to the Securities and Exchange Commission, available at https://www.navient.com/assets/about/investors/shareholder/annual-reports/NAVI_2016_Form_10-K_2-24-17_Final.pdf

[23] *See* 2019 Form 10-K Annual Report to the Securities and Exchange Commission, available at https://www.navient.com/assets/about/investors/shareholder/annual-reports/NAVI_2019_10-K_2-27-20_Final.pdf

179.     However, once Defendants have convinced a borrower to obtain cosigners, Defendants make it very difficult, if not impossible, to allow a cosigner to later be released.

180.     Since January 21, 2014, Navient permits a student debtor to apply for cosigner release after making 12 consecutive on-time principal and interest payments and meeting its "credit underwriting criteria."  Prior to January 21, 2014, and depending on the applicable terms of the borrower's loan, Navient required borrowers to make between 12 and 48 "consecutive, on-time principal and interest payments" before applying for cosigner release.

181.     Navient employs several tactics to prevent a borrower from complying with this criteria, thereby forcing them to keep their cosigners on their loans.

182.     Navient first fails to specifically identify what it means by "consecutive" or "on-time."

183.     Navient uses this failure to define these terms to their advantage, including when a borrower chooses to make an overpayment or multiplier of the monthly amount due.

184.     For example, if a borrower owes $50.00 per month as the minimum payment, and the borrower makes a $300.00 payment one month, Navient will apply the payment to the $50.00 then currently due and place the borrower in a paid ahead status for the following five months that were covered by the $250.00 excess payment.  Navient then sends the borrower a statement showing a $0 balance due for the next 5 months (rather than paying toward principal, etc.).  Upon receiving those statements, the borrower is led to believe that the $300.00 payment covered the minimum $50.00 per month for 6 months and thus, that the payments for the next 5 months were made on-time.  In turn, the borrower is then led to believe that they only need to make on-time monthly payments for only another six months after the initial six months are paid with the $300.00.

185.    Until at least mid-2015, Navient treated the lack of payment on a $0 amount due as a failure to make an on-time principal and interest payment.  As such, upon applying for a cosigner release after the borrower is led to believe that she paid consecutively for 12 months, Navient would decline the request on the grounds that the borrower purportedly did not make enough consecutive payments for 12 months (because Navient would not count the 6 months of payments from the $300.00).

186.    Worse, by requiring that a borrower meet some unexplained internal credit underwriting criteria, Navient can decline to release a cosigner, even when a borrower has successfully satisfied the requirement to make 12 consecutive on-time payments, or more.

187.    Indeed, Navient deliberately fails to explain what credit requirements a borrower must have to meet its underwriting criteria.  As such, whenever Navient refuses to release a cosigner based on its internal credit underwriting criteria, it is impossible for Plaintiffs to cure any purported defects because Plaintiffs have no idea what the criteria and/or defects are.

188.    And, when a borrower seeks clarification as to what defects must be cured, Navient is unresponsive and deliberately fails to provide any information that could assist the borrower to fix any of the purported defects and/or meet the underwriting criteria.

189.    In making it impossible for borrowers to understand what is actually required to obtain a release of a cosigner, Defendants systematically, intentionally, and maliciously obstruct Plaintiffs' ability to release cosigners by failing to provide Plaintiffs with actionable reasons for denying release, even when warranted by any measure.

190.    This has resulted in Navient improperly saddling Plaintiffs' family members with significant student loan debt.

## XI.    DEFENDANTS PROMOTED A BOGUS LOYALTY INCENTIVE PROGRAM WHICH DID LITTLE TO NOTHING TO LOWER STUDENT LOANS.

191.    From approximately 2006 to May 2020, Defendants operated a loyalty program called Upromise, by which members could accrue credits and rebates by using a Upromise credit card and/or linking external debit and/or credit transactions to the Upromise program.

192.    Under this program, a member of the Upromise program could earn credits/points by making eligible purchases at grocery stores, retail locations, restaurants, and online sites.  Those credits/points could then be used to pay down eligible student loans with Defendants.

193.    From 2006 to May 2020, Defendants advertised the Upromise program as a means by which their members could save significant amounts on their student loans.

