# GT GreenbergTraurig

Rebecca Zisek, Esq.
Tel 973.443.3242
Fax 973.301.8410
Rebecca.Zisek@gtlaw.com

Lisa Simonetti, Esq.
Tel 310.586.7824
Fax 310.586.7800
simonettil@gtlaw.com

October 26, 2022

**SUBMITTED VIA ECF**
The Honorable Leda Dunn Wettre, U.S.M.J.
United States District Court for the District of New Jersey
Martin Luther King Building & U.S. Courthouse
50 Walnut Street
Newark, NJ 07102

      Re: Case No. 2:20-cv-07712,
      *Manetta, et al. v. Navient Corporation, et al.*

Dear Judge Wettre:

      Defendant Navient Solutions, LLC ("NSL") submits this letter pursuant to the Court's order dated October 18, 2022. The Court directed NSL to "set[] forth what relevant information it believes the third-party witnesses [Maulik Sanghavi ("Sanghavi") and his wife, Michelle Robalino-Sanghavi ("Robalino-Sanghavi")] possess with respect to the allegations in *Manetta v. Navient Corp.*, No. 20-cv-7712, that could not be obtained from the named plaintiffs themselves." As detailed below, NSL has deposed each of the nine named plaintiffs. Not a *single one* can provide any *facts* in support of the fraud-based claims asserted here. Instead, when asked for specific examples of fraud and how they came to believe that NSL engaged in any improper conduct, the named plaintiffs routinely pointed to Sanghavi and Robalino-Sanghavi, stating that they had identified the supposed fraud and recommended them to plaintiffs' counsel to file this lawsuit.[1] Accordingly, at this point, Sanghavi and Robalino-Sanghavi are the *only* fact witnesses that can supposedly provide any details, explanations, or specifics on the alleged fraud. *See, e.g., Korotki v. Cooper Levenson, April, Niedelman & Wagenheim, P.A.*, 2022 U.S. Dist. LEXIS 108271, at *16 n.19 (D.N.J. June 17,

---

[1] Indeed, Sanghavi has testified and noted in the letter to the Court that his and his wife's beliefs and their communications with the named plaintiffs were the "genesis" of *Manetta*.

Hon. Leda Dunn Wettre, U.S.M.J.
October 26, 2022
Page 2

2022) ("Need [to obtain information from a third party in a case] is enhanced when information is uniquely available from the party from whom it is sought.") (internal citations and quotations omitted). Further, Sanghavi and Robalino-Sanghavi cannot be excused from testifying by any contention that named plaintiffs intend to rely on a purported expert. Expert testimony, too, must be supported by fact. Put simply, absent the testimony of these fact witnesses, NSL is exposed to the potential for prejudice and the inability to properly develop its defenses, including that the instant claims are, and always have been, baseless.

## Discussion

As stated in the letter submitted on September 23, 2022, Sanghavi and Robalino-Sanghavi are pursuing separate claims against NSL. The *Sanghavi* claims include fraud, violation of the New Jersey Consumer Fraud Act, breach of contract, and breach of the implied covenant of good faith and fair dealing. In *Manetta*, named plaintiffs bring claims for fraud, violation of the New Jersey Consumer Fraud Act, violation of the Delaware Consumer Fraud Act, violation of the Florida Deceptive and Unfair Trade Practices Act, and violation of the New York General Business Law.[2] The allegations in *Sanghavi* and *Manetta* are largely the same (i.e., NSL misallocates payments and improperly applies capitalized interest, and then attempts to "hide" such facts, including through its billing statements and customer service). While Sanghavi and Robalino-Sanghavi bring their claims only for themselves, named plaintiffs purport to represent a "Nationwide Class" consisting of: "All individuals in the United States and its territories who have ever had any loans with [NSL] and/or had any loans (private or federal) serviced by [NSL] at any time."[3]

It is fundamental that a claim for fraud requires proof of: (1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) plaintiff's reliance on the representation. *See, e.g., Christidis v. First Penn. Mortg. Trust*, 717 F.2d 96, 99 (3d

---

[2] A claim for breach of fiduciary duty was dismissed with prejudice. Dkt. 34, July 8, 2021 Order.

[3] The named plaintiffs further propose "state subclasses" for student loan borrowers residing in Delaware, Florida, New Jersey, and New York.

