```
 1              IN THE UNITED STATES DISTRICT COURT
 2                FOR THE DISTRICT OF NEW JERSEY
 3                       _____
 4
        BRIAN MANETTA, SERGIO     )
 5      PEREIRA, ESTHER           )
        SYGAL PEREIRA, MATTHEW    )
 6      MARKOSIAN, NAIMISH BAXI, )Civil Action No.
        HARVEY MINANO, SYDNEY     )2:20-cv-07712-SDW-LDW
 7      PECK, MAHMUD IBRAHIM,     )
        and GEORGE AMORES,        )
 8      individually and on       )
        behalf of all others      )
 9      similarly situated        )
                                  )
10               Plaintiffs,      )
                                  )
11          vs.                   )
                                  )
12      NAVIENT CORPORATION,      )
        NAVIENT SOLUTIONS, LLC    )
13      f/k/a NAVIENT SOLUTIONS, )
        INC., f/k/a SALLIE MAE,   )
14      INC., and SLM             )
        CORPORATION,              )
15                                )
                 Defendants.      )
16                                )
17
18
19                  REMOTE DEPOSITION
20                         OF
21               GEORGE MICHAEL AMORES
22             WEDNESDAY, MAY 4, 2022
23
24
25
```

                                                        Page 1

George Michael Amores - May 4, 2022

1       A.   Sporadically during my college time there.

2   I don't know exactly how long.

3       Q.   When you were in undergrad, you did that?

4       A.   Yes.

5       Q.   All right.  What did you do next?

6       A.   I graduated and went into publishing.

7       Q.   Who did you work for in publishing?

8       A.   Peter Lang, publishing firm.

9       Q.   What were your job duties there?

10      A.   It was an entry-level position to help

11  with -- talking to professors and setting things up

12  for professors, as that was the main books that we

13  were looking at were professors writing books for

14  their college classes.

15      Q.   How long did you have that job?

16      A.   I think less than a year.

17      Q.   What did you do next?

18      A.   For a few months I went to John Wiley &

19  Sons, a publishing firm.

20      Q.   What were your duties there?

21      A.   Similar with helping the executives put

22  together information for the talent.

23      Q.   Is that also an academic publishing house?

24      A.   I believe they're the ones that do the "For

25  Dummies" books.

Veritext Legal Solutions
866 299-5127

George Michael Amores - May 4, 2022

```
 1          A.  Now -- yes, now, it does.
 2          Q.  Okay.  So when were you referred to the
 3    firm?
 4          A.  Before that.
 5          Q.  That would clearly be true.
 6              How much before that?
 7          A.  That's as far as I remember.
 8          Q.  So just to be clear, you can't remember
 9    whether you were referred in 2015, as compared to
10    2020?  You just can't remember at all?
11          A.  Somewhere between that.
12          Q.  Who referred you to the firm?
13          A.  Maulik Sanghavi.
14          Q.  How did he know of them?
15          A.  Excuse me?
16          Q.  How did he know of them?
17          A.  I don't know.  Just....
18          Q.  Did Mr. Sanghavi know someone in the firm?
19          A.  You'd have to ask him.  I don't recall.
20          Q.  Have you ever spoken to Mr. Sanghavi about
21    your participation in this lawsuit?
22          A.  No.  Not in general, no.
23          Q.  So aside from the one conversation in
24    approximately 2015, have you ever spoken with him
25    again about any student loan issues?
```

Page 37

George Michael Amores - May 4, 2022

1        Q.   Have you ever been in deferment?

2        A.   Yes.

3        Q.   Do you have any understanding of how

4   deferment impacts capitalized interest?

5        A.   No.

6        Q.   Do you believe that Navient Solutions's

7   repayment system and customer service is designed to

8   impede repayment and the discovery of errors?

9        A.   I don't know.

10       Q.   Does Navient conceal information from you

11   regarding your loans?

12       A.   Not that I'm aware.

13       Q.   Does Navient provide you with monthly

14   statements that are misleading?

15       A.   I don't know.

16       Q.   Does Navient have a loyalty program which

17   does not lower the payments to be made on student

18   loans?

19       A.   I don't know.

20       Q.   Do you know anything about Navient's Office

21   of Customer Advocate?

22       A.   No.

23       Q.   What is that?

24       A.   I said, "No."

25       Q.   So you don't know what it is?

Page 40

1          Can you give me an example on here?

2      A.  Yeah, just anything when it comes to the

3  principal or the interest, I see that the numbers

4  change from month to month.

5      Q.  Okay.  So why don't you take any payment or

6  group of payments and tell me why you think that's

7  inaccurate or improper.

8      A.  I'm not sure about the financials.

9      Q.  I'm not sure what you mean.

10      A.  Just it -- I don't know why it fluctuates.

11  That's all I know.

12      Q.  Okay.  And before you had reviewed this

13  document in connection with your deposition

14  preparation, had you ever seen it before?

15      A.  Besides the preparation?  No.

16      Q.  Okay.

17          Let's mark as next in order the document

18  that starts -- or Plaintiffs 00009 and ends on 00011.

19          (Exhibit 6 was identified.)

20  BY MS. SIMONETTI:

21      Q.  This is not titled.  It has -- it's a chart

22  form document, and it reflects a date in the upper

23  left first column of March 2, 2021.

24          Mr. Amores, have you seen this document

25  before?

Veritext Legal Solutions
866 299-5127

```
 1                    IN THE UNITED STATES DISTRICT COURT
 2                      FOR THE DISTRICT OF NEW JERSEY
 3
 4        BRIAN MANETTA, SERGIO PEREIRA, )
          ESTHER SYGAL-PEREIRA, MATTHEW  )
 5        MARKOSIAN, NAIMISH BAXI,       )
          HARVEY MINANO, SYDNEY PECK,    )
 6        MAHMUD IBRAHIM, AND GEORGE     )
          AMORES, INDIVIDUALLY AND ON    )
 7        BEHALF OF ALL OTHERS SIMILARLY )
          SITUATED,                      )
 8                                       )
                  PLAINTIFFS,            )
 9                                       )  CIVIL ACTION NO.
            V.                           )  2:20-cv-07712-
10                                       )  SDW-LDW
          NAVIENT CORPORATION, NAVIENT   )
11        SOLUTIONS, LLC F/K/A NAVIENT   )
          SOLUTIONS, INC. F/K/A SALLIE   )
12        MAE, INC., AND SLM CORPORATION,)
                                         )
13                DEFENDANTS.            )
          _____)
14
15
16
17
18                  ZOOM DEPOSITION OF NAIMISH BAXI
19                    THURSDAY, MAY 5, 2022
20
21
22
23
24        JOB NO. 5152467
25        REPORTED BY:  D'ANNE MOUNGEY, CSR 7872
```

Page 1

```
 1        Q     Did you see it before it was filed?        10:38:49

 2        A     I believe so.  I can't remember.  Again, I  10:38:53

 3   believe so.                                            10:39:00

 4        Q     Did you make any changes to a draft or      10:39:01

 5   anything like that?                                    10:39:04

 6        A     I did not.                                  10:39:05

 7        Q     What was the first point in time that you   10:39:09

 8   came to believe that you have any claims against Navient  10:39:12

 9   Solutions?                                             10:39:16

10        A     I'm sorry.  Can you repeat that?            10:39:17

11        Q     Sure.                                       10:39:20

12              What was the first point in time that you   10:39:22

13   came to believe that you had any claim against Navient  10:39:24

14   Solutions?                                             10:39:27

15        A     I don't remember exactly when that was.     10:39:29

16        Q     Can you estimate for me at all?             10:39:38

17        A     I'm truly not sure.                         10:39:41

18        Q     Can you tell me how you came to that belief?  10:39:47

19        A     A colleague of mine -- yeah.                10:39:51

20              Colleague of mine had brought it up and     10:39:56

21   that's kind of when I looked at it.                    10:39:59

22        Q     What's your colleague's name?               10:40:04

23        A     Michelle Robalino.                          10:40:06

24        Q     Can you spell the last name for us.         10:40:11

25        A     R-O-B-A-L-I-N-O.                            10:40:14
```

Page 26

Naimish Baxi - May 5, 2022

```
 1        Q      Okay.  Where did you work with Ms. Robalino?   10:40:23

 2        A      She was my co-resident at Mount Sinai.         10:40:27

 3        Q      Is she currently practicing medicine?          10:40:40

 4        A      I'm not sure.                                  10:40:46

 5        Q      Do you remain in contact with her at all?      10:40:48

 6        A      I do.  I haven't been in contact with her in   10:40:52

 7   the past several months.                                   10:40:56

 8        Q      Where is she living?                           10:41:02

 9        A      In New Jersey.  I'm not sure where.            10:41:04

10        Q      What did you discuss with Ms. Robalino that    10:41:14

11   might suggest to you that you have a claim with Navient    10:41:18

12   Solutions?                                                 10:41:21

13        A      She -- she just asked if -- she asked if -- I  10:41:21

14   I'm not sure exactly how it came up.                       10:41:32

15               She asked if I was using Navient or was        10:41:37

16   Navient servicing my loans and her -- yeah.                10:41:42

17               We looked at it and her husband is a lawyer    10:41:51

18   and he kind of looked at it together, and that's when I    10:41:55

19   sort of better understood that there might be something    10:42:04

20   wrong here.                                                10:42:08

21        Q      Okay.  So her husband's last name is           10:42:10

22   Robalino?                                                  10:42:14

23        A      No.                                            10:42:17

24        Q      What's his last name?                          10:42:18

25        A      S-A-N-G-H-A-V-I.                               10:42:21
```

Page 27

Naimish Baxi - May 5, 2022

```
 1        Q     Let me repeat that back to make sure I have        10:42:30

 2   that.                                                         10:42:32

 3              S as in Sam, A as in A, N as in Nancy,             10:42:33

 4   G-H-A-V as in Victor, I, Sanghavi?                            10:42:37

 5        A     Correct, correct.                                  10:42:44

 6        Q     What's his first name?                             10:42:46

 7        A     Maulik.                                            10:42:47

 8        Q     Can you spell that for us?                         10:42:49

 9        A     M-A-U-L-I-K.  I'm not a 100 percent sure, but      10:42:51

10   I believe that's how he spells his name.                     10:42:59

11        Q     Okay.  That's good enough.                         10:43:01

12              Where is his practice based?                       10:43:08

13        A     I'm not sure where he is now.                      10:43:12

14        Q     Where was he working at the time that you had      10:43:16

15   this discussion with him?                                     10:43:19

16        A     I think he was working with the state.  I'm        10:43:21

17   not 100 percent sure about that either.                       10:43:24

18        Q     Okay.  That got a little garbled.                  10:43:26

19              He was working for the state?                      10:43:30

20        A     Sorry.  I think he was working for the state,      10:43:31

21   but I'm not sure -- I'm not 100 percent sure about that       10:43:33

22   either.                                                       10:43:38

23        Q     Okay.  Especially with the connection, let's      10:43:40

24   just try not to speak at the same time.                       10:43:45

25        A     Okay.                                              10:43:50
```

Page 28

Naimish Baxi - May 5, 2022

| | | |
|---|---|---|
| 1 | Q     Okay.  We did it again.  It will make | 10:43:50 |
| 2 | D'Anne's life a lot easier if we just keep it separated. | 10:43:55 |
| 3 | What did you discuss with Ms. Robalino and | 10:44:03 |
| 4 | Mr. Sanghavi that led you to believe there might be an | 10:44:09 |
| 5 | issue with your student loans? | 10:44:13 |
| 6 | A     I don't exactly remember what we discussed. | 10:44:19 |
| 7 | After we went over some things, I was referred to this | 10:44:30 |
| 8 | law firm and -- yeah, that's where things went. | 10:44:36 |
| 9 | Q     Okay.  And you don't have to give me the | 10:44:45 |
| 10 | specifics of what you discussed, but give me any | 10:44:48 |
| 11 | description you can of what you discussed. | 10:44:51 |
| 12 | MR. TRIPODI:  Objection. | 10:44:55 |
| 13 | Discussed with whom? | 10:44:57 |
| 14 | MS. SIMONETTI:  If you said something, | 10:45:04 |
| 15 | Mr. Tripodi, we can't hear you at all. | 10:45:07 |
| 16 | MR. TRIPODI:  Okay.  Discussed with whom? | 10:45:08 |
| 17 | Clarify the question. | 10:45:12 |
| 18 | MS. SIMONETTI:  We're talking about the | 10:45:13 |
| 19 | conversations that were had with Ms. Robalino and | 10:45:14 |
| 20 | Mr. Sanghavi.  That's what we're talking about. | 10:45:19 |
| 21 | MR. TRIPODI:  Okay. | 10:45:21 |
| 22 | THE WITNESS:  It was a very general | 10:45:23 |
| 23 | discussion about discrepancies within the billing | 10:45:24 |
| 24 | practices, but it was -- all I remember it was general. | 10:45:28 |
| 25 | I don't remember with granular details at all. | 10:45:34 |

Page 29

Naimish Baxi - May 5, 2022

```
 1    BY MS. SIMONETTI:                                    10:45:37

 2        Q     Okay.  What kinds of discrepancies?        10:45:38

 3        A     I don't remember what we discussed         10:45:41

 4    specifically at that time.                           10:45:47

 5        Q     You mentioned a few moments ago that you went  10:45:50

 6    over some things with one or both of them.           10:45:54

 7              What did you go over?                       10:45:58

 8        A     Just my statements.                        10:46:00

 9        Q     And you're certain it was only the         10:46:13

10    statements?                                          10:46:16

11        A     I believe so.                              10:46:18

12        Q     Did Mr. Sanghavi show the statements to    10:46:32

13    anyone else, to your knowledge?                      10:46:36

14        A     Not to my knowledge.                       10:46:39

15        Q     Did you also show the statements to        10:46:43

16    Ms. Robalino?                                        10:46:45

17        A     I don't remember.  I think it was to both of  10:46:47

18    them.                                                10:46:56

19        Q     To your knowledge, did Ms. Robalino show the  10:46:57

20    statements to anyone else?                           10:47:01

21        A     No, not to my knowledge.                   10:47:02

22        Q     Aside from those two and your lawyers, have  10:47:06

23    you talked with any other person about information   10:47:11

24    that's reflected on Navient Solutions's monthly      10:47:14

25    statements?                                          10:47:16
```

Page 30

```
 1                  Where were you?                        10:50:51

 2         A     I don't remember.  I think it was a phone 10:50:53

 3    conversation.                                        10:50:57

 4         Q     Just to be clear, you can't remember any  10:51:08

 5    detail at all about the discussion and what might have 10:51:13

 6    been wrong with your monthly statements; is that right? 10:51:17

 7         A     Correct.                                  10:51:21

 8         Q     Why don't you take a look in this Exhibit 1 10:51:24

 9    at paragraph 95.  Just scroll down.                  10:51:29

10         A     Yes, I'm here.                            10:51:56

11         Q     Why don't you take a couple moments to read 10:51:57

12    that.                                                10:52:01

13               (Document reviewed by the witness.)       10:52:31

14               THE WITNESS:  Yes.                        10:52:31

15    BY MS. SIMONETTI:                                    10:52:32

16         Q     Are these issues that you discussed with  10:52:32

17    Mr. Sanghavi?                                        10:52:35

18         A     Not in this detail.                       10:52:37

19         Q     How is Mr. Sanghavi aware of the Tripodi  10:52:47

20    firm?                                                10:52:52

21         A     I'm not sure.                             10:52:53

22         Q     Did you ask?                              10:52:54

23         A     No.                                        10:53:04

24         Q     Did you contact any other lawyers before you 10:53:04

25    decided to file this case?                           10:53:07
```