194.    For example, in its 2019 10-K Annual Report, SLM Corporation reported that "[s]ince its inception, Upromise members have earned more than $1 billion through the program."

195.    Defendants used this Upromise incentive program (and its promises of savings) to attract borrowers.

196.    However, once Defendants could secure new borrowers and users of its Upromise program, Defendants operated the Upromise incentive program in a manner that did anything but save their members money.

197.    For example, for credits going towards student loans, Defendants structured the timing and application of the credits to be applied towards interest payments only and not towards principal – despite marketing representations touting lowering a student's debt balance if they enroll.  It goes without saying that applications of credits toward only interest do nothing to lower a student's principal balance, thereby diluting the value of any perceived credit to Plaintiffs and ensuring amplification of value to Defendants.

45

## XII.  NAVIENT'S OFFICE OF THE CUSTOMER ADVOCATE IS MERELY AN IMITATION OF ITS CUSTOMER SERVICE.

198.    In several of its filed Form 10-K Reports, including 2019, Navient touts its responsiveness to its student loan borrowers, which Navient claims is bolstered by its creation of an Office of the Customer Advocate.

199.    Navient's touted responsiveness is anything but responsive.

200.    Navient controls the wait times of callers to its customer service phone system, and it has the ability to speed up wait times and, presumably, to also throttle and increase wait times through its automated system.

201.    When a borrower calls the general customer service number 888-272-5543, the caller is routed through a long, automated system often littered with advertisements, stock notices, and automatic hang-ups.  Indeed, if the caller asks to speak with a "representative" or "operator" the automated system asks the caller to provide a reason the caller would like to speak to a representative and says "if you're unable to provide one, I'll have to end the call," if the caller says "representative" again the system abruptly hangs up.

202.    A search on Defendants' website or online portal for the Office of the Customer Advocate does not yield any results for the Office of the Customer Advocate or contact information.

203.    The Office of the Customer Advocate closes at 5 P.M. EST, but Navient's general customer service is open until 9 P.M. EST.

204.    In short, gaining access to the Office of the Customer Advocate is difficult, complicated, and often fruitless, leading many borrowers to simply give up and submit to Defendants' improper servicing of their loans.

## XIII.   CLASS ALLEGATIONS.

### A.   Nationwide Class Definition

205.   All Plaintiffs bring this action in their individual capacity and on behalf of the following Nationwide Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3):

> **Nationwide Class**: All individuals in the United States and its territories who have ever had any loans with Defendants and/or had any loans (private or federal) serviced by Defendants at any time.

In addition to the Nationwide Class, Plaintiffs bring this action on behalf of their respective state subclasses, and/or groupings of state subclasses.

### B.   State Subclass Definitions

206.   Plaintiffs bring this action in their individual capacities and on behalf of the following Delaware Subclass pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and/or 23(b)(3):

> **Delaware Subclass**: All individuals in Delaware who have ever had any loans with Defendants and/or had any loans (private or federal) serviced by Defendants at any time.

207.   Plaintiffs bring this action in their individual capacities and on behalf of the following Florida Subclass pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(3), and/or 23(c)(4):

> **Florida Subclass**: All individuals in Florida who have ever had any loans with Defendants and/or had any loans (private or federal) serviced by Defendants at any time.

208.   Plaintiffs bring this action in their individual capacities and on behalf of the following New Jersey Subclass pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and/or 23(b)(3):

> **New Jersey Subclass**: All individuals in New Jersey who have ever had any loans with Defendants and/or had any loans (private or federal) serviced by Defendants at any time.

209.    Plaintiffs bring this action in their individual capacities and on behalf of the following New York Subclass pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and/or 23(b)(3):

**New York Subclass**: All individuals in New York who have ever had any loans with Defendants and/or had any loans (private or federal) serviced by Defendants at any time.

210.    The Nationwide Class and Subclasses may collectively be referred to as the "Classes." Excluded from the Classes are Defendants and any of their affiliates, parents, subsidiaries, officers, and directors; any entity in which Defendants have a controlling interest; all persons who make a timely election to be excluded from the Classes; governmental entities; all judges assigned to hear any aspect of this litigation, including their spouse or immediate family members; any juror selected to hear this litigation; and Plaintiffs' counsel, including their spouse or immediate family members.