Cir. 1983) (New Jersey state law). Named plaintiffs' statutory claims also sound in fraud.[4]

From the outset of this action, NSL was concerned that the named plaintiffs did not provide specific facts to support their allegations of fraudulent loan servicing. NSL filed a Motion to Dismiss or Strike, but the Court allowed several claims to proceed to discovery. *See* Dkt. 34, Order dated July 8, 2021. Thus, during the fact discovery period, NSL attempted to obtain *facts* -- i.e., specifics and examples for *how* or *why any* transaction on named plaintiffs' loans was fraudulent or otherwise wrongful (e.g., "NSL allocated $X to principal but should have allocated $Y" or "NSL charged capitalized interest contrary to the loan's terms"). NSL took the depositions of named plaintiffs (totaling over 29 hours of testimony), and asked them to identify any misrepresentation by NSL or any improper transactions with their loans, such as a payment misallocation or application of improper interest. *None of the named plaintiffs could do so.* For example:

> Matthew Markosian: "Q. [] Has [NSL] ever applied capitalized interest in your student loans? A. I don't know. … Q. [] Can you tell me how you have been harmed in any way by anything that [NSL] did in servicing your loans? A. Well, **if** I have been paying back my loan over a longer period of time than I should have and -- or **if** I ultimately paid more than I should have, then there's a financial harm there, I would imagine. Q. Is there any document that you can point to that would support a contention that you've been paying for a longer period of time than you should have? Anything at all? A. Like I said, my understanding is that there was -- that there was an expert that reviewed these materials and [] supports this theory, but outside of that, I don't have any independent knowledge or any -- I can't identify anything else. … No, I don't have any independent knowledge with respect

---

[4] *See, e.g.*, N.J.S.A. § 56:8-2 (defining an "unlawful practice" as, among other things, "deception, fraud, false pretense, false promise, misrepresentation"); 6 Del. C. § 2512. Section 2513(a) (similarly defining "unlawful practice"); § 501.204(1), Fla. Stat. (providing a civil cause of action for "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce"); *Toca v. Tutco, LLC*, 430 F. Supp. 3d 1313, 1328 (S.D. Fla. 2020) (citation omitted) (the Florida statute allows for a plaintiff to recover if he proves he was injured "by an objectively deceptive act or statement"); NY GBL § 349 (prohibiting "deceptive acts" directed at consumers, which are "misleading in a material way" and result in injury); *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000) (stating elements of NY GBL claim).

Hon. Leda Dunn Wettre, U.S.M.J.
October 26, 2022
Page 4

to the servicing of my loans. It's not something I've ever paid attention to. So no, I don't -- there's no evidence I'm going to present, you know. … Q. Have you ever seen any document that reflected a misapplication of a payment? A. I don't know. I mean, I don't know that I was aware that there was this misapplication." Markosian Dep. pages 29:19-32:8 (bold emphasis added). "Q. Do you conten[d] that there's anything about the monthly statements that is misleading? A. No. I -- Q. Has [NSL] concealed any information from you regarding your student loans? A. I don't know. Q. Has [NSL] made any misrepresentations to you? A. I don't know. Q. Has [NSL] failed to disclose any information about your loans that you would consider to be important? A. I don't know. Q. From your point of view, what would a proper allocation of payments be? A. I don't have a point of view on that topic. I mean, I'm not a finance -- you know, I don't have a background in it. I don't know. Q. Have you done your best today to tell me everything that you think [NSL] did wrong on your student loans? Do you have anything to add? A. I don't." Markosian Dep. at 39:21-40:21. *See also* 25:2-28:14 ("Q. … How did you develop that understanding [that payment misallocation may have occurred on his loan]? A. I think just from the complaint … Q. [] Do you have any independent basis for believing that these allegations are true other than just reading them here in the complaint? A. Other than -- my understanding is there's an expert -- no, I don't have any -- I don't have any independent basis to -- no. …").

George Amores: "Q. On your loans, did [NSL] allocate monthly payments to loans with lower interest rates rather than loans with higher rates? A. I wouldn't know that. Q. Did [NSL] charge artificially inflated minimum interest payments on your loans? A. I don't know. Q. Did [NSL] misapply any capitalized interest? A. Not that I knew." Amores Dep. at 25:1-10. "Q. Do you believe that [NSL's] repayment system and customer service is designed to impede repayment and the discovery of errors? A. I don't know. Q. Does [NSL] conceal information from you regarding your loans? A. Not that I'm aware. Q. Does [NSL] provide you with monthly statements that are misleading? A. I don't know. Q. Does [NSL] have a loyalty program which does not lower the payments to be made on student loans? A. I don't know. Q. Do you know anything about [NSL]'s Office of Customer Advocate? A. No." Amores Dep. at 40:6-22. "Q. Okay. So why don't you take any payment or group of payments and tell me why you think that's inaccurate or improper. A. I'm not sure about the financials. Q. I'm not sure what you

mean. A. Just it -- I don't know why [the payment amount] fluctuates. That's all I know." Amores Dep. at 54:5-11.