Page 33

Naimish Baxi - May 5, 2022

| | | | |
|---|---|---|---|
| 1 | A | No. | 10:53:09 |
| 2 | Q | Let's take a look at the first few bullets | 10:53:12 |
| 3 | | under this paragraph 95.  You see in that first line, it | 10:53:15 |
| 4 | | says: | 10:53:23 |
| 5 | | "For example, in 2014, plaintiff Baxi | 10:53:23 |
| 6 | | made regular monthly payments that | 10:53:26 |
| 7 | | defense allocated inconsistently | 10:53:28 |
| 8 | | inaccessibly towards interest rather | 10:53:31 |
| 9 | | than principal." | 10:53:31 |
| 10 | | Do you see that? | 10:53:35 |
| 11 | A | Yes. | 10:53:35 |
| 12 | Q | Let's work through sentence by sentence. | 10:53:42 |
| 13 | | What information do you have that supports | 10:53:44 |
| 14 | | the statement in that line? | 10:53:46 |
| 15 | A | I don't have information that supports that. | 10:53:53 |
| 16 | Q | If you look at that first bullet, which | 10:54:10 |
| 17 | | states: | 10:54:15 |
| 18 | | "On July 20, 2014, for 1103 Stafford - | 10:54:15 |
| 19 | | unsubsidized, defendants debited | 10:54:20 |
| 20 | | 29 dollars and 40 cents and applied | 10:54:24 |
| 21 | | 12 dollars and 19 cents to interest and | 10:54:27 |
| 22 | | 17 dollars 21 cents to principal." | 10:54:31 |
| 23 | | Do you see that? | 10:54:36 |
| 24 | A | Yes. | 10:54:37 |
| 25 | Q | Where did that information come from? | 10:54:38 |

Page 34

Naimish Baxi - May 5, 2022

```
 1       A      From my statements.                          10:54:41

 2       Q      Okay.  And upon what basis do you believe    10:54:48

 3   that that allegation is true?                           10:54:53

 4       A      Based on what my attorneys have explained to 10:55:04

 5   me based on their --                                    10:55:08

 6       Q      I'm going to caution you.  Don't tell me what 10:55:10

 7   your lawyers have told you.  I'm not asking for that.   10:55:13

 8   I'm asking --                                           10:55:15

 9       A      Sorry.                                       10:55:17

10       Q      I'm asking for what you know.                10:55:18

11              These are allegations made on your claims, so 10:55:20

12   I'm asking you what you know.                           10:55:22

13              Go ahead.                                    10:55:25

14       A      I just know what the statement says; that a  10:55:29

15   certain amount was applied to the interest and a certain 10:55:34

16   amount was applied to the principal.                    10:55:36

17       Q      So based on your understanding of the        10:55:40

18   statement and what would be reflected on the statement, 10:55:42

19   what's wrong with that allocation?                      10:55:45

20       A      I don't know.                                10:55:47

21       Q      All right.  Let's look at the second bullet. 10:55:48

22              And, again, what information do you have that 10:55:54

23   would support the allegation it's incorrect?            10:55:57

24       A      I just have what's in front of me.           10:56:05

25       Q      What is your understanding or belief as to   10:56:11
```

Page 35

| | | |
|---|---|---|
| 1 | how payments should be allocated on your student loans? | 10:56:14 |
| 2 | A    I'm not sure. | 10:56:19 |
| 3 | Q    Do you have any understanding at all? | 10:56:36 |
| 4 | A    I have a basic understanding that there's a | 10:56:41 |
| 5 | principal and interest. | 10:56:44 |
| 6 | Q    Okay. | 10:56:49 |
| 7 | A    Some amount has to be -- some amount of each | 10:56:50 |
| 8 | payment goes towards both of them. | 10:56:53 |
| 9 | Q    Okay.  And in your understanding, what should | 10:56:57 |
| 10 | that allocation be? | 10:57:02 |
| 11 | A    I don't have an understanding.  I imagine | 10:57:04 |
| 12 | it's based on some formula. | 10:57:06 |
| 13 | Q    All right.  So I'm just going to make sure | 10:57:08 |
| 14 | that we're clear here. | 10:57:12 |
| 15 | If you don't have an understanding, what | 10:57:14 |
| 16 | supports your contention that these allegations | 10:57:17 |
| 17 | reflected in paragraph 95 are true? | 10:57:19 |
| 18 | A    I'm not sure. | 10:57:24 |
| 19 | Q    Scroll down a little bit more to 116, and I | 10:57:45 |
| 20 | will tell you, I found these paragraphs just by | 10:57:57 |
| 21 | searching your name.  It's where you show up on. | 10:58:00 |
| 22 | Why don't you read 116 through 118. | 10:58:07 |
| 23 | A    Got it. | 10:58:40 |
| 24 | Q    So you see in the top of that page, it says: | 10:58:44 |
| 25 | "Plaintiff Baxi misallocation - lower | 10:58:48 |

Page 36

Naimish Baxi - May 5, 2022

| | | | |
|---|---|---|---|
| 1 | | interest loans." | 10:58:51 |
| 2 | | Do you see that? | 10:58:51 |
| 3 | A | Yes.  Yes. | 10:58:53 |
| 4 | Q | What does that reference to "lower interest | 10:59:06 |
| 5 | | loans" mean? | 10:59:08 |
| 6 | A | I know there's several loans and the | 10:59:12 |
| 7 | | different loans had different interest rates. | 10:59:18 |
| 8 | Q | Let's look at paragraph 116, which reads: | 10:59:30 |
| 9 | | "For example, on April 20, 2014, | 10:59:34 |
| 10 | | plaintiff Baxi made a payment totaling | 10:59:39 |
| 11 | | 675 dollars and 16 cents.  There's | 10:59:40 |
| 12 | | three loans.  1-01 Sallie Mae Medical | 10:59:44 |
| 13 | | School-Stafford loan.  1-02 Sallie Mae | 10:59:47 |
| 14 | | Medical School-Stafford loan.  And 1-03 | 10:59:52 |
| 15 | | Stafford-unsubsidized." | 10:59:56 |
| 16 | | Do you see that? | 11:00:02 |
| 17 | A | Yes. | 11:00:05 |
| 18 | Q | Are you familiar with the numbering | 11:00:05 |
| 19 | | associated with those loans? | 11:00:07 |
| 20 | A | No. | 11:00:10 |
| 21 | Q | Have you ever seen that type of numbering on | 11:00:11 |
| 22 | | any documents related to Navient Solutions's loans? | 11:00:14 |
| 23 | A | I think they're the numbers on my statements. | 11:00:18 |
| 24 | | I believe I've seen that. | 11:00:23 |
| 25 | Q | Okay.  So if you look at 1-01 Sallie Mae | 11:00:24 |

Page 37

Naimish Baxi - May 5, 2022

| | | |
|---|---|---|
| 1 | Medical School-Stafford loan, what does that mean to | 11:00:30 |
| 2 | you? | 11:00:32 |
| 3 | A    I'm not sure. | 11:00:34 |
| 4 | Q    Let's look at paragraph 117 and this relates | 11:00:43 |
| 5 | to that loan that's 1-03.  That says:  R3. | 11:00:47 |
| 6 | "At the time the interest rate on | 11:00:53 |
| 7 | plaintiff Baxi's loan 1-03 | 11:00:55 |
| 8 | Stafford-unsubsidized loan was higher | 11:00:57 |
| 9 | than the two Sallie Mae loans." | 11:01:02 |
| 10 | Says: | 11:01:04 |
| 11 | "Defendants unilaterally allocated | 11:01:04 |
| 12 | greater portions of his payment toward | 11:01:06 |
| 13 | the Sallie Mae loans (with lower | 11:01:08 |
| 14 | interest rates)." | 11:01:13 |
| 15 | Then there are three payments that are detailed | 11:01:15 |
| 16 | there in bullets. | 11:01:19 |
| 17 | Where does the information in those bullets | 11:01:24 |
| 18 | come from? | 11:01:28 |
| 19 | A    My statements. | 11:01:30 |
| 20 | Q    Did you provide that information to include | 11:01:36 |
| 21 | in this complaint? | 11:01:39 |
| 22 | A    I provided -- yes, I provided my statements. | 11:01:41 |
| 23 | Q    Okay.  Did you identify these transactions as | 11:01:47 |
| 24 | being examples of supposed misallocation of payments? | 11:01:51 |
| 25 | A    No. | 11:01:57 |

Page 38

Naimish Baxi - May 5, 2022

| | | |
|---|---|---|
| 1 | Q    Is there anything that you can point to on | 11:01:59 |
| 2 | any monthly statement that would support a suggestion of | 11:02:03 |
| 3 | misallocated payments? | 11:02:07 |
| 4 | A    No. | 11:02:09 |
| 5 | Q    So upon what basis do you believe that the | 11:02:13 |
| 6 | allegations in those bullets is correct? | 11:02:17 |
| 7 | A    I'm not sure. | 11:02:19 |
| 8 | Q    Do you have any belief at all? | 11:02:24 |
| 9 | A    Yeah.  I'm not sure. | 11:02:28 |
| 10 | I mean, upon what basis?  I'm not sure. | 11:02:36 |
| 11 | Yeah.  I don't know. | 11:02:39 |
| 12 | Q    What is your understanding or belief as to | 11:02:45 |
| 13 | how Navient Solutions is supposed to allocate payments | 11:02:48 |
| 14 | across loans? | 11:02:55 |
| 15 | A    I'm not sure how they're supposed to.  I just | 11:03:01 |
| 16 | know it's formulated.  I'm sorry.  I'm assuming there's | 11:03:06 |
| 17 | some formula, but I don't know specifically how. | 11:03:26 |
| 18 | Q    Did you ever call Navient Solutions to | 11:03:30 |
| 19 | discuss the allegation of payments on your loans? | 11:03:33 |
| 20 | A    No. | 11:03:37 |
| 21 | Q    But you did call Navient Solutions on a good | 11:03:39 |
| 22 | number of occasions over the years, would you agree? | 11:03:43 |
| 23 | A    Correct. | 11:03:46 |
| 24 | Q    Did you ever ask for any explanation as to | 11:03:48 |
| 25 | application of payments in any way? | 11:03:54 |

Page 39

Naimish Baxi - May 5, 2022

```
 1        A     No.                                          11:03:57

 2        Q     How about capitalized interest?              11:03:58

 3        A     No.                                          11:04:01

 4        Q     If you look on the allegations in            11:04:08

 5   paragraph 118, which I won't read, you can read them, do 11:04:10

 6   you have any information that supports the allegations?  11:04:16

 7        A     No.                                          11:04:21

 8        Q     What's your understanding of what you're     11:04:35

 9   seeking in this lawsuit?                                11:04:36

10        A     I'm not sure.  I'm not really seeking        11:04:48

11   anything other than -- yeah.                            11:04:53

12              I'm not sure how to answer that.  I'm not    11:04:57

13   seeking anything like tangible.                         11:04:59

14        Q     Then what's your purpose in bringing the     11:05:05

15   lawsuit?                                                11:05:07

16        A     Well, I think that if these -- I think these 11:05:09

17   inconsistent -- these -- I'm not sure how to answer     11:05:17

18   that.                                                   11:05:23

19              I just need a second to think about it.      11:05:23

20        Q     Sure.                                        11:05:26

21        A     Can you repeat the question?                 11:05:27

22              MS. SIMONETTI:  D'Anne, can you just read it 11:05:30

23   back.                                                   11:05:32

24              (The record was read as follows:             11:05:32

25        Q     Then what's your purpose in                  11:05:05
```

Page 40

Naimish Baxi - May 5, 2022

```
 1                  bringing the lawsuit?)                  11:05:07

 2                  THE WITNESS:   My purpose is -- well, twofold,   11:05:55

 3     I guess.                                             11:05:59

 4                  My purpose is if these allegations are true,   11:06:00

 5     then I think that Navient has to be held accountable.   11:06:06

 6     BY MS. SIMONETTI:                                    11:06:15

 7          Q     Okay.  So how have you been harmed in any way   11:06:15

 8     by the servicing of your loans by Navient Solutions?   11:06:20

 9          A     I'm sorry.  How have I been -- can you repeat   11:06:24

10     that once more?                                      11:06:32

11          Q     Sure.                                     11:06:33

12                How have you been harmed in any way by   11:06:34

13     Navient Solutions servicing of your student loans?   11:06:37

14          A     How have I been harmed?                   11:06:42

15                I'm not sure.                             11:06:55

16          Q     Can you think of anything?                11:06:57

17          A     I cannot.                                 11:07:08

18          Q     If you take a look back for a moment at these   11:07:09

19     paragraphs 116 to 118, is there a reason that the   11:07:13

20     transactions discussed in here are from 2014?       11:07:20

21          A     I don't know.                             11:07:24

22          Q     Was there ever a point in time that you had   11:07:33

23     difficulty receiving the monthly statements from Navient   11:07:39

24     Solutions?                                           11:07:47

25          A     I don't remember.                         11:07:47
```

Page 41

Naimish Baxi - May 5, 2022

| | | |
|---|---|---|
| 1 | Q    Did you ever call Navient Solutions to ask | 11:07:55 |
| 2 | about any information on your monthly statement? | 11:07:59 |
| 3 | A    I have called them.  Yes, I have called them. | 11:08:04 |
| 4 | I don't remember if I called them like asking for | 11:08:10 |
| 5 | information. | 11:08:14 |
| 6 | Q    Have you ever called Navient Solutions to ask | 11:08:20 |
| 7 | for an explanation for anything reflected on your | 11:08:23 |
| 8 | monthly statement? | 11:08:26 |
| 9 | A    Not that I recall. | 11:08:27 |
| 10 | Q    Has Navient Solutions charged artificially | 11:08:41 |
| 11 | inflated minimum interest payments on your loans? | 11:08:45 |
| 12 | A    I don't know. | 11:08:48 |
| 13 | Q    Has Navient Solutions misapplied any | 11:08:53 |
| 14 | capitalized interest to your loans? | 11:08:56 |
| 15 | A    I don't know. | 11:08:59 |
| 16 | Q    Do you have any view as to adequacy of | 11:09:11 |
| 17 | Navient Solutions customer service? | 11:09:17 |
| 18 | A    No. | 11:09:20 |
| 19 | Q    When you called Navient Solutions, did they | 11:09:26 |
| 20 | assist you with the questions and issues that you had? | 11:09:29 |
| 21 | A    I don't remember. | 11:09:35 |
| 22 | Q    I think you told me earlier that you listened | 11:09:36 |
| 23 | to some call recordings; is that right? | 11:09:42 |
| 24 | A    Yes. | 11:09:45 |
| 25 | Q    How many did you listen to? | 11:09:46 |

Page 42

Naimish Baxi - May 5, 2022

```
 1    call that you listened to?                        11:11:09

 2         A    I think it was me requesting for deferment or   11:11:12

 3    forbearance; one or the other.  Maybe I only listened to  11:11:22

 4    two calls.  I'm sorry.                            11:11:27

 5         Q    That's okay.                            11:11:28

 6              Did you receive a forbearance through that  11:11:45

 7    telephone call?                                   11:11:48

 8         A    I don't remember.  I mix up one or the other.  11:11:49

 9         Q    I'm just talking about the telephone call  11:11:57

10    during the conversation.                          11:12:00

11         A    Yeah.  I don't remember if I received a  11:12:00

12    forbearance or not in that call.                  11:12:02

13         Q    Do you remember any instance where you called  11:12:07

14    Navient Solutions and you were not provided assistance  11:12:10

15    that you needed?                                  11:12:14

16         A    No, I don't remember.                   11:12:16

17         Q    Do you remember making more calls than two?  11:12:20

18         A    I think I've made more than two calls.  11:12:24

19         Q    Do you have any belief that Navient Solutions  11:12:38

20    repayment system is designed to delay repayment for  11:12:41

21    student loans?                                    11:12:47

22         A    I'm sorry.  Can you repeat that?        11:12:48

23         Q    Do you have any reason to believe that  11:12:59

24    Navient Solutions's repayment system is designed to  11:13:01

25    delay repayment of student loans?                 11:13:05
```