211.    Plaintiffs reserve the right to modify or amend the class definitions, including the addition of one or more subclasses, after having the opportunity to conduct discovery.

**C.      Fed. R. Civ. P. 23 Requirements**

212.    <u>Numerosity</u>: The Classes are composed of thousands to millions of individuals and thus are so numerous that joinder of all members is impracticable.

213.    <u>Typicality</u>: Plaintiffs' claims are typical of the claims of putative class members in that each was a borrower whose loans were given and/or serviced by Defendants.  Plaintiffs and the Class Members were injured through Defendants' common course of misconduct, and Plaintiffs are advancing the same legal theories on behalf of themselves and the Class Members.

214.    <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Class Members.  Plaintiffs' interests and the interests of all other members of each respective class are

identical, and Plaintiffs are cognizant of their respective duties and responsibilities to the Class Members.  Further, the interests of the Class Members are not conflicting or divergent but, rather, are common.   Accordingly, Plaintiffs can fairly and adequately represent the interests of both classes.  Moreover, Plaintiffs' counsel is competent and experienced in litigating class actions. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the Class Members' interests.

215.    <u>Commonality and Predominance</u>: There are numerous questions of law and fact common to the Classes, and these common questions predominate over any issues affecting only individual class members.  Questions common to the Classes include, but are not limited to:

a. Whether Defendants' misrepresentations to borrowers about their loans constituted fraud;

b. Whether Defendants' misrepresentations to borrowers about their loans constituted a violation of the New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-1, *et seq.*;

c. Whether Defendants' misrepresentations to borrowers about their loans constituted a violation of the Delaware Consumer Fraud Act, Del. Code Ann. §§ 2511, *et seq.*:

d. Whether Defendants' misrepresentations to borrowers about their loans constituted a violation of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.;*

e. Whether Defendants' misrepresentations to borrowers about their loans constituted a violation of New York Consumer Protection from Deceptive Acts and Practices Law, General Business Law §§ 349, *et seq.*;

f. Whether Defendants' misrepresentations to borrowers about their loans constituted breach of contract;

g. Whether Defendants' misrepresentations to borrowers about their loans constituted breach of fiduciary duty; and

h. Whether Plaintiffs and the members of the proposed classes are entitled to declaratory, injunctive, or other equitable relief.

216.    <u>Superiority</u>: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered

in the management of this class action.  The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to an individual plaintiff may not be sufficient to justify individual litigation.  Here, the damages suffered by Plaintiffs and the Classes are relatively small compared to the burden and expense required to individually litigate their claims against Defendants, and thus, individual litigation to redress Defendants' wrongful conduct would be impracticable.  Individual litigation by each Class Member would also strain the court system, create the potential for inconsistent or contradictory judgments, and increase the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

217.    In addition, Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and others similarly situated, making final injunctive or corresponding declaratory relief with respect to the proposed class appropriate.

## CAUSES OF ACTION

### COUNT I
### COMMON LAW FRAUD

218.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

219.    Defendants made, authorized or caused representations to be made to Plaintiffs, which are set forth above, including:

- Misallocating payments disproportionately to interest rather than principal;

- Charging inflated minimum monthly payments and applying the excess payment to interest only;

- Applying single loan payments across multiple loans, so as to spread a payment out over multiple loans' principals and interests, rather than one loan's principal and interest;

- Applying single loan payments across multiple loans, so as to spread a payment out over loans with the lower interest rate first, so that more debt accrues on the higher interest loans;

- Capitalizing interest at irregular frequencies and improper times;

- Employing an antiquated, confusing, and misleading online payment system to provide information in order to prevent Plaintiffs and New Jersey Subclass members from being able to understand their loan payments and applications;

- Employing misleading monthly billing statements with inaccurate, deceptive, and confusing information;

- Refusing to release cosigners even when release-eligibility criteria should have been met;

- Refusing to provide accurate cosigner release criteria;

- Refusing to provide accurate historical transactional information on student loans to Plaintiffs and New Jersey Subclass members;

- Failing to provide Plaintiffs and New Jersey Subclass members with a clear, reliable, and consistent way to apply automated online payments and extra payments to specific loans; and

- Promoting a rewards credit card and program, which rewards were never allocated towards reducing the principal due.