Exhibit A (deposition excerpts). To be clear, these are only illustrations of named plaintiffs' utter lack of knowledge. The testimony of named plaintiffs was consistent. *See* Baxi Dep. at 34:2-41:17, 42:6-18, 44:23-46:8, 70:16-24; Ibrahim Dep. at 33:1-34:23; Manetta Dep. at 32:23-33:8, 40:4-19; Minano Dep. at 21:22-24:12; Peck Dep. at 26:8-28:25 and 35:9-36:20; Pereira Dep. at 21:1-9, 39:17-41:25, and 50:13-25, 58:12-62:19; Sygal-Pereira Dep. at 28:12-34:25 and 59:12-17.

However, *each* of the named plaintiffs testified that they discussed NSL's loan servicing with Sanghavi and/or Robalino-Sanghavi, and that those discussions ultimately led to the filing of *Manetta*. Some named plaintiffs even testified that Sanghavi and/or Robalino-Sanghavi found *specific issues* (such as payment misallocation) with their accounts, and that they discussed examples of fraud (from either their accounts or those of Sanghavi and/or Robalino-Sanghavi). But the named plaintiffs cannot provide *any* information about those purported issues or the conversations. For instance:

> Naimish Baxi: … Q. Can you tell me how you came to th[e] belief [that you had any claim against NSL]? A. A colleague of mine [Robalino-Sanghavi] had brought it up and that's kind of when I looked at it. … We looked at it and her husband [Sanghavi] is a lawyer and he kind of looked at it together, and that's when I sort of better understood that there might be something wrong here. … Q. … What did you discuss with Ms. Robalino and Mr. Sanghavi that led you to believe there might be an issue with your student loans? A. I don't exactly remember what we discussed. After we went over some things, I was referred to this law firm and -- yeah, that's where things went. … A. [My discussion with Robalino-Sanghavi] was a very general discussion about discrepancies within the billing practices, but it was -- all I remember it was general. I don't remember with granular details at all. [] Q. Okay. What kinds of discrepancies? A. I don't remember what we discussed specifically at that time. Q. You mentioned a few moments ago that you went over some things with one or both of them. What did you go over? A. Just my statements. … Q. Did [either Robalino-Sanghavi or Sanghavi] show the statements to anyone else, to your knowledge? A. Not to my knowledge. …" Baxi Dep. 26:18-30:21. "Q. Just to be clear, you can't remember any

Hon. Leda Dunn Wettre, U.S.M.J.
October 26, 2022
Page 6

detail at all about the discussion and what might have been wrong with your monthly statements; is that right? A. Correct." Baxi Dep. 33:4-7. "Q. So as you sit here right now, are you aware of any other person who believes that there was misallocation of payments on student loans? A. I guess yes, [Robalino-Sanghavi], who is initially the person that referred me. But other than her, no." Baxi Dep. 87:21-88:2.

Mahmud Ibrahim: "Q. … How did you come to believe that you might have legal claims? A. One of my former co-residents, [Robalino-Sanghavi], had contacted me and sent that [sic]. Her husband [Sanghavi] had noticed some inconsistencies in [their accounts]. Then I guess they asked a few other people and had noticed similar issues in their accounts. So she reached out to me and asked if they can see some of my statements to see if they find the same inconsistencies, which they did, and then from there [Sanghavi] had referred us to our attorney. … Q. What were the inconsistencies that they identified on their loans? A. That the payments were being applied appropriately. Q. What was wrong with how the payments were being applied? A. More of the payment was going towards the interest rather than the principal, thereby leaving a higher principal balance and in turn creating more interest down the line. Q. Did they identify any other inconsistencies? A. And that the payments were being applied more towards the lower-interest loans rather than the higher-interest loans." Ibrahim Dep. 29:8-30:18.

Brian Manetta: "… what [Sanghavi] was telling me, which, obviously, the substance I can't recall at this point precisely, but what he was saying was kind of in accord with what I had been suspecting [was wrong with my loans]. Q. So what's your best recollection, if you can't remember specifically? What did he tell you that he found on his own loans? A. That there was misapplication of payments, overpayments not going to principal, things like that. Q. Is that all he told you? A. I think -- I think we discussed – it's all that he told me that I can recall. Just the misallocation and -- and payments kinda not going where they were supposed to go." Manetta Dep. at 28:6-30:6; *see also* 102:6-16 ("A. Do I have a belief that [misallocation of payments] has caused me financial harm? … Yes. Q. And is that based only upon what you've been told by Mr. Sanghavi and others? A. It's based on that, it's based on my initial suspicion that something was amiss, yes.").