Page 44

```
 1        A      Yeah.  My understanding is -- yes, that it is    11:13:08

 2     or might be.                                               11:13:20

 3        Q      Okay.  What's the basis for that                 11:13:21

 4     understanding?                                             11:13:23

 5        A      Discussions with my lawyer.                      11:13:24

 6        Q      Is there anything else?                          11:13:29

 7        A      No.                                              11:13:32

 8               MR. TRIPODI:  Let me know when you have a        11:13:40

 9     chance to break for about five minutes.                   11:13:42

10               MS. SIMONETTI:  Yeah.  Just a few minutes and    11:13:46

11     we can probably be done.                                  11:13:48

12               MR. TRIPODI:  Okay.                              11:13:49

13     BY MS. SIMONETTI:                                          11:13:54

14        Q      Mr. Baxi, do you have an understanding that      11:13:54

15     Navient Solutions documents and customer service is       11:13:56

16     designed to impede the discovery of errors on accounts?   11:14:03

17        A      I am not aware.                                  11:14:09

18        Q      Do you have any reason to believe that          11:14:13

19     Navient Solutions has concealed any information from you  11:14:16

20     regarding your student loans?                             11:14:19

21        A      I do not.                                        11:14:22

22        Q      We talked about this a little bit more and      11:14:26

23     apologize if I'm repeating myself, but do you have a      11:14:29

24     basis for believing that Navient Solutions's monthly      11:14:32

25     statements are misleading?                                11:14:37
```

Page 45

Naimish Baxi - May 5, 2022

```
1        A     No, I'm not sure.                        11:14:39

2        Q     Do you have a belief that Navient Solutions    11:14:46

3    promotes the use of cosigners?                     11:14:49

4              Do you know what a cosigner is?           11:14:52

5        A     I'm not entirely sure what a cosigner is.    11:14:54

6        Q     So do you have any beliefs about Navient    11:14:58

7    Solutions's practices with respect to cosigners?    11:15:01

8        A     I don't have any beliefs of that.         11:15:04

9        Q     Are you aware of any loyalty program offered    11:15:07

10   by Navient Solutions?                              11:15:11

11       A     I am not.                                 11:15:13

12       Q     Have you ever heard of something called    11:15:14

13   Upromise?                                          11:15:16

14       A     I have like seen -- I have seen that, but --    11:15:19

15   I've seen that logo on something, but I don't know what    11:15:24

16   that is.                                           11:15:27

17       Q     Do you know what is the office of customer    11:15:31

18   advocate at Navient Solutions?                     11:15:34

19       A     No.                                       11:15:37

20       Q     Have you ever had any communications with    11:15:38

21   that office?                                       11:15:40

22       A     I don't know.  I don't think so.         11:15:41

23       Q     Have you ever had any understanding about    11:15:44

24   what it does?                                      11:15:49

25       A     I don't know.                            11:15:51
```

Page 46

| | | |
|---|---|---|
| 1 | MR. TRIPODI:  Okay.  We'll probably be back | 12:18:28 |
| 2 | before the hour.  If you want to come back earlier, | 12:18:31 |
| 3 | we'll let you know when we're available.  That's fine. | 12:18:33 |
| 4 | MS. SIMONETTI:  It will probably take me an | 12:18:37 |
| 5 | hour just to get through this. | 12:18:40 |
| 6 | MR. TRIPODI:  Okay. | 12:18:42 |
| 7 | MS. SIMONETTI:  You can e-mail me. | 12:18:43 |
| 8 | (Whereupon, a lunch recess was held | 12:18:43 |
| 9 | from 12:18 a.m. to 1:21 p.m.) | 13:21:48 |
| 10 | MS. SIMONETTI:  Back on the record. | 13:21:48 |
| 11 | BY MS. SIMONETTI: | 13:21:49 |
| 12 | Q    Mr. Baxi, we've looked at a number of monthly | 13:21:50 |
| 13 | statements already today. | 13:21:52 |
| 14 | Do you agree? | 13:21:54 |
| 15 | A    Yes. | 13:21:55 |
| 16 | Q    Is there any monthly statement from any | 13:21:57 |
| 17 | period of time that you can point to in support of the | 13:22:00 |
| 18 | allegation that there is misallocation of payments? | 13:22:04 |
| 19 | A    I cannot specifically point to one. | 13:22:07 |
| 20 | Q    Okay.  We can go through a lot more, but if | 13:22:11 |
| 21 | there is nothing you can identify on any monthly | 13:22:14 |
| 22 | statement, I won't proceed with showing them to you. | 13:22:17 |
| 23 | A    Correct.  I don't think I can identify one | 13:22:23 |
| 24 | particular one. | 13:22:26 |
| 25 | MS. SIMONETTI:  Let me ask you to look at a | 13:23:32 |

Page 70

| | | |
|---|---|---|
| 1 | someone that has loan service by Navient that, you know, | 13:55:20 |
| 2 | that has examples of what we're claiming. | 13:55:26 |
| 3 | Q   To be clear, what you're claiming is that | 13:55:33 |
| 4 | there was misallocation of payments on your loans? | 13:55:35 |
| 5 | A   Yes. | 13:55:40 |
| 6 | Q   Are you claiming anything else? | 13:55:42 |
| 7 | A   No, I don't think so. | 13:55:44 |
| 8 | Q   So in your role as a proposed class | 13:55:58 |
| 9 | representative, what are your obligations? | 13:56:01 |
| 10 | A   My obligations are just to give my attorneys | 13:56:05 |
| 11 | the information that helps with this case and I'm | 13:56:13 |
| 12 | obligated to represent potentially the other people in | 13:56:23 |
| 13 | the class. | 13:56:30 |
| 14 | Q   At this point, have you told me about all the | 13:56:35 |
| 15 | information you provided to your lawyers about the case? | 13:56:38 |
| 16 | A   I believe so. | 13:56:44 |
| 17 | Q   Just to make sure we're clear, have you | 13:56:52 |
| 18 | discussed your claims with any persons other than your | 13:56:54 |
| 19 | lawyers and Mr. Ibrahim? | 13:57:00 |
| 20 | A   No. | 13:57:02 |
| 21 | Q   So as you sit here right now, are you aware | 13:57:05 |
| 22 | of any other person who believes that there was | 13:57:07 |
| 23 | misallocation of payments on student loans? | 13:57:10 |
| 24 | A   I guess yes, Michelle, who is initially the | 13:57:23 |
| 25 | person that referred me.  But other than her, no. | 13:57:27 |

Page 87

Naimish Baxi - May 5, 2022

| | | | |
|---|---|---|---|
| 1 | Q | That's Ms. Robalino; correct? | 13:57:38 |
| 2 | A | Correct. | 13:57:41 |
| 3 | Q | Did Ms. Robalino ever contact Navient | 13:57:43 |
| 4 | Solutions about any issues regarding misallocation? | | 13:57:47 |
| 5 | A | I'm not sure. | 13:57:50 |
| 6 | Q | Did she tell you that she did? | 13:57:53 |
| 7 | A | No. | 13:57:57 |
| 8 | Q | Can you think of a reason why she wouldn't? | 13:58:02 |
| 9 | A | I'm not sure. | 13:58:11 |
| 10 | Q | Have you kept a record of how much time you | 13:58:21 |
| 11 | have spent on the case? | | 13:58:24 |
| 12 | A | I have not. | 13:58:27 |
| 13 | Q | Can you estimate how much time you spent on | 13:58:31 |
| 14 | the case? | | 13:58:34 |
| 15 | A | I don't think I can give a ballpark.  I truly | 13:58:34 |
| 16 | don't know. | | 13:58:45 |
| 17 | Q | Well, there would be a big difference | 13:58:46 |
| 18 | between, say, two hours and a thousand hours. | | 13:58:49 |
| 19 | | Can you estimate it in any way? | 13:58:52 |
| 20 | A | Yes.  It's not a thousand hours.  Yeah.  I | 13:58:55 |
| 21 | can't really give you a reasonable estimate, so -- but | | 13:59:02 |
| 22 | it's not a thousand hours. | | 13:59:06 |
| 23 | Q | I'm assuming it's not two hours since we've | 13:59:09 |
| 24 | been sitting here for more than that today? | | 13:59:13 |
| 25 | A | Correct. | 13:59:16 |

Page 88

IN THE UNITED STATES DISTRICT COURT

FOR THE STATE OF NEW JERSEY

_____

BRIAN MANETTA, et al,

   Plaintiffs,

Vs.                                    NO. 2:20-cv-07712-SDW

NAVIENT CORPORATION et al,

   Defendants.

_____

DEPOSITION

OF

MAHMUD IBRAHIM

May 24th, 2022

Page 1

1   your student loans?

2      A.   It was some time in 2020.  I don't

3   remember the exact date.

4      Q.   Well, this complaint was filed on June

5   24th, 2020.  Does that help you remember?

6      A.   I'm assuming was a few months before

7   then.

8      Q.   All right.  How did you come to believe

9   that you might have legal claims?

10      A.   One of my former co-residents, Michelle

11   Roblina (Phonetic), had contacted me and sent

12   that.  Her husband had noticed some

13   inconsistencies in her account and asked if --

14   he also noticed in his account as well.  Then I

15   guess they asked a few other people and had

16   noticed similar issues in their accounts.

17          So she reached out to me and asked if

18   they can see some of my statements to see if

19   they find the same inconsistencies, which they

20   did, and then from there her husband, Maulik,

21   had referred us to our attorney.

22      Q.   What is her husband's name?

23      A.   Maulik.  M A U L I K.

24      Q.   What's his last name?

Veritext Legal Solutions
866 299-5127

```
 1      A.    I'm not sure.

 2      Q.    Does "Sanghavi" sound familiar to you?

 3      A.    Yes, that's it.

 4      Q.    What were the inconsistencies that they

 5   identified on their loans?

 6      A.    That the payments were being applied

 7   appropriately.

 8      Q.    What was wrong with how the payments

 9   were being applied?

10      A.    More of the payment was going towards

11   the interest rather than the principal, thereby

12   leaving a higher principal balance and in turn

13   creating more interest down the line.

14      Q.    Did they identify any other

15   inconsistencies?

16      A.    And that the payments were being

17   applied more towards the lower-interest loans

18   rather than the higher-interest loans.

19      Q.    Anything else?

20      A.    Those were the two major issues.

21      Q.    Were there any other issues at all that

22   they identified on their loans?

23      A.    The customer service thing that you

24   brought up earlier.  In terms of my loan
```

1      Q.    What is your understanding of any

2    inconsistencies that appear on your student

3    loans?

4      A.    So same thing we mentioned earlier.  So

5    it is the payments were being erratically

6    applied to more of the interest rather than the

7    principal payment, and the payments were being

8    applied to the lower-interest loans rather than

9    the higher-interest loans.

10     Q.    Are there any specific instances that

11   you looked at that reflect what you just said?

12     A.    That I found, no, not until the

13   attorneys pointed it out to me.

14     Q.    If you look at a statement at this

15   point in time are you capable of identifying any

16   transaction that you think reflects an

17   inconsistency?

18     A.    No.

19     Q.    Do you have any ability to do that at

20   all?

21     A.    I do not, no.

22     Q.    Do you know whether Mr. Sanghavi or his

23   wife contacted Navient Solutions about these

24   inconsistencies?

Veritext Legal Solutions
866 299-5127

```
 1      A.   I do not, no.

 2      Q.   Do you know whether they took any

 3  action at all about the inconsistencies?

 4      A.   I have no idea.

 5      Q.   Have you talked with either of them

 6  about this lawsuit?

 7      A.   No, not since they initially referred

 8  me to the attorney.

 9      Q.   Do you remain in contact with

10  Mr. Sanghavi?

11      A.   I haven't talked to him, like I said,

12  since he referred us.

13      Q.   How about his wife, Ms. Roblina?  I

14  think she has a hyphenated last name.

15      A.   No.  Again, I haven't talked to her --

16  I have not talked to her at all since they

17  referred us.

18      Q.   So aside from speaking with them and

19  turning over documents, have you done anything

20  to confirm the allegations in the complaint are

21  true as to your claims?

22      A.   Nothing.  I defer all that to the

23  experts.

24      Q.   But you haven't spoken with an expert
```

Veritext Legal Solutions
866 299-5127

```
 1                 IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF NEW JERSEY
 3
     BRIAN MANETTA, SERGIO PEREIRA,    )
 4   ESTHER SYGAL-PEREIRA, MATTHEW     )
     MARKOSIAN, NAIMISH BAXI, HARVEY   )Case No.:
 5   MINANO, SYDNEY PECK, MAHMUD       )2:20-cv-07712-SDW-
     IBRAHIM, and GEORGE AMORES,       )LDW
 6   individually and on behalf of     )
     all others similarly situated,    )
 7                                     )Pages 1 to 112
            Plaintiffs,                )
 8                                     )
       vs.                             )
 9                                     )
     NAVIENT CORPORATION, NAVIENT      )
10   SOLUTIONS, LLC f/k/a NAVIENT      )
     SOLUTIONS, INC. F/k/a SALLIE      )
11   MAE, INC., and SLM CORPORATION,   )
                                       )
12          Defendants.                )
     _____)
13
14
15                    DEPOSITION OF:
16                 BRIAN JOSEPH MANETTA
17                WEDNESDAY, MAY 25, 2022
18            7:00 a.m. Pacific Standard Time
19
20
21   REPORTED BY:
22   Vickie Blair
23   CSR No. 8940, RPR-CRR
24   JOB NO. 5187000
25   PAGES 1 - 112
```

                                                    Page 1

```
 1          A      That I don't know.

 2          Q      How would you determine that?

 3          A      I don't think that I could determine that.

 4          Q      Why not?

 5          A      Because I'm not a forensic accountant.

 6          Q      Why would a forensic accountant be needed to

 7    make that determination?

 8          A      I just don't think I have the math skills to

 9    go back and reallocate interest payments, it seems like

10    a very complicated and daunting task to me, it's not one

11    that I'm particularly suited for.  I don't know how I

12    would be able to do that.

13          Q      Did you ever ask anyone else if they would

14    be able to do that?

15          A      I actually made an appointment with my

16    accountant because I thought something was wrong with

17    the way the loans were coming out, but unfortunately he

18    passed away, and then -- before we could have that

19    meeting, and so I never -- I didn't have that -- that

20    meeting was never held.

21          Q      How about Mr. Sanghavi, did you ask him?

22          A      Yes.

23          Q      And was he able to perform this with respect

24    to his own loans?

25          A      With respect to his own loans?  I'm not sure
```

Page 28

1    what he did with respect to his loans, except to

2    identify a potential issue for me, and when I looked at

3    it, I said, yes, I think that's -- what he was telling

4    me, which, obviously, the substance I can't recall at

5    this point precisely, but what he was saying was kind of

6    in accord with what I had been suspecting.

7         Q     So what's your best recollection, if you

8    can't remember specifically?  What did he tell you that

9    he found on his own loans?

10        A     That there was misapplication of payments,

11   overpayments not going to principal, things like that.

12        Q     Is that all he told you?

13        A     I think -- I think we discussed -- it's all

14   that he told me that I can recall.  Just the

15   misallocation and -- and payments kinda not going where

16   they were supposed to go.

17        Q     Did you do anything to follow up on what he

18   told you?  Did you call Navient Solutions?  Did you do

19   anything other than contact counsel?

20        A     I did not.

21        Q     What's the status of Mr. Sanghavi's

22   litigation against Navient Solutions?