220.   The material misrepresentations set forth above were fraudulent, and Defendants' representations fraudulently omitted material facts.

221.   Defendants knew that their representations and omissions were false and/or misleading at the time they were made.

222.   Defendants made the misrepresentations with the intent to deceive Plaintiffs.

223.   Plaintiffs justifiably relied upon Defendants' misrepresentations and omissions.

224.   As a result of their reliance upon Defendants' misrepresentations and omissions, Plaintiffs have been damaged.

**COUNT II**
**NEW JERSEY CONSUMER FRAUD ACT**
**N.J. STAT. ANN. §§ 56:8-1, *ET SEQ*.**

225.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

226.   Plaintiffs bring this cause of action on behalf of themselves, the Nationwide Class, and/or a grouping of state subclasses, including the New Jersey Subclass.

227.   Defendants' business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts, or practices under the New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-1, *et seq.*

228.   Plaintiffs and the New Jersey Subclass Members are "persons" within the meaning of N.J.S.A. § 56:8-1(d).

229.   Pursuant to the New Jersey Consumer Fraud Act, "merchandise" includes "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S.A. § 56:8-1(c).

230.   Defendants' student loan servicing business qualifies as a "sale" of "merchandise" as defined by N.J.S.A. §§ 56:8-1(c) and (e).

231.   Pursuant to N.J.S.A. § 56:8-2:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice. . . .

232.   Defendants engaged in unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact, with respect to the servicing of Plaintiffs' loans, including:

- Misallocating payments disproportionately to interest rather than principal;

- Charging inflated minimum monthly payments and applying the excess payment to interest only;

- Applying single loan payments across multiple loans, so as to spread a payment out over multiple loans' principals and interests, rather than one loan's principal and interest;

- Applying single loan payments across multiple loans, so as to spread a payment out over loans with the lower interest rate first, so that more debt accrues on the higher interest loans;

- Capitalizing interest at irregular frequencies and improper times;

- Employing an antiquated, confusing, and misleading online payment system to provide information in order to prevent Plaintiffs and New Jersey Subclass members from being able to understand their loan payments and applications;

- Employing misleading monthly billing statements with inaccurate, deceptive, and confusing information;

- Refusing to release cosigners even when release-eligibility criteria should have been met;

- Refusing to provide accurate cosigner release criteria;

- Refusing to provide accurate historical transactional information on student loans to Plaintiffs and New Jersey Subclass members;

- Failing to provide Plaintiffs and New Jersey Subclass members with a clear, reliable, and consistent way to apply automated online payments and extra payments to specific loans; and

- Promoting a rewards credit card and program, which rewards were never allocated towards reducing the principal due.

233.   Defendants' practices, as set forth above, were unfair because:

- The practices were immoral, oppressive, and unscrupulous because they imposed upon Plaintiffs and New Jersey Subclass members with no meaningful choice, imposed an unreasonable burden on Plaintiffs and New Jersey Subclass members, and were so oppressive as to leave Plaintiffs and New Jersey Subclass members with little alternative but to submit to the practices.  Plaintiffs and New Jersey Subclass members had no control over Defendants' acts, and Plaintiffs' and New

Jersey Subclass members' attempts to ensure that loan payments were applied correctly were futile; and

- Plaintiffs and New Jersey Subclass members cannot reasonably avoid the injury caused by Defendants, since Defendants are in ultimate control of student loan payment processing and routinely refuse to follow Plaintiffs' and New Jersey Subclass members' instructions.

234.    Defendants' unfair practices and conduct were directed toward Plaintiffs.

235.    The above unfair and deceptive practices and acts by Defendants were material misrepresentations of a presently existing or past fact.

236.    Defendants knew or believed that the above unfair and deceptive practices and acts were material misrepresentations.

237.    Defendants intended that other persons rely on the above unfair and deceptive practices and acts by Defendants that were material misrepresentations of a presently existing or past fact, and their reliance was reasonable.