> <u>Sydney Peck</u>: "Q. [] And what did Mr. Sanghavi identify for you that supposedly was wrong with the servicing [of your loans]? A. He didn't give me exact details, but he said that I should have, you know, an attorney look at it … And I don't remember exactly what he pointed out to me, but he did say, "Oh, there's some weird things here." And honestly, I don't remember the words that he used, so I apologize." Peck Dep. at 30:17-35:8; *see also* Peck Dep. 36:21-38:3 ("Q. So I think you told me earlier that Mr. Sanghavi identified for you that there were differences in the allocations of interest and principal across months; is that right? A. Yes. …"). *See also* 38:24-39:12 (Q: "did Mr. Sanghavi express a belief to you that errors had been made in the servicing of his loans as well? A. I think he mentioned that.").

Exhibit A (deposition excerpts). Again, these are just illustrations. *See also* Amores Dep. at 37:12-13, Minano Dep. at 77-83; Markosian Dep. at 21:19-23:25 and 41:12-20; Pereira Dep. 18:6-19:18; Sygal-Pereira Dep. at 15:11–17:11.

Against this background, it is obvious that NSL must secure the testimony of Sanghavi and Robalino-Sanghavi. Named plaintiffs know nothing in support of their claims. If anyone does, it is Sanghavi and Robalino-Sanghavi.

Nonetheless, in his abbreviated deposition session, Sanghavi refused to provide any detail or specifics about the alleged fraud they claim to have uncovered (in their accounts and/or in the accounts of the *Manetta* named plaintiffs). And now, in their letter to the Court, Sanghavi and Robalino-Sanghavi attempt to distance themselves from *Manetta*, stating (among other things) that *Sanghavi* and *Manetta* are "distinct" and "unrelated," and that any questions about their loans or about *Sanghavi* are "irrelevant" to *Manetta* (but, at the same time, they assert a common interest privilege with *Manetta* counsel).[5] Given the circumstances here, including that the *Manetta* plaintiffs bring nationwide class

---

[5] Sanghavi testified that he spoke to *Manetta* counsel between 20 and 100 times. *Sanghavi* was filed over 29 months before *Manetta* (and seemingly before the named plaintiffs were introduced to *Manetta* counsel) so it is unclear when the common interest privilege could have been formed. However, a blanket assertion of privilege over all communications is improper. The privilege only applies to communications made *after* the privilege was formed, and with respect to communications which were made for the purpose of furthering the lawsuits and were not waived (e.g., by the inclusion of a third party). *See Travelers Prop. Cas. Co. of Am. v. USA Container Co.*, 2012 U.S. Dist. LEXIS 196119 at *22 (D.N.J. Oct. 25, 2012); *In re Leslie Controls, Inc.*, 437 B.R. 493, 496 (Bankr. D. Del. 2010).

Hon. Leda Dunn Wettre, U.S.M.J.
October 26, 2022
Page 8

claims based on alleged, systematic fraud regarding capitalized interest and payment allocation -- the same fraud alleged to have occurred in *Sanghavi* -- Sanghavi and Robalino-Sanghavi's loans and observations of supposed fraud are highly relevant.

In addition, as noted above, certain named plaintiffs testified that only an unidentified "expert" can explain the supposed fraud. But experts cannot save a defective claim (e.g., establish the elements of fraud). Experts provide opinions based on existing facts. *See, e.g.*, *Dzielak v. Whirlpool Corp.*, No. 2:12-0089 (KM)(JBC), 2017 U.S. Dist. LEXIS 39232, at *9 (D.N.J. Mar. 17, 2017) ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.") (citing F.R.E. 703). Meanwhile, affirmative expert reports are not due in *Manetta* until December 2, 2022. NSL therefore does not know whether the *Manetta* plaintiffs will assert -- as Sanghavi and Robalino-Sanghavi have -- that their expert is non-testifying or a consultant whose thoughts are typically not discoverable. Fed. Rule Civ. Proc. 26(b)(4)(D). If they do, Sanghavi and Robalino-Sanghavi would be the *only* fact witnesses who could articulate the supposed fraud, and Sanghavi admittedly can do so. He purportedly identified alleged fraudulent transactions before filing *Sanghavi* and before he retained a consultant/expert. Sanghavi Dep. at 28:16-29:3 and 46:9-21.

In conclusion, *Manetta* has been pending for nearly two and a half years and, despite NSL's diligence in taking discovery, no facts have been provided in support of named plaintiffs' claims. It is perfectly clear that named plaintiffs cannot supply such facts. The only potential source of facts is Sanghavi and Robalino-Sanghavi. Accordingly, NSL is entitled to their testimony.

Respectfully submitted,

  */s/ Lisa Simonetti*
Lisa Simonetti

cc:   All counsel and parties of record (via ECF)
      Sanghavi and Robalino-Sanghavi (via e-mail)