23        A     I'm not sure.  I don't know.

24        Q     Do you know anything about it at all?

25        A     I know it's been going on for some time, but

Page 29

```
 1    I don't know which stage.  I would assume that there has
 2    not been a trial, but I don't know.
 3         Q     When's the last time you spoke with
 4    Mr. Sanghavi?
 5         A     He's one of my very good friends, I speak to
 6    him pretty regularly.
 7               THE REPORTER:  I'm sorry, I didn't hear the
 8    tail end of what you said.
 9               THE WITNESS:  Yeah, I was just pausing
10    because I heard a dog.
11               THE REPORTER:  But you were still talking
12    while the dog was barking.  Here's what I have you
13    saying.
14                    (Record read as follows:
15                    "Q  He's one of my very good
16               friends, I speak to him pretty regularly.")
17               THE WITNESS:  Yeah, I speak to him pretty
18    regularly, not -- not only about the -- about -- about
19    his litigation, which, yeah, is occurring, but, you
20    know, we talk about our families, talk about that kind
21    of thing, so --
22    BY MS. SIMONETTI:
23         Q     How do you know him?
24         A     The 8:00 a.m. first day of law school, he
25    sat next to me, and we went through the contracts class,
```

Page 30

```
 1          A      Yeah, I think it's all -- I think it's all
 2     in the complaint.
 3          Q      Okay.  So let's take a look at paragraph 99.
 4          A      Okay.  Do you mind, I printed out a hard
 5     copy, can I use the hard copy?
 6          Q      Yeah.
 7          A      Is that okay?
 8          Q      Definitely.
 9          A      Yeah, I'm there.
10          Q      Okay.  So this is the section entitled
11     "Plaintiff Manetta Misallocation - Principal/Interest."
12                 Okay.  In paragraph 100 --
13          A      Uh-huh.
14          Q      -- this references loan 1-01 consolidation.
15          A      Uh-huh.
16          Q      Do you recognize that as the loan
17     identifying number?
18          A      Yes.
19          Q      And then there are four bullet points --
20          A      Uh-huh.
21          Q      -- under your -- let's just take the first
22     one as an example (as read):
23                           On July 20, 2007, defendants debited
24                  $204.06 and applied $193.80 to interest and
25                  $10.26 to principal.
```

Page 32

```
 1                      Do you see that?
 2        A      Yes.
 3        Q      Okay.  How -- how is that an example of
 4   misallocation?
 5        A      That is an example of the misallocation
 6   because I think when you look at the next bullet points,
 7   the interest -- how much is applied to interest and
 8   principal are constantly fluctuating.
 9        Q      Okay.  Do you know how interest accrues on
10   your student loans?
11        A      The -- it's my understanding that it accrues
12   daily.
13        Q      Okay.  Where did this information come from?
14        A      I believe this came from the -- this
15   information came from the Navient website.
16               If you -- it's extraordinarily difficult to
17   find on the website, but I think -- I think I was able
18   to, and I might have been assisted by Mr. Sanghavi, by
19   Maulik as to how to even find it.
20               I know with my private loans, it was very
21   easy to just click on something, and it gave you a chart
22   of how this is done, this is how this is done.
23               I had to go through awhile on the Navient
24   website to get to -- I believe you can export your
25   payment history and how it's allocated on Excel, and
```

Page 33

```
 1    that's all.
 2        A       Yeah, my recollection is, no, I've paid on
 3    time.
 4        Q       Has capitalized interest ever been applied
 5    to your loans?
 6        A       I don't know.
 7        Q       What's capitalized interest?
 8        A       I would be guessing wildly as to what the
 9    definition of capitalized interest is.  I believe I
10    understand the concept, where the interest becomes part
11    of the principal, but I don't think I can give you
12    anything more than that.
13        Q       Is there anything on this first page of this
14    statement that is confusing to you?
15        A       Confusing to -- can you -- can you ask that
16    question again?  Confusing to me how?
17        Q       In any way.  Do you understand it?
18        A       I understand the question, it's pretty
19    broad.  As I'm reading it now, I don't seem confused.
20        Q       Okay.  Let's go to the second page.
21                Do you remember reviewing the page that
22    looks like this, it's formatted like this, in the past?
23        A       And we're talking about the number ending
24    87; correct?
25        Q       Yes.
```

1      Q      Do you have any understanding of what

2  obligations Navient Solutions might have under

3  regulations promulgated through the Department of

4  Education?

5      A      I do not.

6      Q      Do you have a belief that the allocation

7  amounts that we looked at before has caused you

8  financial harm?

9      A      Do I have a belief that it has caused me

10  financial harm?

11      Q      Uh-huh.

12      A      Yes.

13      Q      And is that based only upon what you've been

14  told by Mr. Sanghavi and others?

15      A      It's based on that, it's based on my initial

16  suspicion that something was amiss, yes.

17      Q      Remind me when that initial suspicion arose?

18      A      2016, 2017.

19      Q      That's right.  And remind me again what

20  caused you to suspect that?

21      A      What caused me to suspect that was certainly

22  in part that my -- my private loans, the principal was

23  being reduced at a -- at a -- at a rate that was -- the

24  principal was being reduced much faster than the federal

25  loans.

                                        Page 102

```
 1          IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF NEW JERSEY
 2
 3     X---------------------------X
        BRIAN MANETTA, SERGIO      : CIVIL ACTION
 4      PEREIRA, ESTHER            : DEPOSITION OF:
        SYGAL-PEREIRA, MATTHEW     :
 5      MARKOSIAN, NAIMISH BAXI,   :
        HARVEY MINANO, SYDNEY      :
 6      PECK, MAHMUD IBRAHIM and   :
        GEORGE AMORES,             :    MATTHEW
 7      individually and on        :  MARKOSIAN
        behalf of others           :
 8      similarly situation,       :
                    Plaintiffs,    :
 9                                 :
               vs.                 :
10                                 :
        NAVIENT CORPORATION,       :
11      NAVIENT SOLUTIONS, LLC     :
        f/k/a NAVIENT SOLUTIONS,   :
12      INC. f/k/a SALLIE MAE,     :
        INC., and SLM              :
13      CORPORATION,               :
                    Defendants.    :
14                                 :
       X---------------------------X
15
16     C O M P U T E R I Z E D   T R A N S C R I P T
       of the stenographic notes of the proceedings in
17     the above-entitled matter as taken by and before
       MELISSA J. LUMI, a Certified Court Reporter, No.
18     30X100237000, and Notary Public of the State of
       New Jersey, taken remotely, on October 12, 2022
19     commencing at 10:00 in the forenoon.
20
21
22
23
24
25
```

```
 1            Q.      I'm going to try to get another
 2     exhibit to show up here.  Sometimes that can be a
 3     challenge, but we're going to try.
 4            A.      I have it.
 5            Q.      You got it?   Great.
 6                    (Complaint is received and marked
 7     as Exhibit 2 for identification.)
 8            Q.      So Exhibit 2 is the Complaint
 9     filed in this case on June 24, 2020.  Have you
10     seen this document before?
11            A.      Yeah, I believe -- yeah, I've seen
12     the Complaint.
13            Q.      Did you review it before it was
14     filed?
15            A.      I believe I did.
16            Q.      Okay.  Did you make any changes to
17     the draft?
18            A.      Me personally, no.
19            Q.      Okay.  How did you learn that you
20     had any supposed claims against Navient?
21            A.      Well, Maulik Sanghavi was a friend
22     of mine, we went to law school together, and he
23     had mentioned to me that he had what he thought
24     was an issue with his school loans and we -- you
25     know, I happened to have the same company, so he
```

Page 21

1    said that he was speaking with a law firm in, I

2    believe in New York, about it and that it might

3    be a good idea if I provide them my documentation

4    so that they can review my account to see if I'm

5    having the same issue that he was having.

6            Q.    What's the issue that he was

7    having?

8            A.    I don't -- honestly, I don't

9    remember him articulating the specific issue at

10   that time.  I mean, I've come to understand after

11   reviewing the complaint what the issues are, but

12   I don't my knowledge at that time.  I don't

13   really remember having specific knowledge of what

14   exactly the issue was, and he said send it over

15   and I did.

16           Q.    So prior to that conversation, you

17   had no reason to believe that there was anything

18   wrong with the servicing of your student loan?

19           A.    No.  I mean, like I said, it had

20   been on auto pay.  It wasn't something, you know,

21   that I looked at very closely.  I mean, it's a

22   bill that had to get paid every month, and, you

23   know, I paid it every month.  I wasn't really

24   paying attention to anything specific about it

25   nor did I think there would be any reason to

                                        Page 22

```
 1    scrutinize, you know, my law school loans and the
 2    repayment thereof.
 3           Q.     Okay.  And in the conversation
 4    that you just related to me, you can give me no
 5    further detail about what the issue was that Mr.
 6    Sanghavi described.  Is that right?
 7           A.     I don't -- you know, not sitting
 8    here today.  I don't have a specific recollection
 9    of what he told me his issue was.  I don't
10    remember.  All I remember was there was, you
11    know, something might not have been right or
12    might have not been done the right way, but
13    beyond that, I can't tell you anymore about the
14    content of that conversation.  I don't even
15    remember, frankly, when it was.  I think it was
16    pre-pandemic.
17           Q.     Do you have any recollection of
18    when it was at all?
19           A.     Like I said, I can tell you that
20    it was pre-pandemic, but beyond that, I would be
21    guessing.  I mean, it certainly wasn't, for
22    example, it wasn't in 2015 or anything like that.
23    I could give you a general window of time, you
24    know, but I couldn't identify specifically the
25    year.
```

Veritext Legal Solutions
866 299-5127

```
 1    of it.
 2            Q.      Okay.  How did you develop that
 3    understanding?
 4            A.      I think just from the complaint.
 5            Q.      Where did the information
 6    underlying the allegations in the complaint come
 7    from?
 8            A.      My information?
 9            Q.      Right.  Your information.
10            A.      From documentation I presume that
11    I had provided.
12            Q.      What documentation did you
13    provide?
14            A.      I think I just gave access to my
15    online account.  I don't remember -- I mean, I
16    think I -- you know, I don't remember anything
17    beyond that.  I may have had some documents, some
18    original loan documents that I provided myself
19    that I had to find in my records, but I don't
20    really remember anything other than that.
21            Q.      Did you review anything that you
22    provided to your lawyers in connection with the
23    preparation of this complaint?
24            A.      I mean, no.  No.  I mean, I --
25    like I said, I think I had to find a document,
```

Page 25

```
 1    like one of the original loan documents, if I
 2    remember.  If I reviewed it, I don't know.  I
 3    wouldn't say reviewed.  I certainly looked at it.
 4    I identified it as a document that he needed, but
 5    I didn't review any documents, you know, in the
 6    sense that I was looking to confirm anything, or
 7    I didn't look at the documents from a lawyer's
 8    perspective.  I just gave the information that
 9    they were looking for.
10            Q.    I'm not asking you at all for any
11    lawyer's perspective.  I understand you're a
12    lawyer.  I'm just asking you as a Plaintiff, as a
13    Plaintiff fact witness.  I'm not asking you for
14    any lawyer analysis in any way whatsoever.
15                So let's look at Paragraph 40 in
16    the complaint if you scroll down.  That is, I
17    think, Page 13.
18            A.    Okay.
19            Q.    Okay.  So why don't you take a
20    moment to read that.
21            A.    Paragraph 164?
22            Q.    Paragraph 40 on Page 13.
23            A.    Oh, forgive me.  I went to Page
24    40.  Okay.
25            Q.    Okay.  So where did this
```

Page 26

1    information come from in Paragraph 40?

2         A.    I assume from my loan documents.

3         Q.    Do you have any independent reason

4    to believe that these loan figures are correct?

5    There's a reference to your total loans, $19,000.

6    Is that correct?

7         A.    I guess that's what I assume the

8    loan documents say.  Like I said, I didn't -- I

9    didn't have a specific recollection of how much

10   outstanding there was, but --

11        Q.    When you read this complaint, did

12   you think that you should take a look at

13   something to make sure these allegations are

14   correct?

15        A.    Well, I -- so I don't -- I'm

16   sorry.  Can you repeat that question?

17        Q.    When you reviewed the draft

18   complaint, did you think that you should look at

19   anything to see if the allegations were correct?

20        A.    Did I think -- no, I didn't think

21   that I should review anything.

22        Q.    Okay.  Can you scroll down to

23   Paragraph 102 that's on Page 25?  You can look at

24   102 and 104.

25        A.    Okay.

Page 27

1          Q.     Why don't you take a minute to
2    read those.
3          A.     Okay.
4          Q.     Okay.  Do you have any independent
5    basis for believing that these allegations are
6    true other than just reading them here in the
7    complaint?
8          A.     Other than -- my understanding is
9    there's an expert -- no, I don't have any -- I
10   don't have any independent basis to -- no.  I
11   mean, my understanding is that there was some
12   sort of review by an expert.  I'm certainly not
13   an expert.  I could not figure any of this stuff
14   out.
15         Q.     Have your loans ever been
16   delinquent?
17         A.     Possibly.  There might have been a
18   period of time in -- shortly after law school.  I
19   don't know -- I don't know when the loans are
20   considered -- when loans go from overdue to
21   delinquent.  I don't believe that my loans have
22   ever been, quote unquote, delinquent, but to the
23   extent delinquent has a specific meaning versus
24   just overdue, I'm not aware of my loans ever
25   being delinquent.

Veritext Legal Solutions
866 299-5127

1          Q.      So when I use the word delinquent,
2     I just mean payments late.  There's no special
3     meaning to it.  That's all it means.  Late.
4          A.      Okay.  Then yes, I've made late
5     payments.
6          Q.      Okay.  Do delinquent payments have
7     any impact on the allocation of payments?
8          A.      I don't know.
9          Q.      Okay.  What's capitalized
10    interest?
11         A.      What is capitalized interest?
12    Capitalized -- you're looking for like a
13    definition of capitalized interest, my
14    understanding?
15         Q.      Yes.  What is your understanding
16    of the meaning of the words capitalized interest?
17         A.      I don't know that I can give you a
18    definition.
19         Q.      Okay.  Has Navient ever applied
20    capitalized interest in your student loans?
21         A.      I don't know.
22         Q.      If they did that, would that have
23    been improper?
24         A.      I don't know.
25         Q.      Okay.  Can you tell me how you

Veritext Legal Solutions
866 299-5127

1    have been harmed in any way by anything that

2    Navient did in servicing your loans?

3            A.      Well, if I have been paying back

4    my loan over a longer period of time than I

5    should have and -- or if I ultimately paid more

6    than I should have, then there's a financial harm

7    there, I would imagine.

8            Q.      Is there any document that you can

9    point to that would support a contention that

10   you've been paying for a longer period of time

11   than you should have?   Anything at all?

12           A.      Like I said, my understanding is

13   that there was -- that there was an expert that

14   reviewed these materials and that there's an

15   expert, as part of this litigation, that supports

16   this theory, but outside of that, I don't have

17   any independent knowledge or any -- I can't

18   identify anything else.

19           Q.      So you would not be offering any

20   testimony in support of your own claims.

21           A.      I'm sorry.  Can you --

22           Q.      You would not be offering any

23   testimony in support of your own claims.

24           A.      I'm not sure that I understand.

25   When?   At a trial?   When --

Page 30

1          Q.     Well, you can offer testimony

2     today, you can offer testimony in trial.  Those

3     are your options.

4          A.     Okay.  No, I don't have any

5     independent knowledge with respect to the

6     servicing of my loans.  It's not something I've

7     ever paid attention to.  So no, I don't --

8     there's no evidence I'm going to present, you

9     know.

10          Q.     Okay.  Why do you think that you

11     have claims that are similar to claims held by

12     any other borrower?

13          A.     It seems like -- well, we all have

14     student loans through the same company, and if

15     they're being processed or handled in the same

16     way, that is whereby payments that the other

17     borrowers are making are applied more interest

18     than principal, then I would say we're probably

19     all similarly situated.

20          Q.     Okay.  Have you spoken with any

21     other borrower?  And we can set aside Mr.

22     Sanghavi.  Any other borrower of Navient who can

23     provide you with any other example of when that

24     happened?

25          A.     When what happened?

Veritext Legal Solutions
866 299-5127

1        Q.      This misapplication of payments
2    that you just talked about.
3        A.      No.
4        Q.      Have you ever seen any document
5    that reflected a misapplication of a payment?
6        A.      I don't know.  I mean, I don't
7    know that I was aware that there was this
8    misapplication.  So --
9        Q.      That's not my question.  My
10   question is have you ever seen any document that
11   reflects a misapplication of a payment?
12       A.      I don't know.  I could have and
13   not recognized it as such, I guess.
14       Q.      Let me see if this is going to
15   work.  Do you have that?
16       A.      Is this another exhibit?
17       Q.      It's Exhibit 3, and it's Bates
18   numbers 005774 through 005826.  Do you see it?
19       A.      I got it.
20               (Document is received and marked
21   as Exhibit 3 for identification.)
22       Q.      Okay.  Why don't you go down a
23   couple of pages, I think it's two pages.  Okay.
24   The second page.
25       A.      Okay.