238.    Defendants intended for Plaintiffs to rely on their acts and practices in applying student loan payments correctly, including to the correct account, and, when applicable, correctly to interest and principal, or principal only, and correcting misapplied student loan payments.

239.    Defendants also intended for Plaintiffs to rely on their loan billing statements, emails, website, and other correspondence as correct, even though the billing statements contained inflated and misleading principal balances, after Defendants impermissibly capitalized loan interest to loan principal, and emails, website, and other correspondence all contained inconsistent and inaccurate loan information.

240.    Defendants' unfair and deceptive practices occurred during the course of conduct involving trade or commerce, specifically the collection of student loan debts.

241.    Plaintiffs and New Jersey Subclass members relied on Defendants' misrepresentations.

242.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and New Jersey Subclass members suffered an ascertainable loss of money or property, including paying inflated principal, interest, and costs associated with their student loans.

243.    Defendants' conduct was addressed to the market generally and otherwise implicates consumer protection concerns and, therefore, a consumer nexus exists in that:

- Defendants' acts and practices in collecting student loans, misapplying loan payments, and impermissibly shifting interest to principal were directed to all individuals whose loans were serviced by Defendants; and

- Defendants' acts and practices otherwise implicate consumer protection concerns including, but not limited to, promoting fair and upright business practices.

244.    Defendants' conduct was willful and intentional and done with evil motive or reckless indifference to the rights of others.  Punitive damages are thus warranted.

245.    As a result of the foregoing, Plaintiffs and New Jersey Subclass members seek relief under N.J.S.A. §§ 56:8-2.11 and 56:8-19, including, but not limited to damages, treble damages, and attorneys' fees and costs.

### COUNT III
### DELAWARE CONSUMER FRAUD ACT
### DEL. CODE ANN. §§ 2511, *ET SEQ.*

246.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

247.    Plaintiffs bring this cause of action on behalf of themselves, the Nationwide Class, and/or a grouping of state subclasses, including the Delaware Subclass.

248.    Defendants' business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the Delaware Consumer Fraud Act, Del. Code. Ann. §§ 2511, *et seq.*

55

249.    Plaintiffs and the Delaware Subclass Members are "persons" within the meaning of Del. Code Ann. § 2511(7).

250.    Pursuant to the Delaware Consumer Fraud Act, "merchandise" includes "any objects, wares, goods, commodities, intangibles, real estate or services." Del. Code Ann. § 2511(6).

251.    Defendants' student loan servicing business qualifies as the "sale" of "merchandise" as defined by the Del. Code Ann. §§ 2511(6) and (8).

252.    The Delaware Consumer Fraud Act prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale . . . of any merchandise." Del. Code Ann. § 2513.

253.    Defendants participated in unfair or deceptive trade practices that violated the Delaware Consumer Fraud Act as described below and alleged throughout the Complaint.  By concealing and improperly servicing student loans, Defendants knowingly and intentionally misrepresented and omitted material facts in connection with their improper servicing of student loans.  Defendant systematically misrepresented, concealed, suppressed or omitted material facts relating to their improper servicing of student loans.

254.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with their improper servicing of student loans, including:

- Misallocating payments disproportionately to interest rather than principal;

56

- Charging inflated minimum monthly payments and applying the excess payment to interest only;

- Applying single loan payments across multiple loans, so as to spread a payment out over multiple loans' principals and interests, rather than one loan's principal and interest;

- Applying single loan payments across multiple loans, so as to spread a payment out over loans with the lower interest rate first, so that more debt accrues on the higher interest loans;

- Capitalizing interest at irregular frequencies and improper times;

- Employing an antiquated, confusing, and misleading online payment system to provide information in order to prevent Plaintiffs and Delaware Subclass members from being able to understand their loan payments and applications;

- Employing misleading monthly billing statements with inaccurate, deceptive, and confusing information;

- Refusing to release cosigners even when release-eligibility criteria should have been met;

- Refusing to provide accurate cosigner release criteria;

- Refusing to provide accurate historical transactional information on student loans to Plaintiffs and Delaware Subclass members;

- Failing to provide Plaintiffs and Delaware Subclass members with a clear, reliable, and consistent way to apply automated online payments and extra payments to specific loans; and

- Promoting a rewards credit card and program, which rewards were never allocated towards reducing the principal due.