Veritext Legal Solutions
866 299-5127

```
 1    through it all again, but you see that the
 2    statement has the same information, same
 3    formatted information every month.  Do you agree
 4    with that?
 5            A.    Yes.
 6            Q.    I think I did ask you this
 7    earlier, but just so we're clear, have you ever
 8    called Navient's customer service line?
 9            A.    Not that I recall.
10            Q.    Have you ever contacted the office
11    of the customer advocate?
12            A.    Not -- no.
13            Q.    Do you know what that is?
14            A.    No, other than presuming based
15    upon the title, no.
16            Q.    Okay.  What do you presume based
17    on the title?
18            A.    I presume that Navient has someone
19    to handle complaints, issues that may arise with
20    loan holders to resolve issues that may arise.
21            Q.    Do you content that there's
22    anything about the monthly statements that is
23    misleading?
24            A.    No.  I --
25            Q.    Has Navient concealed any
```

Page 39

1    information from you regarding your student

2    loans?

3            A.     I don't know.

4            Q.     Has Navient made any

5    misrepresentations to you?

6            A.     I don't know.

7            Q.     Has Navient failed to disclose any

8    information about your loans that you would

9    consider to be important?

10           A.     I don't know.

11           Q.     From your point of view, what

12   would a proper allocation of payments be?

13           A.     I don't have a point of view on

14   that topic.  I mean, I'm not a finance -- you

15   know, I don't have a background in it.  I don't

16   know.

17           Q.     Have you done your best today to

18   tell me everything that you think Navient did

19   wrong on your student loans?   Do you have

20   anything to add?

21           A.     I don't.

22           Q.     Did you do any research on the

23   firm representing you before you retained them?

24           A.     No.

25           Q.     How did you choose them?

Page 40

1           A.     I don't know that.  I mean -- I

2     just went with the firm.  I didn't --

3           Q.     How did you know about the firm?

4           A.     I mean, I had heard of the firm in

5     the past, as practicing civil litigation in

6     northern New Jersey from 2006 to, you know, up

7     until a few months ago, and it wasn't an

8     unfamiliar name.

9           Q.     Okay.  How did you select it?  Did

10    you look at the class action experience?   I

11    mean, what did you do?

12          A.     I didn't -- it was, again, Mr.

13    Sanghavi had -- we had a discussion, he

14    recommended that I send documents to a firm and I

15    did.  I didn't do any of my own independent

16    research into that law firm or any other law

17    firm.  I recognized one of the names in the

18    letterhead just from practicing civil litigation

19    in northern New Jersey, like I said, but beyond

20    that, that's it.

21          Q.     What's your understanding of your

22    role in this case as a proposed class action

23    representative?

24          A.     My understanding of my role is

25    that I represent a member of a class of people

Page 41

```
 1                IN THE UNITED STATEES DISTRICT COURT
 2                  FOR THE DISTRICT OF NEW JERSEY
 3

 4

 5     BRIAN MANETTA, SERGIO PEREIRA,        )
       ESTHER SYGAL-PEREIRA, MATTHEW         )
 6     MARKOSIAN, NAIMISH BAXI,              )   CASE NO.
       HARVEY MINANO, SYDNEY PECK,           )   2:20-CV-07712-
 7     MAHMUD IBRAHIM, AND GEORGE            )   SDW-LDW
       AMORES, INDIVIDUALLY AND ON BEHALF    )
 8     OF ALL OTHERS SIMILARLY SITUATED,     )
                                             )
 9                        PLAINTIFFS,        )
                                             )
10                  VS.                      )
                                             )
11     NAVIENT CORPORATION, NAVIENT          )
       SOLUTIONS, LLC F/K/A NAVIENT          )
12     SOLUTIONS, INC. F/K/A SALLIE MAE,     )
       INC., AND SLM CORPORATION,            )
13                                           )
                          DEFENDANTS.        )
14     _____)
15

16

17

18                  DEPOSITION OF HARVEY MINANO
19                    FRIDAY, APRIL 15, 2022
20

21

22     LOCATION:  REMOTE PROCEEDING
23     REPORTED REMOTELY BY:  SUSAN S. HENRIQUEZ, CERTIFIED
       SHORTHAND REPORTER NO. 13763
24

25     JOB NO. 5152496
```

Page 1

1          A    Yes.

2          Q    Mr. Minano, have you ever seen this before?

3          A    Yes.

4          Q    What is it?

5          A    This is the -- what was filed, I believe.

6               MR. VAN SPLINTER:  Take your time to look at this

7     document just to make sure.

8               THE WITNESS:  Right.  This is what I remember

9     that was filed.

10    BY MS. SIMONETTI:

11         Q    Okay.  This is the Complaint that was filed in

12    the case?

13         A    Yes.

14         Q    Did you review this before it was filed?

15         A    I went over it briefly, yes.

16         Q    And you went over it briefly with your lawyers?

17         A    I'm sorry?

18         Q    You went over it with your lawyers; correct?

19         A    I believe so, yes.

20         Q    Did you make any changes to a draft?

21         A    No.

22         Q    Based on this Complaint, what is your

23    understanding of the claims that you're asserting?

24         A    The claims, to my understanding, is that there

25    were some -- how do I say this?  There was some fraudulent

```
 1          activity that was happening with my student loans.  That's

 2          what this is kind of in regards to, the Complaint.

 3               Q    What sort of fraudulent activity do you allege?

 4               A    I'm not sure.

 5               Q    Do you have any understanding at all?

 6               A    Not really, no, of the fraudulent activity, no.

 7               Q    Do you have any factual basis for believing that

 8          there's fraudulent activity on your student loans?

 9               A    Not me, no.

10               Q    So who would have that information?

11               A    I talked about it with my lawyers.  I think they

12          might have something.

13               Q    Well, your lawyers can't be witnesses.

14               A    Right.

15               Q    Do you have any information that would suggest

16          there's fraudulent activity on your loans?

17               A    The one that I noticed was when we got our

18          statements, like every month or so, they had a number on

19          the top that was not the actual number that I owed.  It

20          was on the fine print, very small, at the bottom.  It was

21          more misleading, and it was brought to my attention,

22          yeah --

23               Q    So --

24                    I'm sorry.  I didn't mean to interrupt you.

25          Please go ahead.
```

Veritext Legal Solutions
866 299-5127

```
 1              A    No, that's okay.

 2              Q    So what was misleading in any information that

 3       was provided to you?

 4              A    I'm not actually sure, just -- I don't know.

 5              Q    Okay.  Did Navient ever misallocate any payments

 6       to interest instead of principal on your accounts?

 7              A    I don't know.

 8              Q    Did Navient ever allocate monthly payments to

 9       loans with lower interest rates rather than to those with

10       higher interest rates?

11              A    I'm not sure.

12              Q    Did Navient ever charge inflated minimum interest

13       payments to you?

14              A    I don't know.

15              Q    Did Navient ever misapply capitalized interest on

16       your loans?

17              A    I don't know.

18              Q    Do you have the view that Navient's repayment

19       system and customer service is designed to impede the

20       discovery of errors and repayment?

21              A    I don't know.

22              Q    Did Navient conceal any information regarding

23       your loans?

24              A    I don't know.

25              Q    Did Navient issue monthly statements that were
```

Page 23

```
 1      misleading?

 2          A    I'm not sure.

 3          Q    Are you aware of any loyalty program with

 4      Navient?

 5          A    No, I am not.

 6          Q    What is the officer -- strike that.

 7               What is the Office of Customer Advocate at

 8      Navient?

 9          A    I don't know what that is.

10          Q    Has Navient ever made any misrepresentation to

11      you?

12          A    I don't know.

13               MS. SIMONETTI:  We're going to mark as next --

14      this is plaintiffs' document production and it's labeled

15      Plaintiffs 01932 to 2058.  This is also pretty large.

16      It'll take a minute.

17        (Whereupon Exhibit No. 2 was marked for identification

18                    and is attached hereto)

19               MS. SIMONETTI:  It's loading.  It's just slow.

20      It's a few hundred pages.

21               MR. VAN SPLINTER:  May we take a two-minute

22      coffee break just while this is loading, Lisa?

23               MS. SIMONETTI:  That's fine.

24               MR. VAN SPLINTER:  Thank you.

25               (Recess from 7:36 to 7:40 a.m. PST)
```

Page 24

1      to your loans?

2           A   I'm not really sure.  I don't know.

3           Q   How did you first become aware that you might

4      have legal claims?

5           A   I was talking to a friend who had similar, I

6      guess, issues with Navient, and we talked it over, and I

7      would refer to my current lawyer regarding my issues that

8      I may have.

9               Could you hear me?

10          Q   I did.  Are you done?

11          A   Yes.

12          Q   What's your friend's name?

13          A   Sorry?

14          Q   What's your friend's name that you spoke with?

15          A   Oh, sorry.  So my friend's name is

16     (unintelligible).

17          Q   You just froze.  We can't hear you.

18              MR. VAN SPLINTER:  You're trailing off.  If you

19     have more to say, say it loud so the court reporter can

20     hear you.  If you don't, stop.  You can't trail because it

21     won't get reflected on the record.

22              THE WITNESS:  Sorry.  Okay.

23              Her name is Dr. Michelle Robalino.  She's a

24     colleague.

25     BY MS. SIMONETTI:

```
 1            Q    How do you spell her last name?

 2            A    Spell her last name?

 3            Q    How do you spell her last name?

 4            A    R-O-B-A-L-I-N-O.  She has a hyphenated last name,

 5       dash, I don't know how to say or pronounce her second

 6       name.  I'm sorry.

 7            Q    And she works with you at your current job?

 8            A    No, a previous job.  She was a colleague.  She

 9       didn't work for Encore, but she worked as a physiatrist

10       where I was a physical therapist.

11            Q    She's a podiatrist?

12            A    Physiatrist, I'm sorry.

13            Q    Physiatrist.  And what company was she working

14       for?

15            A    I'm not sure what the name of her company was.

16            Q    Okay.  What issues were you discussing with her

17       regarding loans that you thought were similar to hers?

18            A    She had a -- she was just telling me about her

19       situation a long time ago, she had issues with them.  And

20       then I brought my -- I guess I -- sorry.  Hold on.  Let me

21       form my words.

22                 So I learned by Michelle that she had some issues

23       with Navient.  And I told her I have Navient as well, and

24       she wanted to see if we had the same issues.  And after

25       that, we -- we were referred to my current lawyer --
```

Page 78

```
 1                  MR. VAN SPLINTER:  She doesn't want to know

 2         anything about our conversations.

 3                  THE WITNESS:  Right, right, no.  That's the

 4         extent of that.

 5         BY MS. SIMONETTI:

 6             Q    Okay.  So I'm just trying to understand:  The

 7         issues with the loans, what were they?

 8             A    That, I'm not sure.  I didn't understand the

 9         specifics at the time.

10             Q    Okay.  So then just in your words, just because

11         I'm trying to understand, explain what the issue is with

12         your loans.

13             A    To my knowledge, I was -- hold on.  Let me

14         rephrase.

15                  I believe I was defrauded.  I just don't know

16         how.

17             Q    Okay.  And on what basis do you believe you've

18         been defrauded?

19             A    I'm not sure.  I don't know.

20             Q    How were you referred to your counsel through

21         these discussions with -- we'll just call her Dr. Michelle

22         for right now?

23             A    Her husband is also a lawyer who was also, I

24         guess, fighting this case on their behalf, a different

25         case.  I don't know.  But the husband's name is Malik
```

Page 79

 1    Sengabi (phonetic spelling), I think.  I don't know how to

 2    spell his name.  I'm sorry.

 3         Q    Okay.  So what role would Mr. Sengabi play in

 4    your becoming connected to your counsel?

 5         A    He helped review the paperwork I gave to

 6    Michelle, and then they referred me -- after that -- I

 7    think they were -- they worked together before.  They

 8    were, I guess, colleagues as well, and that's how they

 9    referred me to them.

10         Q    So in that sentence you just said "they" worked

11    together for -- who's "they"?

12         A    Mr. Sengabi and my counsel.

13         Q    Did Mr. Sengabi ever represent you?

14         A    No, not to my knowledge, I think.  I don't know.

15    No.

16         Q    So explain why you believe you are a suitable

17    class representative to this case?

18         A    I do not know how to answer that.

19         Q    Explain to me why you believe that your counsel

20    are suitable to represent a class in this case?

21              MR. VAN SPLINTER:  I'm going to object to that

22    question.

23              You can answer it.

24              THE WITNESS:  I can answer it?  Okay.

25              I don't know.

                                                      Page 80

```
 1        BY MS. SIMONETTI:

 2             Q    Did you do any research about the firm?

 3             A    I did not.

 4             Q    Has the firm handled any other class action

 5        cases?

 6             A    For me?

 7             Q    For anyone.

 8             A    I'm sorry?

 9             Q    For anyone.

10             A    I don't know.

11             Q    Did you just say, "I don't know"?

12             A    I said I don't know.

13             Q    Do you expect to receive some type of benefit,

14        financial benefit, for serving as the class

15        representative?

16             A    I believe there may be something like that, but

17        I'm not sure of any specifics about that.

18             Q    Do you have any belief of what you should recover

19        in this action on any claim?

20             A    I don't know.

21             Q    How much time have you spent on this case so far?

22             A    Me?

23             Q    Yeah, you, uh-huh.

24             A    I don't know what you're asking in terms of,

25        like, hours, days, or months.
```

Page 81

```
 1           Q    However you can quantify it.
 2           A    On and off for the last couple of years since
 3      this whole thing started.  Yeah, I don't know.  I'm sorry.
 4           Q    Can you give me an estimate?
 5                MS. SIMONETTI:  I'm sorry, we're going to have
 6      some barking.  It's going to be a little while of barking,
 7      sorry.
 8                THE WITNESS:  Are you still waiting for an
 9      answer?
10      BY MS. SIMONETTI:
11           Q    Yup.  We're waiting.
12           A    I'm sorry.  What was the question?
13           Q    The question was:  How much time have you spent
14      on this case so far?
15           A    Oh, sorry.  I really don't know how much time I
16      spent on it.  I don't know.
17           Q    Have you been keeping track of your time in any
18      way?
19           A    I have not.
20           Q    Aside from your current lawyers, have you ever
21      retained a lawyer before?
22           A    Only once.  It was when I was in the market to
23      buy a property, a house.  I had, like, a real estate
24      lawyer.  But that was the only other time I ever had a
25      lawyer.
```

Page 82

```
1              Q    Right, in certain states you need that; right?

2              A    Right.  I'm in New Jersey.

3              Q    Please describe to me how your claims are similar

4       claims that might be held by any other borrower serviced

5       by Navient?

6              A    Can you rephrase your question?

7              Q    Describe to me how your claims in this lawsuit

8       are similar to claims that any other borrower of Navient

9       might have.

10             A    I don't know, sorry.

11             Q    Have you talked with anyone aside from your

12      friend Michelle about possible claims or issues with

13      Navient servicing student loans?

14             A    (Unintelligible.)

15                  THE COURT REPORTER:  Did you say "no"?

16                  MS. SIMONETTI:  I didn't hear anything.

17                  THE WITNESS:  Oh, I said no.

18      BY MS. SIMONETTI:

19             Q    Have you spoken with any other plaintiffs in this

20      case?

21             A    Not individually, no.

22             Q    Have you spoken to them in any other form?

23             A    I have not -- wait.  I have once.  We were in,

24      like, a group meeting, I guess you could say, with our

25      counsel.
```

Page 83

```
 1               IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF NEW JERSEY
 3
 4    BRIAN MANETTA, SERGIO          )
      PEREIRA, ESTHER                )
 5    SYGAL-PEREIRA, MATTHEW         )
      MARKOSIAN, NAIMISH BAXI,       )
 6    HARVEY MINANO, SYDNEY PECK,    )
      MAHMUD IBRAHIM, and GEORGE     ) Case No.
 7    AMORES, individually and on    ) 2:20-cv-07712-SDW-LDW
      behalf of all others          )
 8    similarly situated,           )
                                     )
 9                    Plaintiffs,    )
                                     )
10    v.                             )
                                     )
11    NAVIENT CORPORATION, NAVIENT   )
      SOLUTIONS, LLC f/k/a NAVIENT   )
12    SOLUTIONS, INC. f/k/a SALLIE   )
      MAE, INC., and SLM             )
13    CORPORATION,                   )
                                     )
14                    Defendants.    )
      _____)
15
16
17
                   REMOTE DEPOSITION OF SYDNEY PECK
18
                         MAY 17, 2022
19
20
21
22
23
24
25    Reported By:  Amy E. Simmons, CSR, RPR, CRR, CRC
```

Page 1

1        Q.   So you've taken cases to trial?

2        A.   Yes.

3        Q.   So I think a little while ago you

4    mentioned that the theory of the case, as you

5    understand it, is a fraud.  I think you mentioned

6    that earlier.