255.   Defendants' practices, as set forth above, were unfair because:

- The practices were immoral, oppressive, and unscrupulous because they imposed upon Plaintiffs and Delaware Subclass members with no meaningful choice, imposed an unreasonable burden on Plaintiffs and Delaware Subclass members, and were so oppressive as to leave Plaintiffs and Delaware Subclass members with little alternative but to submit to the practices. Plaintiffs and Delaware Subclass members had no control over Defendants' acts, and Plaintiffs' and Delaware Subclass members' attempts to ensure that loan payments were applied correctly, were futile; and

- Plaintiffs and Delaware Subclass members cannot reasonably avoid the injury caused by Defendants, since Defendants are in ultimate control of student loan payment processing and routinely refuse to follow Plaintiffs' and Delaware Subclass members' instructions.

256.     Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of student loan borrowers.

257.     Defendants knew or should have known that their conduct violated the Delaware Consumer Fraud Act.

258.     Had Plaintiffs and Delaware Subclass Members known the truth about the improper servicing of their loans, they would not have made payments in connection with their loans that were improperly allocated and/or were for payment of improper charges.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

259.     Defendants owed Plaintiffs and the Delaware Subclass Members a duty to disclose the truth about the manner in which Defendants were improperly servicing their student loans.

260.     Plaintiffs and the Delaware Subclass Members suffered monetary damages as a result of Defendants' conduct, including paying inflated principal, interest, and costs associated with their student loans.

261.     Defendants' violations present a continuing risk to Plaintiffs and the Delaware Subclass Members, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

262.     Defendants are liable to Plaintiffs and the Delaware Subclass Members for all damages sustained. Del. Code Ann. § 2525.

## COUNT IV
## FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
## FLA. STAT. ANN. §§ 501.201, *ET SEQ.*

263.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

264.    Plaintiffs bring this cause of action on behalf of themselves, the Nationwide Class, and/or a grouping of state subclasses, including the Florida Subclass.

265.    Defendants' business acts and practices alleged herein constitute unfair, unconscionable, and/or deceptive methods, acts or practices under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), §§ 501.201, *et seq.*

266.    Plaintiffs and Florida Subclass Members are "consumers" within the meaning of F.S.A. § 501.203(7).

267.    Defendants' conduct, as set forth herein, occurred in the conduct of "trade or commerce" within the meaning of F.S.A. § 501.203(8).

268.    The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …" Fla. Stat. § 501.204(1).  Defendants participated in unfair and deceptive trade practices that violated the FDUTPA.

269.    Defendants engaged in numerous unfair acts and practices in the servicing of Plaintiffs' and the Florida Subclass Members' loans, including:

- Misallocating payments disproportionately to interest rather than principal;

- Charging inflated minimum monthly payments and applying the excess payment to interest only;

- Applying single loan payments across multiple loans, so as to spread a payment out over multiple loans' principals and interests, rather than one loan's principal and interest;

- Applying single loan payments across multiple loans, so as to spread a payment out over loans with the lower interest rate first, so that more debt accrues on the higher interest loans;

- Capitalizing interest at irregular frequencies and improper times;

- Employing an antiquated, confusing, and misleading online payment system to provide information in order to prevent Plaintiffs and Florida Subclass members from being able to understand their loan payments and applications;

- Employing misleading monthly billing statements with inaccurate, deceptive, and confusing information;

- Refusing to release cosigners even when release-eligibility criteria should have been met;

- Refusing to provide accurate cosigner release criteria;

- Refusing to provide accurate historical transactional information on student loans to Plaintiffs and Florida Subclass members;

- Failing to provide Plaintiffs and Florida Subclass members with a clear, reliable, and consistent way to apply automated online payments and extra payments to specific loans; and

- Promoting a rewards credit card and program, which rewards were never allocated towards reducing the principal due.