7        A.   Yeah.

8        Q.   Can you explain to me what is your belief

9    with respect to fraud that you believe was

10   committed by Navient Solutions?

11       A.   So I would say that I can't tell you

12   exactly which item is the fraud, right?  I can't

13   tell you in the complaint what exactly amounts to

14   fraud.  But I can tell you that some of the

15   allegations are kind of misapplying payments.

16            And I'll give you an example.  For

17   instance, I know that payments are supposed to be

18   a certain amount to principal and a certain amount

19   to interest.  However, there are times when it's a

20   little bit more to interest than the other

21   payments are.

22            So, like, for month-to-month, it's a

23   different amount that goes to interest versus

24   principal, but, like, months that are sequential.

25   And I understand that that causes Navient to

Page 26

```
 1    essentially make a little bit more money at my
 2    expense, right, because whatever is not paid on
 3    principal, if I have a higher principal, I pay
 4    longer and more.
 5              But that's as far as I can really delve
 6    into the details.  As you might imagine, I chose
 7    to be a lawyer rather than something math
 8    related.
 9        Q.   What information do you base the belief
10    upon that there was fraud committed by Navient
11    Solutions?
12        A.   Oh, you know, I was -- over the years my
13    student loans have caused quite a bit of anxiety
14    for me.  And I had had, you know, my aunt take a
15    look and a good friend of mine take a look to say,
16    "Am I missing something?"
17              I don't understand how over time I'm not
18    going down at the rate that I thought I would.  I
19    get that that -- I mean, that makes sense.  I know
20    that -- I know there's interest.  I know that it
21    takes longer -- it takes a long time to pay off
22    your loans.  I understand that.
23              But I do know that upon closer
24    inspection, that there were times in my -- once I
25    found someone that was willing to kind of look and
```

Page 27

```
 1    walk me through things without overwhelming me
 2    with the details, I know that there were some
 3    inconsistencies in how things were paid -- were
 4    applied in my account.
 5         Q.   Who assisted you with that?
 6         A.   So I went to law school with one of my
 7    good friends.  His name is Maulik.  And when we
 8    first graduated law school, he went a different
 9    route than I went.  He went private.  I went into
10    the public sector.
11              And so my friends were kind of checking
12    on me, "Are you okay?"  You know, "How are things
13    going?"
14              And I said, "Things are kind of tough for
15    me."  And I said, "I have to figure out if it's
16    worth me consolidating, doing all of these
17    different things."
18              And over time I've stayed in touch with
19    this friend who I think had a much better handle
20    on interest rates, et cetera.  I know that, like,
21    when we were in law school we talked about
22    investments and my eyes went blank.  And he knew
23    the key phrases for investments.  So he's someone
24    I talked to quite a bit, and he's someone that I
25    know -- that I reached out to.
```

Veritext Legal Solutions
866 299-5127

```
 1    entity or company reviews that type of
 2    application?
 3         A.   The government.
 4         Q.   Would that be the Department of
 5    Education?
 6         A.   I would imagine, but I'm not totally
 7    sure.  I don't remember.  I'm sure that at some
 8    point I have either an email or some sort of
 9    receipt that I sent these things over, but I don't
10    remember if it was the Department of Education.
11         Q.   Do you have an understanding of what
12    role, if any, the Department of Education has in
13    setting any requirements or obligations on your
14    federal student loans?
15         A.   No, I don't know the ins and outs of
16    that.
17         Q.   Okay.  When did you first talk with
18    Mr. Sanghavi about your student loans?
19         A.   2008, probably.
20         Q.   And I'm sorry, how do you know him?
21         A.   We were in the same section in law
22    school.  We were pretty close friends, remain
23    close friends.
24         Q.   How does Mr. Sanghavi know your current
25    lawyers?
```

Veritext Legal Solutions
866 299-5127

1    A.   He introduced me, I think.  I believe he

2    worked with a few of them at a previous law firm.

3    Q.   So when you sat down with Mr. Sanghavi in

4    2008, what information did you review with him?

5    A.   Oh, 2008 was more just talking about how

6    screwed I felt with the amount -- like how

7    daunting it felt to have student loans.

8         Over the years I talked to him quite a

9    few times, over a dozen times, probably, about the

10   state of my loans, things like, "Oh, once I

11   finally pay them off maybe you can talk to me

12   about investment because I eventually will need to

13   retire."

14        And, you know, so the student loan topic

15   would come up.  And like, "How are things going

16   with you?"  In other -- in the midst of other

17   conversations, like, just simply, "Hey, why don't

18   you think about looking in the private sector?

19   You'll be able to pay things off faster."

20        And I said, "Hell, no.  I'm not willing

21   to do that."

22        Just like friend conversations, but also,

23   like, he was my only friend that wasn't terrified

24   by percentage rates.

25   Q.   Okay.  I think you mentioned earlier that

Page 31

1    you did at some point sit down and review

2    something with him; is that right?

3         A.   Yes.  So when I got rejected, the first

4    thing that happened was when I got rejected from

5    the ten-year student loan repayment, we chatted

6    about it.

7              I, like, read off to him what my balances

8    were, and I think, you know, he was like, "Oh,

9    that" -- we talked very -- like, it was a cursory

10   conversation.

11             And then later he -- I spoke to him again

12   about, like -- my office, a bunch of us were

13   denied, people who graduated the same year as I

14   did, which is before everyone is gearing things

15   towards a repayment.  A bunch of us sat down and

16   said, "What are we going to do about this?  Should

17   we challenge it?  How are we going to challenge

18   it?"

19             And he was always the friend I spoke to

20   about it, like, "Hey, what do you think about

21   that?"

22             And I can't remember when it was, but

23   when I talked about refinancing, "I'm pregnant.

24   I'm going to refinance.  What do you think?  Where

25   should I go?" my aunt was the one who told me

Page 32

```
 1    SoFi.  So once I looked at everything, I went with
 2    her recommendation.
 3              But I asked him, "What do you think?
 4    What are places that I should look into?  Do I
 5    call a bank?  Who do I call?"
 6              And then later when I refinanced and I
 7    was talking to him about, like, "Man, I really
 8    think I should have -- I wish I was paid off," we
 9    talked more.
10              And then I think at that point he's like,
11    "Well, what's going on with your loans?  Like
12    what's still left?"
13              And I don't remember exactly what I
14    showed him.  I don't know if I showed him -- if I
15    showed him physically or just read things to him
16    physically, read things to him of, like, what I
17    owed and what my payments were, et cetera.
18              And I don't remember where it went from
19    that other than "You should talk to these
20    attorneys."
21         Q.   Okay.  And when approximately were you
22    having these conversations and you were referred
23    to counsel?
24         A.   I don't remember.  It was after -- I
25    believe it was during the pandemic because I
```

Page 33

1    remember chatting with him at a desk that I didn't

2    have before the pandemic in my room.

3         Q.   So this case was filed in June of 2020.

4    Does that help you recall?

5         A.   So probably before that.  So maybe I

6    first spoke to him -- honestly, it's around the

7    pandemic, the inception of the pandemic, but I

8    don't remember exactly when I spoke to him.  I

9    just remember having a conversation with him while

10   I was sitting at my new desk.

11        Q.   Okay.  And what did Mr. Sanghavi identify

12   for you that supposedly was wrong with

13   the servicing?

14        A.   He didn't give me exact details, but he

15   said that I should have, you know, an attorney

16   look at it, perhaps an attorney that would be able

17   to retain someone, some sort of forensic

18   accountant or some expert that would be able to

19   look at it.  I may be using the wrong term.

20             And I don't remember exactly what he

21   pointed out to me, but he did say, "Oh, there's

22   some weird things here."

23             And honestly, I don't remember the words

24   that he used, so I apologize.

25        Q.   When was the last time you discussed your

Page 34

```
 1    loans with Mr. Sanghavi?
 2         A.    I think recently I mentioned to him I'm
 3    going to reapply to the loan forgiveness program.
 4    I think recently we were chatting about some
 5    political thing and I mentioned, "Oh, yeah, Biden
 6    signed this, so I may have a window until October
 7    of this year to apply for the loan forgiveness
 8    again."
 9         Q.    Okay.  So with respect to your claims,
10    what misrepresentation did Navient Solutions make
11    to you?
12         A.    So I'm not exactly sure.  That's why I
13    relied on counsel and their forensic -- I keep
14    saying "forensic."  It might be the wrong word.
15         Q.    It's okay.
16         A.    Their expert.
17         Q.    So aside from whatever has been
18    communicated to you by counsel, do you have any
19    information that would suggest to you that there
20    has been a misrepresentation by Navient Solutions?
21         A.    Just a feeling that things don't look
22    right on my -- just a feeling that they don't look
23    right.  Again, if I knew exactly what it was, I
24    think I would have addressed it a lot sooner.  But
25    I don't, because I'm really -- that's not my area,
```

Page 35

1    right?  I specifically chose to be a public

2    defender so no one would ever have to pay me

3    money.  Like no client, ever.  I never have to

4    deal with that.

5              And so it's not my area, and it does give

6    me quite a bit of anxiety.  So I can't tell you

7    exactly other than it's a nagging thing that I've

8    been dealing with since 2007.

9              And I was really thankful that I was

10   referred to them so somebody could take a look and

11   tell me if I was right or wrong that something was

12   wrong.

13        Q.   Has Navient Solutions failed to provide

14   you with information that's material to your

15   knowledge?  Has Navient Solutions made an

16   omission?

17        A.   So I'm not sure because I don't know what

18   I should have been told versus what I was told,

19   what information I was able to obtain.  I don't

20   know.

21        Q.   So I think you told me earlier that

22   Mr. Sanghavi identified for you that there were

23   differences in the allocations of interest and

24   principal across months; is that right?

25        A.   Yes.  And I apologize.  That does bring

Page 36

1    something up.  So about 2008, I made a call to

2    what we'll call Navient, and tried to inquire how

3    I could indicate that I wanted money to go -- if

4    I'm overpaying, how I can pay on the principal

5    versus the interest?  And I really was not able to

6    get a good answer.

7              I remember that I tried -- I don't know

8    how many times -- to make a higher payment because

9    I wanted to attack, like, once a year, the

10   principal if I had any extra money saved or

11   anything like that.  And I wasn't able to kind of

12   discern how I could pay down the principal and

13   which loan -- how I could determine what loan I

14   wanted it applied to.

15             And that's where I hit a roadblock and

16   felt really frustrated and kind of overwhelmed.  I

17   think that was the turning point for me, because

18   while I am very clearly not an expert on this

19   area, as you can hear by my answers, I will tell

20   you the one thing I understand is you want to pay

21   your principal off first.

22             And that's something that I tried to do

23   early on, and I did not -- I was not able to get,

24   like, direct information as to how to pay

25   principal off on the higher -- specifically on any

Page 37

1    loan, let alone the ones that had a higher

2    percentage rate.  Because I know I had different

3    percentage rates through what is now Navient.

4        Q.   Okay.  What's capitalized interest?

5        A.   I believe it's interest that's added to

6    principal.  I don't know why or how, but I believe

7    it makes your principal go up.

8        Q.   Has capitalized interest ever been

9    applied to your loans?

10       A.   I don't know.

11       Q.   Did Mr. Sanghavi identify any alleged

12   issues with capitalized interest applied to your

13   loans?

14       A.   I have no idea if he saw that, but he did

15   not express that to me.

16           MS. SIMONETTI:  Why don't we take a

17   five-minute break?  Is that okay?  I'm going to

18   have someone look for something.

19           MR. TRIPODI:  Okay.

20           THE WITNESS:  That's fine for me.

21           MS. SIMONETTI:  Okay.  Five, ten minutes.

22   Thank you.

23        (Break taken from 11:21 a.m. to 11:36 a.m.)

24       Q.   (BY MS. SIMONETTI)  So, Ms. Peck, did

25   Mr. Sanghavi express a belief to you that errors

Page 38

```
 1    had been made in the servicing of his loans as

 2    well?

 3         A.    I think he mentioned that.

 4         Q.    Were those errors of the same sort that

 5    he identified on your loans?

 6         A.    He did not specify that.

 7         Q.    Did he ever contact Navient Solutions, to

 8    your knowledge, to discuss any issues with his

 9    loans?

10         A.    No idea.

11         Q.    Did you ever ask him?

12         A.    No.

13         Q.    Did you contact Navient Solutions to

14    discuss any issues that he had identified on your

15    loans?

16         A.    No.

17         Q.    Why not?

18         A.    He didn't give me -- I didn't feel it was

19    appropriate to call them until I had a better idea

20    of what was going on with my loans because I'm not

21    really able to articulate what's going on with

22    them very well.  And I felt like it wouldn't do

23    anything until I had a better idea with a more

24    trained eye.

25         Q.    So just to make sure I understand, you
```

Veritext Legal Solutions
866 299-5127

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF NEW JERSEY

 3        BRIAN MANETTA, SERGIO PEREIRA,

 4        ESTHER SYGAL-PEREIRA, MATTHEW

 5        MARKOSIAN, NAIMISH BAXI,

 6        HARVEY MINANO, SYDNEY PECK,

 7        MAHMUD IBRAHIM, and GEORGE

 8        AMORES, individually and on

 9        behalf of all others similarly

10        situated

11                   Plaintiffs,

12        v.                              CIVIL ACTION NO:

13        NAVIENT CORPORATION, NAVIENT      2:20-cv-07712-SDW-LDW

14        SOLUTIONS, LLC f/k/a NAVIENT

15        SOLUTIONS, INC. f/k/a SALLIE MAE,

16        INC., and SLM CORPORATION,

17                   Defendants.

18        _____/

19

20                   The deposition of SERGIO PEREIRA was held

21        via Veritext Zoom on Wednesday, May 11, 2022,

22        commencing at 8:21 a.m. PDT before Esther Levi, Notary

23        Public.

24

25        REPORTED BY:  Esther Levi
```

Page 1

```
 1            Q.   Did you read any particular provision?

 2            A.   I can't tell you what part I've read.  No, I

 3       cannot.  I may -- once again, I may have glanced

 4       through it, but I have not -- I can't tell you exactly

 5       what part of -- --

 6            Q.   So when did you first suspect that you had

 7       any claim relating to your student loan?

 8            A.   This event occurred through speaking with

 9       friends.  They -- they -- pardon me.  I have a friend

10       that went to medical school with.  She was actually

11       speaking with my wife in regards to -- we were all

12       together actually -- speaking about loans and payments.

13                 And it came to surface that they had noticed

14       through her husband that there were some irregularities

15       that are taking place on their repayments of their

16       bills.

17                 And because we were very much in the same

18       type of -- you know, we went to school the same time,

19       we had very similar loans, there was a question whether

20       or not this may have affected us as well.

21            Q.   What's the name of the friend that you spoke

22       with?

23            A.   Michelle Robalino Singhavi.  Pardon me.

24            Q.   And what's her husband's name?

25            A.   Molik Singhavi.
```

Page 18

1        Q.   So what irregularities did they identify to

2   you with respect to their student loan?

3        A.   To -- essentially payments were not going

4   appropriately where they needed to go.

5        Q.   What does that mean?

6        A.   At that time I wasn't quite sure.  But

7   essentially they were saying that you're making

8   payments and they were not being distributed as they

9   should.  That was the general consensus at that time.

10        Q.   From their perspective how were the payments

11   being distributed?

12        A.   I can't tell you exactly.  I don't have that

13   recollection.

14        Q.   From their perspective how were they meant

15   to be distributed?

16        A.   Once again, the overall gist of it is I

17   don't know exactly how they meant it to be distributed.

18   I can't speak for them.

19        Q.   So can you tell me at this point anything

20   about how Navient Solutions misallocated payments on

21   your student loan?

22        A.   As I know of now?

23        Q.   Yes.

24        A.   Okay.

25             So from my understanding, one of the things

```
 1                    So I'm asking what information have you

 2          reviewed that would support the belief that you just

 3          told me?