270.   Defendants' practices, as set forth above, were unfair because:

- The practices were immoral, oppressive, and unscrupulous because they imposed upon Plaintiffs and the Florida Subclass Members with no meaningful choice, imposed an unreasonable burden on Plaintiffs and the Florida Subclass Members, and were so oppressive as to leave Plaintiffs and the Florida Subclass Members with little alternative but to submit to the practices.  Plaintiffs and the Florida Subclass Members had no control over Defendants' acts, and Plaintiffs' and the Florida Subclass Members' attempts to ensure that loan payments were applied correctly, were futile; and

- Plaintiffs and the Florida Subclass Members cannot reasonably avoid the injury caused by Defendants, since Defendants are in ultimate control of student loan payment processing and routinely refuse to follow Plaintiffs' and the Florida Subclass Members' instructions.

271. Defendants' omissions and practices described herein were likely to, and did in fact, deceive and mislead members of the public, including Plaintiffs and the Florida Subclass Members, acting reasonably under the circumstances, to their detriment.

272. Defendants failed to reveal facts that were material to Plaintiffs and the Florida Subclass Members' decisions regarding the repayment of their loans, and Defendants intended that Plaintiffs and the Florida Subclass Members would rely upon the omissions.

273. Defendant's actions impact the public interest because Plaintiffs and the Florida Subclass Members were injured in exactly the same way as hundreds or thousands of others making payments on their student loans as a result of and pursuant to Defendant's generalized course of deception.

274. Had Plaintiffs and the Florida Subclass Members known the truth about the servicing of their student loans, they would not have made payments in connection with their loans that were improperly allocated and/or were for payment of improper charges.

275. As a result of Defendants' improper conduct, Plaintiffs have suffered damages, including paying inflated principal, interest, and costs associated with their student loans.

276. The foregoing acts, omissions and practices proximately caused Plaintiffs and the Florida Subclass Members to suffer actual damages with they are entitled to recover such damages, together with attorneys' fees and costs of suit.

## COUNT V
## NEW YORK CONSUMER PROTECTION FROM DECEPTIVE ACTS AND PRACTICES LAW
## N.Y. GEN. BUS. LAW §§ 349, *ET SEQ.*

277. Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

278. Plaintiffs bring this cause of action on behalf of themselves, the Nationwide Class, and/or a grouping of state subclasses, including the New York Subclass.

61

279.     Defendants' business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under New York Gen. Bus. Law §§ 349, *et seq.*

280.     Plaintiffs and the New York Subclass Members are "persons" within the meaning of New York Gen. Bus. Law § 349(h).

281.     Defendants' actions as set forth herein occurred in the conduct of trade or commerce under New York Gen. Bus. Law § 349.

282.     New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."  New York Gen. Bus. Law § 349. Defendants' conduct, as described in this Complaint, constitutes "deceptive acts or practices" within the meaning of the New York GBL.   All of Defendants' deceptive acts and practices, which were intended to mislead consumers in a material way in the process of paying their student loan debt constitute conduct directed at consumers and "consumer-oriented."   Further, Plaintiffs and the New York Subclass Members suffered injury as a result of the deceptive acts or practice.

283.     Defendants' actions, as set forth above, occurred in the conduct of business, trade or commerce.

284.     Defendants participated in unfair or deceptive trade practices that violated the New York General Business Law, including by:

- Misallocating payments disproportionately to interest rather than principal;

- Charging inflated minimum monthly payments and applying the excess payment to interest only;

- Applying single loan payments across multiple loans, so as to spread a payment out over multiple loans' principals and interests, rather than one loan's principal and interest;

- Applying single loan payments across multiple loans, so as to spread a payment out over loans with the lower interest rate first, so that more debt accrues on the higher interest loans;

- Capitalizing interest at irregular frequencies and improper times;

- Employing an antiquated, confusing, and misleading online payment system to provide information in order to prevent Plaintiffs and New York Subclass members from being able to understand their loan payments and applications;

- Employing misleading monthly billing statements with inaccurate, deceptive, and confusing information;

- Refusing to release cosigners even when release-eligibility criteria should have been met;

- Refusing to provide accurate cosigner release criteria;

- Refusing to provide accurate historical transactional information on student loans to Plaintiffs and New York Subclass members;

- Failing to provide Plaintiffs and New York Subclass members with a clear, reliable, and consistent way to apply automated online payments and extra payments to specific loans; and

- Promoting a rewards credit card and program, which rewards were never allocated towards reducing the principal due.