 4               A.    I've looked through the complaint.

 5               Q.    Is that it?

 6               A.    I've looked through the complaint.  And,

 7          once again, I glanced through some of those promissory

 8          notes.  But realistically I did not -- I personally did

 9          not find those variances.

10               Q.    We talked earlier about the number of loans

11          that you -- strike that.

12                    Have you paid off any of --

13               A.    I'm sorry.

14               Q.    -- your student loans?  It's okay.

15                    Have you paid off any of your student loans?

16               A.    I'm not sure.  When you have so many, it's

17          difficult to keep track.

18               Q.    Do you know why you have so many separate

19          loans?

20               A.    They were needed -- they were -- I think

21          essentially they were used per semester to cover -- the

22          loans would cover a small percent of time.  And I

23          needed -- because you're in medical school, you can't

24          really sustain a job.  They were used both for school

25          purposes as well as living expenses.
```

Veritext Legal Solutions
866 299-5127

```
 1        Exhibit -- I'm sorry.  Esther, can you help me?  Is it
 2        4?
 3                  THE COURT REPORTER:  I think it's just 3.
 4                  MS. SIMONETTI:  Okay.  Well, that's 3 then.
 5                  (Pereira Deposition Exhibit 3 was marked for
 6        purposes of identification.)
 7             Q.   Okay.
 8                  Mr. Pereira, have you seen this before?
 9             A.   I have.
10             Q.   And you reviewed this in connection with
11        your deposition preparation.  I think you told me that.
12                  Did you review this in a draft before it was
13        filed?
14             A.   I have.
15             Q.   Did you make any changes to the draft?
16             A.   I don't think so.
17             Q.   Have you described for me the claims that
18        you are asserting in this action?
19             A.   The claims that -- that I'm personally
20        asserting or the action is asserting?
21             Q.   That you personally are asserting.
22             A.   I'm asserting that through processes of
23        Navient I was -- there are fraudulent actions that took
24        place that were directly affecting my payment to the
25        length of my loans.
```

Veritext Legal Solutions
866 299-5127

1        Q.   Okay.

2             Just to make sure that we're clear.  Tell me

3        what went on with respect to your loans and your

4        payments as compared to what other -- -- have alleged

5        in the complaint.

6        A.   I would have to -- I refer to the lawyers

7        who utilize specialists or experts to review the

8        specific details of my specific loans.  I don't have

9        specific details of how I was affected.

10            There are some examples that are listed here

11       that show some of the manners in which it affected me,

12       but those examples are not a full encompassing list of

13       everything that was done.

14       Q.   As you sit here today, can you identify any

15       harm that you have suffered from Navient Solutions

16       servicing of your loan?

17       A.   Yes.  There is extended -- there is

18       overpaying of the interest opposed to moneys going

19       towards the principal.  There was inappropriate

20       capitalization of the loan.  There was misassignment of

21       moneys that were sent from one loan as opposed to

22       others which resulted in those delinquent or late

23       payments.

24            That's what I think at the top of my head

25       right now.  I can look through this and see what other

Page 40

```
1    things there may have been that was mentioned.  But,
2    once again, this is not a fully inclusive list.
3         Q.   Can you identify any point in time where you
4    overpaid interest on your student loans?
5         A.   I cannot.
6         Q.   Can you identify any point in time where
7    there was improper capitalization of interest on your
8    loan?
9         A.   There seems -- once again, I cannot.  But
10   the complaint does list specific sites in which there
11   was capitalization errors.
12        Q.   What is capitalization?
13        A.   Capitalization is when the moneys of the
14   principal plus the interest are put together and that
15   becomes the ongoing principal from that point forward.
16        Q.   Can you explain a little more what you mean
17   by misassignment of moneys that resulted in
18   delinquencies?
19        A.   It seems as though -- it seems that payments
20   were made that would cover my minimum, my balances,
21   however, instead of being equally distributed or to all
22   of the -- to cover all of the loans, there was
23   increased loans -- there was an increase of payments
24   made to certain particular loans where other loans were
25   left delinquent.
```

Page 41

```
1        amount of $2,036.89.

2               You see that?

3        A.    I do.

4        Q.    The next line states the original principal.

5               What does that mean?

6        A.    I don't know.  I think it means that was the

7    initial amount that was taken out as a loan.

8        Q.    All right.

9               The next line down says capitalized

10   interest.  And that's the amount of $2,570.21.

11              Do you see that?

12       A.    I do.

13       Q.    Based on this statement or your

14   understanding of your loan in 2017, is there anything

15   wrong with the amount of capitalized interest stated

16   there?

17       A.    I wouldn't be able to tell you.

18       Q.    What would you look at to try to determine

19   that?

20       A.     In all honesty, I, you know, I would not

21   have looked at these and trying to make specific

22   assessment as to if everything is being done correctly

23   or not.  I would expect it would have been, but I would

24   not looking -- I would not particularly be looking for

25   mistakes.
```

```
 1              A.   Which paragraph would you like me?

 2              Q.   132.  I'm sorry.  131 and 132.

 3              A.   Okay.  I'm there.

 4              Q.   Okay.

 5                   So let's start with 131.

 6              A.   Yes, ma'am.

 7              Q.   Okay.

 8                   So it says Plaintiff Pereira's 1-03 Stafford

 9         Unsubsidized loan and 1-05 Global Health

10         Stafford loan were both capitalized on both September

11         24, 2010 and October 3, 2010.

12                   So in this allegation is it your view that

13         the capitalization on both loans was improper?

14              A.   I did not know when the loans were supposed

15         to be capitalized.  I know they were supposed to be at

16         specific well defined times.  And this is an assessment

17         by the, you know, the experts that looked at our loans.

18              Q.   When are the well defined times that

19         capitalization should be applied?

20              A.   I don't know the specific timetable.

21              Q.   Have you ever read a disclosure or any type

22         of correspondence from Navient Solutions that describes

23         capitalized interest?

24              A.   I'm sure I have at some point.

25              Q.   Do you have any understanding of when
```

Page 58

1      capitalized interest will be applied to your loan based

2      on anything you've ever read?

3           A.   With specific timetables, I don't know.  I

4      -- not specifically.  I don't know.

5           Q.   Do you have a general understanding?  Any

6      understanding?

7           A.   There's what I think, but it's not what I

8      know.  So I don't have any specific knowledge of

9      specific times -- --

10          Q.   And as you sit here today, have you

11     explained to me why any of the capitalizations as

12     discussed in Paragraph 131 and 132 could possibly be

13     wrong?

14          A.   I cannot.  It seems -- it would seem as

15     though the capitalization times are very close in time.

16     But outside of that, I cannot tell you why they're

17     wrong.

18          Q.   On your loans did Navient Solutions allocate

19     monthly payments to loans with lower interest rates

20     rather than higher interest rates?

21          A.   I believe that's one of the claims, yes.

22          Q.   Upon what do you base your belief that

23     Navient Solutions did that?

24          A.   Discussions with the lawyers.

25          Q.   Okay.

Veritext Legal Solutions
866 299-5127

```
 1                    And just to be clear, you can say that you
 2          had discussions with the lawyers, but I'm not asking
 3          you for the content of those conversations at any point
 4          in time.
 5                    You understand that?
 6                    Because those conversations are privileged.
 7          A.    Yes, ma'am.
 8          Q.    So that's just as far as -- I mean you're
 9          doing fine, but I just want to make sure there's no
10          mistake.
11          A.    Okay.
12          Q.    Okay.
13                    Did Navient Solutions charge artificially
14          inflated minimum interest payments on your loan?
15          A.    Once again, so I have the information basis
16          to what has been found when reviewing my records.
17          Q.    And that's by the lawyers and experts?
18          A.    Yes, ma'am.
19          Q.    Is Navient Solutions' repayment system
20          designed to delay repayment?
21          A.    I can't tell you that.
22          Q.    Is Navient Solutions' repayment system
23          designed to appease the discovery of errors?
24          A.    I can't tell you that.  I don't have that
25          specific knowledge.
```

Page 60

1          Q.   Has Navient Solutions concealed any

2     information from you regarding your student loan?

3          A.   Not that I know.

4          Q.   We just looked at a form of account

5     statement.  Did you find anything in that document or a

6     similar account statement to be misleading?

7          A.   It seems -- I'm not a financial person or I

8     don't have -- my -- my understanding of finances are

9     very limited.  So without an appropriate background, I

10    couldn't tell you exactly what I'm looking at.  At face

11    value the information is there, but I would not know

12    exactly what to look for.

13         Q.   So is it your belief that only a person with

14    a financial background or financial expertise can

15    understand the monthly account statement?

16         A.   I think they're -- -- at understanding, you

17    know, exactly if there are more things that should be

18    looked at as opposed to just at plain value.  You know,

19    I look at information that's written there and I accept

20    it to -- I accept it to be true and expect it to be all

21    that I need to know.

22         Q.   Okay.

23              And so what additional things or more things

24    would have to be looked at?

25         A.   I'm not sure.  Pardon me.

                                                  Page 61

1             Q.    Does Navient Solutions have a royalty

2       program?

3             A.    Is that the You Promise program.

4             Q.    I'm asking you.

5             A.    I don't know.

6             Q.    Did you ever enroll in You Promise?

7             A.    I did.  I had a credit card from You

8       Promise.

9             Q.    Did you use it?

10            A.    Occasionally.

11            Q.    Do you have any complaints about the You

12      Promise credit card?

13            A.    No.

14            Q.    What is Navient Solutions' Office of

15      Customer Advocate?

16            A.    I don't know.

17            Q.    Has Navient Solutions made any

18      misrepresentations to you about your student loan?

19            A.    I don't specifically know.

20                  MS. SIMONETTI:  Let's go off the record for

21      a second.

22                  (Discussion off the record.)

23                  (A break was taken.)

24            Q.    Okay.

25                  Mr. Pereira, during the lunch break, I did

                                                    Page 62

```
 1              IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF NEW JERSEY
 3
 4                                    )
     BRIAN MANETTA, SERGIO           )
 5   PEREIRA, ESTHER                 )
     SYGAL-PEREIRA, MATTHEW          )
 6   MARKOSIAN, NAIMISH BAXI,        )
     HARVEY MINANO, SYDNEY PECK,     )  Civil Action No.
 7   MAHMUD IBRAHIM, and GEORGE      )  2:20-cv-07712-SDW-
     AMORES, individually and on     )  LDW
 8   behalf of all others            )
     similarly situated,             )
 9                                    )
                    Plaintiffs,      )
10                                    )
                    vs.              )
11                                    )
     NAVIENT CORPORATION,            )
12   NAVIENT SOLUTIONS, LLC,         )
     f/k/a NAVIENT SOLUTIONS,        )
13   INC., f/k/a SALLIE MAE,         )
     INC., and SLM CORPORATION,      )
14                                    )
15                  Defendants.      )
16
17                      VOLUME I
18             VIDEOCONFERENCE DEPOSITION OF
19                    MAULIK SANGHAVI
20             Taken in behalf of Defendants
21                      *   *   *
22               September 12, 2022
23                 Cranford, New Jersey
24       Teresa L. Dunn, CSR, CCR, RPR
25       Court Reporter
```

Page 1

1    come from, and they all say that it's you.

2         So, you know, I don't think that because

3    you are pro se like there's no protection for

4    you for work product, but I'm not litigating

5    your case.  I'm litigating this case.

6         So I think you are going to have to

7    answer these questions in this case and, you

8    know, Stradley will handle your case.  I know

9    Eric, I know Ben.  They're doing their jobs I'm

10   sure.

11        So do you want to think about this for a

12   minute and take a break?

13   A.   No, I'm not answering those specific

14   questions based on attorney-client privilege,

15   spousal privilege, work product.

16   Q.   So let's try this, has a consultant

17   reviewed any of your records and concluded that

18   there were improper charges of capitalized

19   interest?

20   A.   Yes.

21   Q.   Is that before you filed the complaint?

22   A.   No.  My complaint?

23   Q.   Yes.

24   A.   No.

25   Q.   In what time frame did --

Page 28

```
 1       A.   In the time frame in between -- in

 2   discovery -- during discovery which we're still

 3   in.

 4       Q.   Do you currently have a discovery

 5   cut-off in your case?

 6       A.   No.

 7       Q.   Do you have an operative scheduling

 8   order?

 9       A.   The last one was -- it's public record.

10   It's been a while.

11       Q.   Aside from capitalized interest what do

12   you think Navient Solutions has done wrong in

13   servicing your complaint?

14       A.   I think it's outlined in the complaint.

15   I'm not going to testify beyond that.

16       Q.   So it would be true that your beliefs

17   and allegations are confined by that complaint?

18       A.   No.  We're in discovery.  It's still an

19   open-ended question.

20       Q.   I don't think you can have it both ways.

21       A.   I think you can.  The complaint

22   identified the initial issues that we have

23   sought.  We have pled them with particularity.

24   We're in ongoing discovery.

25            Navient has been slow to produce their
```

Page 29

1    make sure that they're the same payments that

2    are reflected on this statement.  I mean, that's

3    a start.

4        Q.   When you look at your own Account

5    History are you able to identify allegedly

6    improper transactions?

7        A.   As I've stated, yes, I think as part of

8    our complaint and as discovery is ongoing, yes.

9        Q.   Forgive me if you already said this, but

10   did the consultant review your transaction

11   history before you filed the complaint?

12       A.   No.  I don't recall, but, no, I don't

13   think so.  My consultant, correct?  In our case,

14   no, I don't recall.

15       Q.   Is that no or you don't recall?

16       A.   I don't specifically recall if it was

17   before the complaint.

18       Q.   So you identified the transactions that

19   are specified in the complaint?

20       A.   In my complaint, yes.

21       Q.   Yes.

22       A.   Yes.

23       Q.   Where are you currently employed?

24       A.   For a large utility.  I'm in the real

25   estate department in New Jersey.

Page 46

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF NEW JERSEY

3    ---------------------------------------------------------

4    Brian Manetta, Sergio Pereira, Esther Sygal-Pereira,

5    Matthew Markosian, Naimish Baxi, Harvey Minano, Sydney

6    Peck, Mahmud Ibrahim, and George Amores, individually

7    and on behalf of all others similarly situated,

8                   Plaintiffs,

9       v.            Civil Action No. 2:20-cv-07712-DSW-LDW

10   Navient Corporation, Navient Solutions, LLC f/k/a

11   Navient Solutions, Inc. f/k/a Sallie Mae, Inc., and SLM

12   Corporation,

13                  Defendants.

14   ---------------------------------------------------------

15

16        REMOTE DEPOSITION OF ESTHER SYGAL-PEREIRA

17

18

19   DATE:  May 10, 2022

20   TIME:  9:00 a.m. CST

21   PLACE:  Veritext Virtual Videoconference

22

23

24   REPORTED BY: KELLEY E. ZILLES, RPR (Via Videoconference)

25   JOB NUMBER:  5186981

                                              Page 1