285.   Defendants' practices, as set forth above, were unfair because:

- The practices were immoral, oppressive, and unscrupulous because they imposed upon Plaintiffs and New York Subclass members with no meaningful choice, imposed an unreasonable burden on Plaintiffs and New York Subclass members, and were so oppressive as to leave Plaintiffs and New York Subclass members with little alternative but to submit to the practices.  Plaintiffs and New York Subclass members had no control over Defendants' acts, and Plaintiffs' and New York Subclass members' attempts to ensure that loan payments were applied correctly, were futile; and

- Plaintiffs and New York Subclass members cannot reasonably avoid the injury caused by Defendants, since Defendants are in ultimate control of student loan payment processing and routinely refuse to follow Plaintiffs' and New York Subclass members' instructions.

286.     Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business and were capable of deceiving a substantial portion of the public.

287.     Defendants knew or should have known that their conduct violated the New York General Business Law.

288.     Had Plaintiffs and the New York Subclass Members known the truth about the servicing of their student loans, they would not have made payments in connection with their loans that were improperly allocated and/or were for payment of improper charges.

289.     Defendants owed Plaintiffs and the New York Subclass Members a duty to disclose the truth about the servicing of their student loans.

290.     Plaintiffs and the New York Subclass Members suffered injury in fact to a legally protected interest.

291.     As a result of Defendants' improper conduct, Plaintiffs and the New York Subclass Members were harmed and suffered actual damages, including paying inflated principal, interest, and costs associated with their student loans.

292.     Defendants' violations present a continuing risk to Plaintiffs and the New York Subclass Members, as well as to the general public.

293.     Defendants' unlawful acts and practices complained of herein affect the public interest.

294.     Pursuant to New York Gen. Bus. Law § 349(h), Plaintiffs and the New York Subclass Members seek damages for Defendants' willful and knowing violation of New York Gen. Bus. Law § 349.  Plaintiffs and the New York Subclass Members also seek attorneys' fees, an order enjoining Defendants' deceptive conduct, and any other just and proper relief available under the New York General Business Law.

## COUNT VI
## BREACH OF FIDUCIARY DUTY

295.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs.

296.    Plaintiffs placed special trust and confidence in Defendants based on their representations that their student loans would be serviced properly.

297.    Defendants knew or should have known that Plaintiffs and others similarly situated placed their trust and confidence in Defendants and relied on them to properly service their student loans.

298.    Defendants have a fiduciary duty to borrowers to properly service their student loans.

299.    Defendants breached that duty by failing to properly service Plaintiffs' student loans.

300.    As a result, Plaintiffs suffered damages, including paying inflated principal, interest, and costs associated with their student loans.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and others similarly situated, respectfully request that the Court:

(1)    Certify the Class and Subclasses, appoint Plaintiffs as representatives of the Class and Subclasses, and appoint their counsel as Class Counsel;

(2)    Enter judgment for liability against Defendants;

(3)    Award compensatory, punitive, and other damages, as may be allowed by law;

(4)    Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order enjoining Defendants from improperly servicing their student loans;

(5)    Grant Plaintiffs their attorneys' fees and costs; and

(6)     Grant such other and further relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby request a jury trial on all issues so triable.

Dated: June 24, 2020                          **KRANJAC TRIPODI & PARTNERS LLP**


                                              By: s/ Xavier M. Bailliard
                                                    Xavier M. Bailliard, Esq.
                                                    James Van Splinter, Esq.
                                                    Joseph Tripodi, Esq.
                                                    30 Wall Street, 12th Floor
                                                    New York, NY 10005
                                                    Tel: (646) 216-2400
                                                    Fax: (646) 216-2373
                                                    Email:     xbailliard@ktpllp.com
                                                               jvansplinter@ktpllp.com
                                                               jtripodi@ktpllp.com

                                              *Attorneys for Plaintiffs*