```
 1    lengthening the amount of time that I would be paying it      09:12:46

 2    and increasing the overall balance over time.                09:12:49

 3        Q.  Upon what do you base your view that this            09:12:53

 4    occurred?                                                    09:12:57

 5        A.  Can you rephrase the question, please.               09:12:59

 6        Q.  What information leads you to believe that this      09:13:06

 7    occurred with your loans?                                    09:13:10

 8        A.  Based on reviewing the statements that I have in     09:13:12

 9    the past of my online statements and looking them over       09:13:19

10    on the Navient Website.                                      09:13:24

11        Q.  So when was the first time that you looked at a      09:13:27

12    statement and thought that there was something wrong         09:13:46

13    with the application of the payment?                         09:13:48

14        A.  So back in 2018 a friend of my husband's brought     09:13:50

15    it to attention that there was something going on with       09:13:58

16    their loan payments and that in turn got us to thinking      09:14:04

17    about and looking through ours and then referring us to      09:14:09

18    Xavier and Jim's firm in order to look into this more.       09:14:15

19        Q.  What's the name of your husband's friend?            09:14:19

20        A.  Michelle Robalino, she went to medical school        09:14:22

21    with him.                                                    09:14:27

22        Q.  Is she married?                                      09:14:28

23        A.  Yes, she is.                                         09:14:35

24        Q.  What's her husband's name?                           09:14:36

25        A.  Maulik Sanghavi.                                     09:14:45
```

Page 15

| | | |
|---|---|---|
| 1 | Q.  What did Ms. Robalino tell you about the issues | 09:14:45 |
| 2 | they were having with their loans? | 09:14:47 |
| 3 | A.  That they were noticing the variances in | 09:14:49 |
| 4 | interest payments and principal payments and the | 09:14:55 |
| 5 | fluctuations.  And also making extra payments outside of | 09:15:01 |
| 6 | monthly, the regular monthly payments and seeing that | 09:15:07 |
| 7 | they weren't appropriately placing the money where it | 09:15:10 |
| 8 | should have been to pay off principal, instead paying | 09:15:15 |
| 9 | more on the interest for the principal and not properly | 09:15:19 |
| 10 | allocating the funds. | 09:15:24 |
| 11 | Q.  Okay.  What would a proper allocation be? | 09:15:25 |
| 12 | A.  In my opinion it would be paying the principal | 09:15:29 |
| 13 | and then paying the interest. | 09:15:33 |
| 14 | Q.  What do you base that opinion on? | 09:15:43 |
| 15 | A.  Based on what's fair. | 09:15:48 |
| 16 | Q.  So is it fair to say that is your opinion? | 09:15:51 |
| 17 | A.  Yes. | 09:16:03 |
| 18 | Q.  Did Ms. Robalino identify any other issues for | 09:16:04 |
| 19 | you with your student loans? | 09:16:15 |
| 20 | A.  I believe that was it. | 09:16:19 |
| 21 | Q.  When you had this conversation in 2018 did you | 09:16:20 |
| 22 | contact Navient Solutions about the payment allocation? | 09:16:26 |
| 23 | A.  No, we did not. | 09:16:29 |
| 24 | Q.  Why not? | 09:16:31 |
| 25 | A.  We wanted to seek our attorneys' advice around | 09:16:32 |

Page 16

```
 1    it first.                                           09:16:38

 2        Q.  And how did Ms. Robalino connect you with your   09:16:46

 3    attorneys?                                          09:16:51

 4        A.  Maulik knows Jim and Xavier.                09:16:52

 5        Q.  How does he know them?                      09:16:58

 6        A.  He's an attorney as well.                   09:17:00

 7        Q.  What's the nature of his practice?          09:17:04

 8        A.  For Maulik?                                 09:17:07

 9        Q.  Yes.                                        09:17:09

10        A.  I'm not sure, I don't recall.  He works with   09:17:10

11    businesses, or a lawyer for businesses.             09:17:19

12        Q.  Okay.  So let's take a look at Exhibit 1.   09:17:22

13            (Exhibit 1 marked for identification.)      09:17:33

14        A.  Okay.  I have it in front of me.            09:17:33

15        Q.  Okay.  Do you see the line at the top that says,   09:17:46

16    "Filed 6/24/20"?                                    09:17:50

17        A.  Yes.                                        09:17:51

18        Q.  Okay.  Why did it take approximately two years   09:17:52

19    for you to file this complaint after you had the    09:17:57

20    conversation with Ms. Robalino?                     09:18:00

21        A.  I don't know why there was a delay in time, all   09:18:02

22    I know is that that's when it was actually filed.   09:18:07

23        Q.  So prior to the conversation in 2018 with Ms.   09:18:11

24    Robalino, did you ever look at a statement and think   09:18:19

25    that there was something wrong with the application of a   09:18:22
```

```
 1   approximately?                               09:53:00

 2       A.  2004.                                09:53:00

 3       Q.  Got it.                              09:53:02

 4       A.  It's now become Premier, Premier acquired   09:53:07

 5   Innovatix, so that was back in 2016.         09:53:11

 6       Q.  Okay.                                09:53:15

 7       A.  So name change there, but still same idea and   09:53:17

 8   concept of the company.                      09:53:22

 9       Q.  Okay.  What is your understanding of the claims   09:53:23

10   that you're asserting in the lawsuit?        09:53:58

11       A.  Can you restate the question, it cut out.   09:54:00

12       Q.  I'm sorry.  What is your understanding of the   09:54:03

13   claims that you're asserting in this lawsuit?   09:54:06

14       A.  My understanding is that the regular monthly   09:54:08

15   payments that I was making, that payments were   09:54:15

16   misallocated towards interest and principal in turn   09:54:22

17   capitalizing on that, on those extra monies that were   09:54:28

18   collected.                                   09:54:32

19       Q.  Did Navient Solutions allocate monthly payments   09:54:33

20   to loans with lower interest rates rather than higher   09:54:42

21   interest rates in your view?                 09:54:46

22       A.  I am not sure.                       09:54:48

23       Q.  Did you ever -- I'm sorry, go ahead.   09:54:49

24       A.  No, no, no, please finish.          09:54:49

25       Q.  I didn't allow you to finish, go ahead.   09:54:58
```

Page 28

```
 1        A.  What I was going to say is that in my        09:54:58

 2   understanding my loans were fixed, so I'm not sure if  09:55:01

 3   they were, if there was any variance in my loan        09:55:07

 4   interest.                                              09:55:10

 5        Q.  Okay.  Did Navient Solutions ever charge      09:55:14

 6   artificially inflated minimum interest payments on your 09:55:20

 7   loans?                                                 09:55:24

 8        A.  Repeat the question.                          09:55:25

 9        Q.  Did Navient Solutions ever charge artificially 09:55:25

10   inflated minimum interest payments on your loans?      09:55:30

11        A.  I don't know how, I don't know as far as how to 09:55:34

12   answer that question.                                  09:55:53

13        Q.  Okay.  Do you not understand the question?    09:55:55

14        A.  I am not understanding the question.          09:55:57

15        Q.  Okay.  Were your loans on auto debit?         09:56:01

16        A.  In the beginning they were paid via check and  09:56:16

17   then it was changed over to auto debit I believe.      09:56:20

18        Q.  Okay.  Did your monthly payments remain the same 09:56:25

19   throughout the time that you were paying down the loans? 09:56:36

20        A.  Yes.                                          09:56:39

21        Q.  Does the amount of $130.29 ring a bell?       09:56:39

22        A.  Yes, it does.                                 09:56:47

23        Q.  That was the monthly payment that you submitted, 09:56:48

24   correct?                                               09:56:50

25        A.  Yes.                                          09:56:51
```

Page 29

```
 1      Q.  Okay.  Did Navient Solutions charge you any      09:56:52

 2   inflated interest on your student loans?                09:57:01

 3      A.  Can you restate that.                            09:57:04

 4      Q.  Sure.  Aside from what you've already described  09:57:14

 5   as a misallocation of payments, did Navient Solutions   09:57:18

 6   charge you any inflated interest?                       09:57:21

 7      A.  I don't know.                                    09:57:23

 8      Q.  Did Navient Solutions misapply any capitalized   09:57:24

 9   interest on your loans?                                 09:57:32

10      A.  I don't know without digging through and         09:57:33

11   reviewing in detail the information.                    09:57:42

12      Q.  Did you ever try to do that?                     09:57:49

13      A.  It was based on other's examples that I moved    09:57:51

14   forward with my part of the case based on it affecting  09:57:59

15   others.                                                 09:58:04

16      Q.  Okay.  And when you say other's examples or      09:58:05

17   affecting others, who are the others?                   09:58:08

18      A.  The other people in the class action suit and    09:58:10

19   complaint.                                              09:58:14

20      Q.  So aside from conversations with your counsel,   09:58:14

21   how would you know whether other named plaintiffs       09:58:22

22   believe that capitalized interest was misapplied to     09:58:27

23   their accounts?                                         09:58:33

24      A.  By reviewing examples of the other individuals.  09:58:33

25      Q.  Okay.  What kind of examples did you look at?    09:58:36
```

Page 30

| | | |
|---|---|---|
| 1 | A.  So in the latter part of the document there are | 09:58:39 |
| 2 | some examples of the other individuals. | 09:58:42 |
| 3 | Q.  Are you referring to the complaint? | 09:58:47 |
| 4 | A.  Yes. | 09:58:48 |
| 5 | Q.  Okay. | 09:58:49 |
| 6 | A.  I believe on Pages 50 or so it starts, or maybe | 09:58:54 |
| 7 | even earlier than that. | 09:59:00 |
| 8 | THE WITNESS:  Jim, I don't know if you | 09:59:01 |
| 9 | recall. | 09:59:03 |
| 10 | Q.  He's not testifying, unfortunately. | 09:59:03 |
| 11 | A.  Got it. | 09:59:06 |
| 12 | Q.  So are you looking at any particular paragraphs | 09:59:07 |
| 13 | in here? | 09:59:10 |
| 14 | A.  Let me scroll through. | 09:59:10 |
| 15 | Q.  Sure. | 09:59:12 |
| 16 | A.  So if you look at page, or Section 99. | 09:59:13 |
| 17 | Q.  Okay. | 10:00:22 |
| 18 | A.  25 page number, Plaintiff Manetta.  So in there | 10:00:23 |
| 19 | there is an example of misallocation of payments. | 10:00:31 |
| 20 | Q.  Okay.  So that's Paragraph 99? | 10:00:35 |
| 21 | A.  Starting from Paragraph 99, then 100 and 101. | 10:00:40 |
| 22 | Q.  So aside from reading these paragraphs, do you | 10:01:14 |
| 23 | have any other examples? | 10:01:17 |
| 24 | A.  Outside of this -- | 10:01:19 |
| 25 | Q.  Let me just restate.  So outside of the | 10:01:22 |

Page 31

| | | |
|---|---|---|
| 1 | complaint, have you reviewed any documents in support of | 10:01:26 |
| 2 | your belief? | 10:01:30 |
| 3 | A.  No. | 10:01:30 |
| 4 | Q.  Okay. | 10:01:32 |
| 5 | A.  Ms. Simonetti, can I rephrase that? | 10:01:45 |
| 6 | Q.  Sure. | 10:01:51 |
| 7 | A.  In terms of looking at in the past statements | 10:01:51 |
| 8 | where there's differences in payments to interest and | 10:01:55 |
| 9 | principal broken down, those would be one example in | 10:01:57 |
| 10 | terms of from my case of where there is, why there is | 10:02:02 |
| 11 | variances and just not understanding that information. | 10:02:07 |
| 12 | Q.  Okay.  Is Navient Solutions' repayment system | 10:02:10 |
| 13 | and customer service designed to delay repayment? | 10:02:17 |
| 14 | A.  Designed to delay repayment.  I don't know. | 10:02:22 |
| 15 | Q.  Is Navient Solutions' repayment system and | 10:02:39 |
| 16 | customer service designed to impede discovery of errors? | 10:02:43 |
| 17 | A.  I don't know. | 10:02:47 |
| 18 | Q.  Do you believe that Navient Solutions has | 10:02:50 |
| 19 | concealed information from you regarding your loans? | 10:02:56 |
| 20 | A.  It's not clear versus concealed in my opinion. | 10:03:00 |
| 21 | Q.  And what's not clear, what are you referring to | 10:03:12 |
| 22 | when you say it's not clear? | 10:03:15 |
| 23 | A.  The rhyme or reason as to where payments are | 10:03:17 |
| 24 | being allocated when a payment is made, towards interest | 10:03:21 |
| 25 | or towards principal for a monthly payment or an | 10:03:30 |

Page 32

```
 1    overpayment.                                        10:03:39

 2         Q.  Did you make any overpayments, did you ever pay   10:03:40

 3    more than the monthly amount on your student loans?   10:03:43

 4         A.  No, I did not.                              10:03:45

 5         Q.  Are you aware of any loyalty program that   10:03:46

 6    Navient Solutions offers?                            10:03:50

 7         A.  I'm not, no.                                10:03:51

 8         Q.  Have you ever heard of something called    10:03:54

 9    Upromise?                                            10:03:58

10         A.  I have heard of it.                         10:03:58

11         Q.  Do you know what it is?                     10:03:59

12         A.  It's a credit card that if you make payments   10:04:00

13    towards that using that credit card that it would pay a   10:04:08

14    portion of your loan, that's my understanding of    10:04:12

15    Upromise in general.                                 10:04:16

16         Q.  Did you apply for that credit card?         10:04:19

17         A.  No.                                         10:04:21

18         Q.  What is the office of customer advocate at   10:04:21

19    Navient Solutions?                                   10:04:30

20         A.  I don't know.                               10:04:30

21         Q.  Can you identify any misrepresentations that   10:04:30

22    Navient Solutions made to you?                       10:04:40

23         A.  Can you explain what you mean by            10:04:41

24    misrepresentation.                                   10:04:44

25         Q.  A misrepresentation would be something that's   10:04:46
```

Page 33

| | | |
|---|---|---|
| 1 | not true, a statement of fact that's not true. | 10:04:50 |
| 2 | A.  I don't have one. | 10:04:58 |
| 3 | Q.  We spoke earlier about the fact that you called | 10:05:28 |
| 4 | Navient Solutions a few times about your loans and your | 10:05:32 |
| 5 | husband's loans, do you remember that? | 10:05:35 |
| 6 | A.  Yes. | 10:05:37 |
| 7 | Q.  In those conversations did you believe that the | 10:05:37 |
| 8 | information that customer service provided to you was | 10:05:47 |
| 9 | adequate? | 10:05:49 |
| 10 | A.  It was so long ago, honestly I don't know if it | 10:05:50 |
| 11 | was adequate. | 10:05:57 |
| 12 | Q.  Do you remember anything about it that was not | 10:05:58 |
| 13 | adequate? | 10:06:00 |
| 14 | A.  I don't. | 10:06:01 |
| 15 | Q.  Have you used the Navient Solutions' Website for | 10:06:02 |
| 16 | reviewing information about your loans? | 10:06:09 |
| 17 | A.  Yes. | 10:06:15 |
| 18 | Q.  Is there anything about the Website that you | 10:06:16 |
| 19 | think is inadequate or confusing? | 10:06:20 |
| 20 | A.  Yes, the fact that I would have to go into each | 10:06:22 |
| 21 | loan separately in order to pull information versus | 10:06:29 |
| 22 | having one area platform and see it all in one section. | 10:06:33 |
| 23 | Q.  Do you have any idea why the loans were | 10:06:39 |
| 24 | separated? | 10:06:42 |
| 25 | A.  I don't. | 10:06:42 |

Page 34

| | | |
|---|---|---|
| 1 | displayed in this format on the Website? | 11:55:29 |
| 2 | A.  Most likely. | 11:55:31 |
| 3 | Q.  I'm sorry, not likely or most likely? | 11:55:32 |
| 4 | A.  Most likely. | 11:55:35 |
| 5 | Q.  Most likely, okay.  And this lays out the | 11:55:36 |
| 6 | history by date on both loans, do you agree with that? | 11:55:42 |
| 7 | A.  I see that. | 11:55:46 |
| 8 | Q.  Okay.  Aside from the documents that we looked | 11:55:47 |
| 9 | at today, are there any other documents that you would | 11:55:58 |
| 10 | rely on to support your claims in this case? | 11:56:01 |
| 11 | A.  No, I don't believe so. | 11:56:03 |
| 12 | Q.  Can you explain to me your understanding of your | 11:56:16 |
| 13 | role as a proposed class representative in this case? | 11:56:19 |
| 14 | A.  My role would be that if there are issues with | 11:56:22 |
| 15 | misallocation of interest, principal for payments made, | 11:56:32 |
| 16 | it's happened to others, then it could be possibly | 11:56:36 |
| 17 | happening to me. | 11:56:40 |
| 18 | MS. SIMONETTI:  Can you read that back, I | 11:56:44 |
| 19 | may not have heard it correctly. | 11:56:46 |
| 20 | A.  Sure.  If misallocation -- | 11:56:48 |
| 21 | Q.  No, I asked the reporter to read it back, I may | 11:56:51 |
| 22 | not have heard it correctly. | 11:56:54 |
| 23 | (Requested material read back.) | 11:56:56 |
| 24 | Q.  Okay.  That's fine.  Can you tell me why you | 11:57:16 |
| 25 | think that your counsel are suitable class counsel? | 11:57:21 |

Page 59